No. 21-13104 (No. 21-13444)

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

---

STATE OF ALABAMA, et al.,
*Appellants*,

v.

UNITED STATES ARMY CORPS OF ENGINEERS, et al.,
*Appellees.*

On Appeal from the United States District Court
for the Northern District of Georgia, Case No. 1:18-MI-00043-TWT

---

# APPELLANTS NATIONAL WILDLIFE FEDERATION, FLORIDA
# WILDLIFE FEDERATION, AND APALACHICOLA BAY
# AND RIVER KEEPER'S BRIEF

---

TANIA GALLONI
FL Bar No. 619221
CHRISTINA I. REICHERT
FL Bar No. 114257
Earthjustice
4500 Biscayne Blvd., Ste. 201
Miami, FL 33137
T: (305) 440-5433
F: (850) 681-0020
tgalloni@earthjustice.org
creichert@earthjustice.org

BONNIE MALLOY
FL Bar No. 86109
Earthjustice
111 S. MLK Jr. Blvd.
Tallahassee, FL
T: (850) 681-0031
F: (850) 681-0020
bmalloy@earthjustice.org

*Attorneys for Appellants National Wildlife Federation, Florida Wildlife
Federation, and Apalachicola Bay and River Keeper*

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

1.    *Ackerman, Georgia (Standing Declarant)[1]

2.    Allen, John C. (Attorney for Appellee / Intervenor State of Georgia)

3.    Allen, Kenneth W. (Attorney for Appellee / Intervenor State of Georgia)

4.    Andre, Abigail (Attorney for Amici Curiae in the District Court Calhoun County, Fla., Franklin County, Fla., Liberty County, Fla., Jackson County, Fla., Florida Coastal Conservation Association, Trip Aukeman, Albert Bryant, Shannon Hartsfield, Lynn Martina, Kevin Martina, Carmen McLemore, Daniel Taunton, Richard Bickel, Thomas Ward, and City of Apalachicola, Fla.)

5.    Apalachee Audubon Society (Amicus Curiae in the District Court)

6.    Apalachicola Bay and River Keeper (Appellant)

7.    Atlanta Regional Commission (Appellee / Intervenor)

8.    Aukeman, Trip (Amicus Curiae in the District Court)

9.    *Balthrop, Mary (Standing Declarant)

10.    Bickel, Richard (Amicus Curiae in the District Court)

---

[1] Additions to the CIP are marked with an "*."

## Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104

11.  Boies Schiller Flexner LLP (Attorneys for Amici Curiae in the District Court Robert Graham and Gwendolyn Graham)

12.  *Brock, Virginia (Standing Declarant)

13.  Bryant, Albert (Amicus Curiae in the District Court)

14.  Calhoun County, Fla. (Amicus Curiae in the District Court)

15.  Carr, Christopher M. (Attorney for Appellee / Intervenor State of Georgia)

16.  Chapman, Jeremy J. (District Commander for Mobile District of the U.S. Army Corps of Engineers)

17.  City of Apalachicola, Fla. (Amicus Curiae in the District Court)

18.  City of Atlanta, Ga. (Appellee / Intervenor)

19.  City of Gainesville, Ga. (Appellee / Intervenor)

20.  Cobb-County Marietta Water Authority (Appellee / Intervenor)

21.  Coe, Alisa (Attorney for Appellants National Wildlife Federation, Florida Wildlife Federation, and Apalachicola Bay and River Keeper)

22.  DeKalb County, Ga. (Appellee / Intervenor)

23.  DeLapp, James A. (Appellee)

24.  Drumm, Starr T. (Attorney for Appellant State of Alabama)

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

25. Dycus, John P. (Attorney for Appellants National Wildlife Federation, Florida Wildlife Federation, and Apalachicola Bay and River Keeper)

26. Earthjustice (Attorneys for Appellants National Wildlife Federation, Florida Wildlife Federation, and Apalachicola Bay and River Keeper)

27. Ellerhorst, Shelly J. (Attorney for Appellee / Intervenor State of Georgia)

28. Fellows LaBriola, LLP (Attorneys for Appellant State of Alabama)

29. Florida Coastal Conservation Association (Amicus Curiae in the District Court)

30. Florida Wildlife Federation (Appellant)

31. Forsyth County, Ga. (Appellee / Intervenor)

32. Fortuna, John L. (Attorney for Appellees / Intervenors Atlanta Regional Commission, Cobb County-Marietta Water Authority, DeKalb County, Ga., Forsyth County, Ga., Fulton County, Ga., Gwinnett County, Ga., City of Atlanta, Ga., and City of Gainesville, Ga.)

33. Franklin County, Fla. (Amicus Curiae in the District Court)

34. *Fuller, Manley (Standing Declarant)

35. Fulton County, Ga. (Appellee / Intervenor)

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

36.    Galloni, Tania (Attorney for Appellants National Wildlife Federation, Florida Wildlife Federation, and Apalachicola Bay and River Keeper)

37.    Gormley, Neil E. (Attorney for Appellants National Wildlife Federation, Florida Wildlife Federation, and Apalachicola Bay and River Keeper)

38.    Graham, Gwendolyn (Amicus Curiae in the District Court)

39.    Graham, Robert (Amicus Curiae in the District Court)

40.    Gray, Michael T. (Attorney for Federal Appellees)

41.    Gretchen, Michael C. (Attorney for Appellant State of Alabama)

42.    Gwinnett County, Ga. (Appellee / Intervenor)

43.    Hartsfield, Shannon (Amicus Curiae in the District Court)

44.    Hill, Brandt P. (Attorney for Appellant State of Alabama)

45.    *Hood, Laurie (Standing Declarant)

46.    Jackson County, Fla. (Amicus Curiae in the District Court)

47.    *Jay, Andrew (Standing Declarant)

48.    Jon L. Schwartz, Attorney at Law, P.C. (Attorneys for Amici Curiae in the District Court Robert Graham and Gwendolyn Graham)

49.    Jones, Lewis B. (Attorney for Appellees / Intervenors Atlanta Regional Commission, Cobb County-Marietta Water Authority, DeKalb County,

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

Ga., Forsyth County, Ga., Fulton County, Ga., Gwinnett County, Ga.,

City of Atlanta, Ga., and City of Gainesville, Ga.)

50.　Kazmarek Mowrey Cloud Laseter LLP (Attorneys for Appellee /

Intervenor State of Georgia)

51.　Kelley, Jason E. (Division Commander for the South Atlantic Division of

the U.S. Army Corps of Engineers)

52.　Kim, Todd (Assistant Attorney General and Attorney for Federal

Appellees)

53.　King & Spalding LLP (Attorneys for Appellees / Intervenors Atlanta

Regional Commission, Cobb County-Marietta Water Authority, DeKalb

County, Ga., Forsyth County, Ga., Fulton County, Ga., Gwinnett County,

Ga., City of Atlanta, Ga., and City of Gainesville, Ga.)

54.　Kirkland & Ellis LLP (Attorneys for Appellee / Intervenor State of

Georgia)

55.　Korte, Brett (Attorney for Amicus Curiae in the District Court Robert

Graham and Gwendolyn Graham)

56.　LaBriola, Stephen T. (Attorney for Appellant State of Alabama)

57.　LaCour, Jr., Edmund G. (Attorney for Appellant State of Alabama)

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

58.    Lamont, Douglas (Appellee)

59.    Law Office of Barbara Sanders (Attorney for Amici Curiae in the District Court St. George Island Civic Club, Inc., and St. George Plantation Owners' Association, Inc.)

60.    Liberty County, Fla. (Amicus Curiae in the District Court)

61.    *Luebkemann, Jordan (Attorney for Appellants National Wildlife Federation, Florida Wildlife Federation, and Apalachicola Bay and River Keeper)

62.    Malloy, Bonnie (Attorney for Appellants National Wildlife Federation, Florida Wildlife Federation, and Apalachicola Bay and River Keeper)

63.    Marshall, Steven (Attorney for Appellant State of Alabama)

64.    Martina, Kevin (Amicus Curiae in the District Court)

65.    Martina, Lynn (Amicus Curiae in the District Court)

66.    Maynard, Cooper & Gale, P.C. (Attorneys for Appellant State of Alabama)

67.    McLemore, Carmen (Amicus Curiae in the District Court)

68.    Mills, Jon (Attorney for Amici Curiae in the District Court Robert Graham and Gwendolyn Graham)

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

69.    National Wildlife Federation (Appellant)

70.    Neiman, Jr., John C. (Attorney for Appellant State of Alabama)

71.    Ocean Conservancy (Amicus Curiae in the District Court)

72.    Patton Dycus Law, LLC (Attorneys for Appellants National Wildlife
       Federation, Florida Wildlife Federation, and Apalachicola Bay and River
       Keeper)

73.    Pinkham, Jaime A. (Acting Assistant Secretary of the U.S. Army for
       Civil Works)

74.    Primis, Craig S. (Attorney for Appellee / Intervenor State of Georgia)

75.    Reichert, Christina I. (Attorney for Appellants National Wildlife
       Federation, Florida Wildlife Federation, and Apalachicola Bay and River
       Keeper)

76.    Roady, Stephen E. (Attorney for Amici Curiae in the District Court
       Apalachee Audubon Society and Ocean Conservancy)

77.    *Rodriguez, Gonzalo E. (Attorney for Appellants National Wildlife
       Federation, Florida Wildlife Federation, and Apalachicola Bay and River
       Keeper)

78.    *Robertson, Preston (Standing Declarant)

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

79.  *Robinson, Clay (Standing Declarant)

80.  Robinson-Dorn, Michael (Attorney for Amicus Curiae in the District Court Robert Graham and Gwendolyn Graham)

81.  *Samet, Melissa (Standing Declarant)

82.  Sanders, Barbara (Attorney for Amici Curiae in the District Court St. George Island Civic Club, Inc., and St. George Plantation Owners' Association, Inc.)

83.  Schwartz, Jonathan L. (Attorney for Amicus Curiae in the District Court Robert Graham and Gwendolyn Graham)

84.  Schifman, Reuben S. (Attorney for Appellee Federal Defendants)

85.  Semonite, Todd T. (Appellee)

86.  Speer, Robert M. (Appellee)

87.  Spellmon, Scott A. (Commander and Chief of Engineers of the U.S. Army Corps of Engineers)

88.  St. George Island Civic Club, Inc. (Amicus Curiae in the District Court)

89.  St. George Plantation Owners' Association, Inc. (Amicus Curiae in the District Court)

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

90. Stack & Associates, P.C. (Attorneys for Amici Curiae in the District Court Apalachee Audubon Society, Ocean Conservancy, St. George Island Civic Club, Inc., and St. George Plantation Owners' Association, Inc.)

91. Stack, Donald J. (Attorney for Amici Curiae in the District Court Apalachee Audubon Society, Ocean Conservancy, St. George Island Civic Club, Inc., and St. George Plantation Owners' Association, Inc.)

92. State of Alabama (Appellant)

93. State of Georgia (Appellee / Intervenor)

94. Sturm, Kimberly A. (Attorney for Amici Curiae in the District Court Calhoun County, Fla., Franklin County, Fla., Liberty County, Fla., Jackson County, Fla., Florida Coastal Conservation Association, Trip Aukeman, Albert Bryant, Shannon Hartsfield, Lynn Martina, Kevin Martina, Carmen McLemore, Daniel Taunton, Richard Bickel, Thomas Ward, and City of Apalachicola, Fla.)

95. Taunton, Daniel (Amicus Curiae in the District Court)

96. Thrash Jr, Thomas W. (U.S. District Judge for the Northern District of Georgia)

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

97.    *Tonsmeire, Dan (Standing Declarant)

98.    Turner, David C. (Appellee)

99.    University of California Irvine Environmental Law Clinic (Attorneys for
Amici Curiae in the District Court Robert Graham and Gwendolyn
Graham)

100.   U.S. Army Corps of Engineers (Appellee)

101.   U.S. Department of Justice, Environmental and Natural Resources
Division (Attorneys for Federal Appellees)

102.   Vermont Law School Environmental Advocacy Clinic (Attorneys for
Amici Curiae in the District Court Calhoun County, Fla., Franklin
County, Fla., Liberty County, Fla., Jackson County, Fla., Florida Coastal
Conservation Association, Trip Aukeman, Albert Bryant, Shannon
Hartsfield, Lynn Martina, Kevin Martina, Carmen McLemore, Daniel
Taunton, Richard Bickel, Thomas Ward, and City of Apalachicola, Fla.)

103.   Waldbeser, Drew F. (Attorney for Appellee / Intervenor State of Georgia)

104.   Ward, Thomas (Amicus Curiae in the District Court)

105.   Weissman, P.C. (Attorneys for Amici Curiae in the District Court
Calhoun County, Fla., Franklin County, Fla., Liberty County, Fla.,

C-10 of 11

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

Jackson County, Fla., Florida Coastal Conservation Association, Trip Aukeman, Albert Bryant, Shannon Hartsfield, Lynn Martina, Kevin Martina, Carmen McLemore, Daniel Taunton, Richard Bickel, Thomas Ward, and City of Apalachicola, Fla.)

106.  Williams, Jean E. (Attorney for Federal Appellees)

107.  Wormuth, Christine (Secretary of the United States Army)

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a) and Eleventh Circuit Rule 26.1-1, Appellants National Wildlife Federation, Florida Wildlife Federation, and Apalachicola Bay and River Keeper affirm that there are no parent or publicly held corporations pertinent to them such as to require disclosure.

/s/ Tania Galloni
TANIA GALLONI

C-11 of 11

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

**STATEMENT REGARDING ORAL ARGUMENT**

Appellants National Wildlife Federation, Florida Wildlife Federation, and

Apalachicola Bay and River Keeper[2] respectfully request oral argument.  11th Cir.

R. 28-1(c), 34-3(c).  This case will decide whether the U.S. Army Corps of

Engineers may evade its duty to analyze the devastating environmental impact of

its actions on Florida's Apalachicola River, floodplain, and bay, and to mitigate its

actions' adverse effects in the Apalachicola-Chattahoochee-Flint (ACF) River

Basin.  The case raises novel, complex legal questions vital to fish and wildlife

conservation, including issues of first impression under the National

Environmental Policy Act, the 2007 Water Resources Development Act, the Fish

and Wildlife Coordination Act, and the Rivers and Harbors Act of 1946.

Appellants submit that the Court would benefit from oral argument in this case.

---

[2] In this brief, Appellants means National Wildlife Federation, Florida Wildlife Federation, and
Apalachicola Bay and River Keeper.  Appellant Alabama will be referred to as Alabama.

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

## TABLE OF CONTENTS

Certificate of Interested Persons and Corporate Disclosure Statement ................C-1

Statement Regarding Oral Argument ......................................................... i

Table of Contents ......................................................................... ii

Table of Citations .........................................................................v

Statement Regarding Adoption of Briefs of Other Parties ................................... xiii

Statement of Subject-Matter and Appellate Jurisdiction ..................................... xiv

Statement of Issues.........................................................................1

Statement of the Case.......................................................................2

Proceedings Below...........................................................................3

Statement of Facts..........................................................................6

    I.     The Apalachicola River, Floodplain, and Bay Comprise an Ecosystem
         of Exceptional Importance that Has Been Severely Degraded by the
         Corps' Control of Freshwater Flows from Upstream Reservoirs ........7

    II.    The Impacts of the Corps' Operations on the Apalachicola Ecosystem
         Have Evaded Environmental Review Required by Federal Law .......11

Standard of Review.........................................................................16

Summary of the Argument....................................................................16

Argument...................................................................................19

    I.     The Corps Violated NEPA .................................................19

ii

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

A.  The Corps' Environmental Impact Statement was Based on a Fundamentally Flawed Premise Rendering its "No Impact" Conclusions Arbitrary and Capricious .....................................20

B.  The Corps' Failure to Analyze Impacts of Drought Operations was Arbitrary and Capricious ...................................................27

C.  The Corps' Failure to Perform a Cumulative Impacts Analysis Violated NEPA .......................................................................31

D.  The Corps Violated NEPA's Requirement to Consider All Reasonable Alternatives...........................................................35

    1.  The Corps Unlawfully Considered Only One Water Management Alternative to its "Current Operations"....36

    2.  The Corps Failed to Consider More Ecologically Sound Courses of Action .........................................................40

E.  The Corps Violated NEPA's Mitigation Requirements ..........43

II.  The District Court's Interpretation of the 2007 Amendment to WRDA is Contrary to Law .................................................................................45

A.  The Unambiguous, Plain Meaning of "Any Report" in Section 2283(d)(1) Encompasses the Corps' EIS and ROD .................47

B.  Even if the Phrase "Any Report" Were Ambiguous, the Corps' Informal Interpretation is not Entitled to Deference.................57

III.  This Court Should Reverse the District Court's Denial of Appellants' Motion for Leave to Amend the Complaint .......................................59

A.  Appellants Alleged a Legally Cognizable Claim Under Section 663 of the FWCA.......................................................................60

iii

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

B.    Appellants Alleged a Legally Cognizable Claim Under the 1946 RHA ................................................................. 62

C.    There Was No Other Substantial Reason to Deny Leave to Amend ................................................................. 65

Conclusion ................................................................................ 66

Certificate of Compliance .......................................................... 67

Certificate of Service ................................................................. 68

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

## <u>TABLE OF CITATIONS</u>

**Cases**                                                                                   **Page(s)**

*Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*,

    67 F.3d 723 (9th Cir. 1995) .................................................................39

*Am. Oceans Campaign v. Daley*,

    183 F. Supp. 2d 1 (D.D.C. 2000) .......................................................35

\*   *Arriaga v. Fla. Pac. Farms, L.L.C.*,

    305 F.3d 1228 (11th Cir. 2002) ..........................................................58

*Bonner v. City of Pritchard*,

    661 F.2d 1206 (11th Cir. 1981) ..........................................................36

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council*,

    467 U.S. 837 (1984).............................................................................47

*Citizens for Smart Growth v. Sec'y of Dept. of Transp.*,

    669 F.3d 1203 (11th Cir. 2012) ....................................................36, 39

*City of Apalachicola, v. U.S. Army Corps of Eng'rs.*,

    No. 3:08-cv-00233, (M.D. Fla, Nov. 23, 2009)..................................13

\*   *City of N. Miami v. Fed. Aviation Admin.*,

    47 F.4th 1257 (11th Cir. 2022) ....................................20, 21, 27, 29

v

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

*Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs*,

941 F.3d 1288 (11th Cir. 2019) ............................................................20

\* *Del. Riverkeeper Network v. Fed. Energy Regul. Comm'n*,

753 F.3d 1304 (D.C. Cir. 2014) ....................................................20, 35

*Democratic Exec. Comm. of Fla. v. Nat'l Republican Senatorial Comm.*,

950 F.3d 790 (11th Cir. 2020) ............................................................14

\* *Env't Def. Fund v. U.S. Army Corps of Eng'rs*,

492 F.2d 1123 (5th Cir. 1974) ................................................35, 37, 42

*Foman v. Davis*,

371 U.S. 178 (1962) ............................................................................65

\* *Fuerst v. Hous. Auth. of Atlanta*,

38 F.4th 860 (11th Cir. 2022) ......................................................16, 51

*Grand Canyon Trust v. Fed. Aviation Admin.*,

290 F.3d 339 (D.C. Cir. 2002) ............................................................20

\* *Hiivala v. Wood*,

195 F.3d 1098 (9th Cir. 1999) ............................................................50

*Horsley v. Feldt*,

304 F.3d 1125 (11th Cir. 2002) ..........................................................16

vi

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

*Kozak v. Hillsborough Cnty.*,

    644 F.3d 1347 (11th Cir. 2011) ...........................................................50

\*   *Ky. Riverkeeper, Inc. v. Rowlette*,

    714 F.3d 402 (6th Cir. 2013) .......................................................32, 45

\*   *Lands Council v. Powell*,

    395 F.3d 1019 (9th Cir. 2005) ....................................................25, 35

\*   *In re MDL-1824 Tri-State Water Rights Litigation*,

    644 F.3d 1160 (11th Cir. 2011) ........................................2, 14, 63, 64

*Miljkovic v. Shafritz & Dinkin, P.A.*,

    791 F.3d 1291 (11th Cir. 2015) ...........................................................48

\*   *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,

    463 U.S. 29 (1983)........................................................................27, 42

*N. Buckhead Civic Ass'n v. Skinner*,

    903 F.2d 1533 (11th Cir. 1990) .........................................................38

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*,

    668 F.3d 1067 (9th Cir. 2011) ............................................................25

*N.C. Wildlife Fed'n v. N.C. Dep't of Transp.*,

    677 F.3d 596 (4th Cir. 2012) .............................................................35

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

*Nat. Res. Def. Council, Inc. v. Morton*,

    458 F.2d 827 (D.C. Cir. 1972)............................................................42

*Nat'l Indep. Theatre Exhibitors, Inc. v. Charter Fin. Grp., Inc.*,

    747 F.2d 1396 (11th Cir. 1984) ........................................................65

*Ouachita Watch League v. Jacobs*,

    463 F.3d 1163 (11th Cir. 2006) ........................................................16

\* *Pennaco Energy, Inc. v. U.S. Dep't of Interior*,

    377 F.3d 1147 (10th Cir. 2004) ........................................................30

*People for the Ethical Treatment of Animals, Inc. v. Miami Seaquarium*,

    905 F.3d 1307 (11th Cir. 2018) ........................................................54

*Quinchia v. U.S. Att'y Gen.*,

    552 F.3d 1255 (11th Cir. 2008) ........................................................58

*Reno v. Koray*,

    515 U.S. 50 (1995)............................................................................58

\* *Robertson v. Methow Valley Citizens Council*,

    490 U.S. 332 (1989)..............................................................43, 44, 45

*Sandifer v. U.S. Steel Corp.*,

    571 U.S. 220 (2014)..........................................................................47

viii

## Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104

*SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*,

  600 F.3d 1334 (11th Cir. 2010) ...........................................................16

*Sierra Club v. Tenn. Valley Auth.*,

  430 F.3d 1337 (11th Cir. 2005) ...........................................................16

\* *Thomas v. Chevron U.S.A., Inc.*,

  832 F.3d 586 (5th Cir. 2016) ......................................................61, 62

\* *Thomas v. Town of Davie*,

  847 F.2d 771 (11th Cir. 1988) .............................................................59

*In re Tri-State Water Rts. Litig.*,

  No. 3:07-MD-01, 2010 WL 11586590, (M.D. Fla. July 21, 2010)...................14

\* *U.S. Commodity Futures Trading Comm'n v. Hunter Wise Commodities, LLC*,

  749 F.3d 967 (11th Cir. 2014) .............................................................50

*United States v. Manasche*,

  348 U.S. 528 (1955)...........................................................................49

\* *In re Walter Energy, Inc.*,

  911 F.3d 1121 (11th Cir. 2018) ...........................................................47

*White Oak Realty, L.L.C. v. U.S. Army Corps of Eng'rs*,

  746 F. App'x 294 (5th Cir. 2018) .........................................................56

Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104

**Statutes**

*Federal Statutes*

5 U.S.C. §§ 701–706 ................................................................3

5 U.S.C. § 706 .....................................................................19

16 U.S.C. § 661 ....................................................................59

16 U.S.C. §§ 661–667e .............................................................3

16 U.S.C. § 663 .................................................................42, 62

16 U.S.C. § 666b ...................................................................16

33 U.S.C. § 2282 ...............................................................52, 56

33 U.S.C. § 2283 (2007) ....................................................3, 45, 46, 56

33 U.S.C. § 2283 (1986) ...........................................................45

33 U.S.C. § 2346 ...................................................................52

42 U.S.C. § 1962d-5b ...............................................................56

42 U.S.C. §§ 4321–4347 .............................................................3

42 U.S.C. § 4332 .............................................................12, 35, 55

Mitigation for Fish and Wildlife and Wetlands Losses, Pub. L. No.

   110-114, § 2036(a)(1), 121 Stat. 1041 (2007) ....................................46

Rivers and Harbors Act (RHA), Pub. L. No. 79-525, 60 Stat. 634 (1946) ......*passim*

x

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

*State Statutes*

Fla. Stat. § 258.36 ...............................................................................8

**Regulations**

*Federal Regulations*

33 C.F.R. § 209.140 ...........................................................................57

33 C.F.R. § 230.15 .............................................................................57

33 C.F.R. § 385.12 .............................................................................57

33 C.F.R. § 385.26 .............................................................................57

40 C.F.R. § 1500.2 .............................................................................35

40 C.F.R. § 1502.1 .......................................................................39, 55

40 C.F.R. § 1502.14 ....................................................................*passim*

40 C.F.R. § 1502.16 ..............................................................38, 43, 45

40 C.F.R. § 1506.2 .............................................................................42

40 C.F.R. § 1506.13 (2020) ...............................................................20

40 C.F.R. § 1508.7 ......................................................................*passim*

40 C.F.R. § 1508.8 .............................................................................45

40 C.F.R. § 1508.20 ...........................................................................43

40 C.F.R. § 1508.25 .....................................................................20, 43

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

*State Regulations*

Fla. Admin. Code. Ann. r. 62-302.700 ....................................................8

**Congressional Materials**

*Apalachicola-Chattahoochee-Flint (ACF) Drought: Federal Reservoir and*

    *Species Management* at CRS-4, Carter et al., Cong. Rsch. Serv.,

    RL34250 (2007)....................................................................64

H.R. 354, 110th Cong. (2007).................................................................64

H.R. Doc. No. 80-300 (1947) ................................................................11

**Other Authorities**

*Any*, Merriam-Webster Dictionary, https://www.merriam-

    webster.com/dictionary/any (Nov. 18, 2022) .....................................48

Memorandum from Theodore Brown, U.S. Army Corps of Engineers

    (Aug. 31, 2009), https://cw-environment.erdc.dren.mil/pdfs/09sep2-

    wrda-mitigation.pdf ............................................................58

*Report,* Black's Law Dictionary (10th ed. 2014)....................................47

*Report*, Merriam-Webster Dictionary, https://www.merriam-

    webster.com/dictionary/report (Nov. 9, 2022) ...................................48

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

**STATEMENT REGARDING ADOPTION OF BRIEFS
OF OTHER PARTIES**

Appellants do not adopt the brief of any other party at this time.

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

## STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION

This appeal concerns challenges to the U.S. Army Corps of Engineers' (Corps) Final Environmental Impact Statement (EIS) and Water Control Manual (WCM) for the Apalachicola-Chattahoochee-Flint (ACF) River System. The action arises under the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–4347; the 2007 Water Resources Development Act (WRDA), 33 U.S.C. §§ 2283–2283c; the Fish and Wildlife Coordination Act (FWCA), 16 U.S.C. §§ 661–667e; the Rivers and Harbors Act (RHA), Pub. L. No. 79-525, 60 Stat. 634 (1946); and the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706. The district court consolidated this action with a related action filed by the State of Alabama and designated the consolidated cases *In re ACF Basin Water Litigation*, No. 1:18-mi-00043-TWT (N.D. Ga.).

The district court exercised jurisdiction under 28 U.S.C. § 1331. The court granted partial judgment on the pleadings on May 22, 2020. Doc. 146.[3] The court denied Appellants' motion for leave to amend the complaint on October 22, 2020. Doc. 160. The court denied Appellants' motion for summary judgment and

---

[3] "Doc." numbers refer to the district court's docket entries.

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

granted Appellees'[4] motion for summary judgment on the remaining claim on

August 11, 2021.  Doc. 234.  The clerk of court entered judgment for the Appellees

on August 12, 2021.  Doc. 235.  Appellants timely filed a notice of appeal on

October 6, 2021.  Doc. 243.

The Court docketed this appeal with the prior-filed appeal by the State of

Alabama, *Alabama v. U.S. Army Corps of Engineers*, No. 21-13104-GG.  Doc.

247.

This appeal is from a final judgment disposing of Appellants' claims.  Fed.

R. App. P. 28(a)(4)(D).  The Court has jurisdiction under 28 U.S.C. § 1291.

---

[4] In this brief, Appellees means the Federal Defendants (Corps) as well as the Intervenors below.

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

## STATEMENT OF ISSUES

1.      Did the district court err in granting summary judgment in favor of Appellees and against Appellants on their NEPA claim, when the Corps: (a) based its environmental impact analysis as to the Apalachicola River, floodplain, and bay on the fundamentally flawed premise that its decades-long "current operations" were having no meaningful impact on the Apalachicola ecosystem; (b) failed to assess the impact of increased drought operations on the Apalachicola ecosystem; (c) failed to assess the cumulative impacts of its proposed action on the Apalachicola ecosystem; (d) failed to consider all reasonable alternatives, considered the environmental impact of only one water management alternative to its current operations, and did not analyze the environmental impact of any ecologically beneficial alternatives; and (e) failed to consider or address mitigation for adverse effects to reaches of the Chattahoochee River?

2.      Did the district court err by ruling that a 2007 amendment to WRDA requiring the Corps to include mitigation plans to redress ecological harm in "any report" where the Corps selects a water resources project alternative applies only to reports submitted to Congress when that interpretation would render the

1

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

amendment superfluous because, pre-amendment, WRDA already required mitigation plans to redress ecological harm in reports submitted to Congress?

3.      Did the district court err in denying leave to amend the complaint by: (a) misconstruing Appellants' proposed claim under Section 663 of the FWCA that the Corps failed to adequately provide for fish and wildlife conservation; and (b) rejecting Appellants' proposed RHA claim on the basis that the RHA did not establish fish and wildlife conservation as an original authorized project purpose notwithstanding the standard articulated by this Court in *In re MDL-1824 Tri-State Water Rights Litigation*, 644 F.3d 1160 (11th Cir. 2011)?

## STATEMENT OF THE CASE

This case arises from the Corps' longstanding failure to reckon with the devastating environmental impact of its operations on Florida's Apalachicola River, floodplain, and bay, an extraordinary ecosystem of major ecological and economic importance.  Through its operation of upstream dams and reservoirs along the Chattahoochee River in Georgia and Alabama, the Corps has long controlled the timing and quantity of freshwater reaching the Apalachicola ecosystem, whose health depends on receiving adequate flows at appropriate times.

2

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

For decades, the Corps has evaded the environmental scrutiny of these operations that federal law requires.

In 2016, the Corps produced a Master Water Control Manual (WCM) and Environmental Impact Statement (EIS) for its operations in the Apalachicola-Chattahoochee-Flint (ACF) River Basin. But rather than analyze the devastating environmental impact of its actions on the Apalachicola River, floodplain, and bay, the Corps determined that its WCM would not meaningfully depart from its current operations and, on that basis, concluded that it would not have a meaningful environmental impact. These conclusions were arbitrary, capricious, and unsupported by law. If they are allowed to stand, the Corps' operations will continue to evade the environmental scrutiny required by federal law, and the Corps will continue to avoid its duty to mitigate these environmental harms. The Court should reverse.

## PROCEEDINGS BELOW

On April 27, 2017, Appellants challenged the Corps' December 2016 EIS and Master WCM and March 2017 Record of Decision (ROD) as violating NEPA, 42 U.S.C. §§ 4321–4347, WRDA, 33 U.S.C. §§ 2283–2283c, the FWCA, 16 U.S.C. §§ 661–667e, and the APA, 5 U.S.C. §§ 701–706. Doc. 7. Appellants filed

3

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

the challenge in the U.S. District Court for the District of Columbia, where a related case by the State of Alabama was pending.  Doc. 1.

The State of Georgia and the Atlanta Regional Commission, City of Atlanta, Cobb County-Marietta Water Authority, Dekalb County, Forsyth County, Fulton County, City of Gainesville, and Gwinett County (collectively, water supply providers (WSPs)), intervened.  Min. Entries May 16, 2017, June 2, 2017, July 17, 2017.  On April 10, 2018, on motion by the Georgia parties, the court transferred the cases to the Northern District of Georgia.  Docs. 86–88.  The transferee court then consolidated the cases.  Docs. 101, 104, 106.

On May 22, 2020, the district court granted the Georgia WSPs' motion for partial judgment on the pleadings.  Doc. 146.[5]  The court dismissed Appellants' FWCA Section 661 claim,[6] *id.* at 20–22, and dismissed Appellants' WRDA claim, *id.* at 10–19.  On October 22, 2020, the district court denied Appellants leave to amend the complaint to add a claim under FWCA Section 663 for the Corps' failure to adequately provide for fish and wildlife conservation and a claim

---

[5] The order also granted a separate motion for judgment on the pleadings against Alabama.
[6] Appellants do not appeal dismissal of the FWCA Section 661 claim.

4

*Alabama, et al. v. U.S. Army Corps of Engineers, et al.*, No. 21-13104

alleging that fish and wildlife conservation is an original project purpose under the RHA.  Doc. 160.

On January 8, 2021, Appellants moved for summary judgment on their NEPA claim.  Doc. 165; superseded by Doc. 219.  Appellants' motion was supported by ten standing declarants.  Doc. 165-1.  Motions for leave to submit amici curiae briefs in support of Appellants' motion were filed by the City of Apalachicola, Fla., Calhoun County, Fla., Franklin County, Fla., Liberty County, Fla., and Jackson County, Fla., the Florida Coastal Conservation Association, and several leaders in the Apalachicola fishery community, Doc. 171; Apalachee Audubon Society and Ocean Conservancy, Doc. 172; former Florida Governor Robert Graham and former Congresswoman Gwendolyn Graham, Doc. 176; and St. George Island Civic Club and St. George Plantation Owners Association, Doc. 185.  The district court granted three of the motions but did not rule on the fourth.  Docs. 208, 209, 210 (granting Docs. 172, 185, 176 respectively).

On August 6, 2021, the parties completed briefing Appellants' motion and Appellees' cross-motions.  Docs. 201, 203, 213–14, 217–18, 224–25, 228, 231,

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

233.  On August 11, 2021, the district court granted summary judgment in favor of Appellees and against Appellants.  Doc. 234 at 41–48.

On October 6, 2021, Appellants timely filed a notice of appeal.  Doc. 243. The Court docketed this appeal with the prior-filed appeal by Alabama, No. 21-13104.  Doc. 247.

## STATEMENT OF FACTS

The Corps controls freshwater flows to Florida's Apalachicola River, floodplain, and bay through its management of upstream reservoirs and dams along the Chattahoochee River in Georgia and Alabama.[7]  The timing and quantity of these flows are critical to supporting the historically rich biodiversity of this extraordinary ecosystem.  Yet for years, the Corps' operations have severely degraded that environment to the detriment of the communities, wildlife, and fishery, tourism, and recreational economies that rely on it—all while the agency failed to comply with federal environmental laws.

---

[7] The Corps operates five reservoir projects in the ACF Basin: Buford Dam and Lake Lanier; West Point Dam and Lake; Walter F. George Lock and Dam and Lake; George W. Andrews Lock and Dam and Lake; and Jim Woodruff Lock and Dam and Lake Seminole.  ACF-18_00053976, at ACF-18_00054034–36, ACF-18_00054036 (map).

Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104

I.    **The Apalachicola River, Floodplain, and Bay Comprise an Ecosystem of Exceptional Importance that Has Been Severely Degraded by the Corps' Control of Freshwater Flows from Upstream Reservoirs.**

Florida's largest river, the Apalachicola, forms at the confluence of the

Chattahoochee and Flint Rivers at Lake Seminole (formed by Jim Woodruff Lock

and Dam).  ACF-18_00054106, at ACF-18_00054127.[8]  The Apalachicola River

then flows unimpeded for more than 100 miles through the Apalachicola

floodplain and into the Gulf of Mexico at Apalachicola Bay.  *Id.*; ACF-

18_00022182, at ACF-18_00022194 (map).  More than 80% of the Apalachicola

River's water flow comes from the upstream Chattahoochee and Flint Rivers.

Doc. 7 at 12 ¶ 45.

The freshwater flows that nourish the Apalachicola River, floodplain, and

bay have formed an extraordinary ecosystem renowned for its biodiversity, which

includes many threatened and endangered species.  ACF-18_00054263, at ACF-

18_00054320.  This ecosystem has provided one of the most important bird

habitats in the southeastern United States.  *Id.*  It has been home to more than 131

---

[8] For ease of cross-reference with the Appendix, Appellants cite the record using the starting page number of each document as listed on the index, followed by a pin cite to the specific page(s) within that document.  Where citations are to an entire document, Appellants cite only the starting page as listed on the index.

7

*Alabama, et al. v. U.S. Army Corps of Engineers, et al.*, No. 21-13104

species of fish, 50 mammal species (including the Florida black bear and West Indian manatee), 1,300 plant species, 360 mollusk species, and to the most diverse assemblage of amphibians and reptiles anywhere in the United States and Canada. *Id.*

In 1969, the State of Florida designated the Apalachicola Bay an aquatic preserve. *Id.* In 1979, the National Oceanic and Atmospheric Administration designated the lower river and bay a National Estuarine Research Reserve. *Id.* In 1979 and 1983, Florida designated Apalachicola River segments as Outstanding Florida Waters.[9] *Id.* In 1984, the United Nations Educational Scientific and Cultural Organization designated the reserve a Biosphere Reserve. *Id.*

The Apalachicola River also nourishes Florida's largest floodplain forest, "a vast wetland system" that "has long been recognized for its tree species richness." *Id.* The Apalachicola floodplain comprises more than 200 miles of sloughs, streams, and lakes that are directly influenced by river fluctuations and provide extensive habitat for fishes and other aquatic species. ACF-18_00022182, at ACF-18_00022193. More than 80% of fish species in the Apalachicola River spend part

---

[9] Aquatic preserves are protected to ensure their aesthetic, biological, and scientific values may endure for future generations' enjoyment. Fla. Stat. § 258.36. Outstanding Florida Waters are designated because of their natural attributes. Fla. Admin. Code Ann. r. 62-302.700.

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

of their life in floodplain habitats. *Id. See* ACF-18_00054263, at ACF-18_00054321–22.

But, to the severe detriment of the environment, freshwater flows reaching the Apalachicola ecosystem have long been controlled and limited by the Corps' operations of upstream dams and reservoirs. The Apalachicola River is no longer "pristine" because of the Corps' manipulation of freshwater flows through upstream dams and dredging of the river through the 1990s. *Id.*, at ACF-18_00054314. Water levels in the Apalachicola River have also declined substantially because of the Corps' channel widening and deepening from the 1950s–1980s. ACF-18_00022182, at ACF-18_00022197. Reduced river flows have decreased floodplain inundation, reducing the "quantity and quality of floodplain habitats" for aquatic species. ACF-18_00022905, at ACF-18_00022912. These declines harm floodplain connections that are essential to fish communities. ACF-18_00054263, at ACF-18_00054314.

The Corps' reduction of freshwater flows to the Apalachicola River in the spring and summer, especially during periods of drought, has worsened the Apalachicola floodplain's decline. ACF-18_00022182, at ACF-18_00022193. By the 2000s, floodplain swamps and forests were drying out and floodplain streams

Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104

were becoming isolated from each other.  ACF-18_00054263, at ACF-18_00054305; ACF-18_00022182, at ACF-18_00022193.  As a result of the Corps' reduction of freshwater flows, the overall density of trees in swamps "significantly decreased" by 37% from 1976 to 2004—and by nearly 44% for the tupelo trees valuable to the honey industry—with a total loss of more than four million trees.[10]  ACF-18_00025183, at ACF-18_00025191.

The Apalachicola River and its vital floodplain forest have been the lifeblood of Apalachicola Bay, an estuary of major ecological and economic importance to the eastern Gulf of Mexico as a nursery for shrimp, blue crabs, and many fish species.  ACF-18_00054263, at ACF-18_00054319–20.  The Apalachicola Bay has been recognized as "one of the most important estuaries" in the United States and "one of the most productive estuaries in the northern hemisphere."  *Id.*

But the Corps' restriction of downstream water flows has placed mounting pressure and stress on Apalachicola Bay (ACF-18_00054803, at ACF-18_00054923) particularly during periods of drought.  "[S]ubstantial reductions"

---

[10] Reduced floodplain connectivity not only harms vegetative communities, but also the wildlife dependent on that vegetation for habitat and nutrition.  ACF-18_00054263, at ACF-18_00054305.

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

of the native trees in the floodplain have led to the "loss" of the bay's ability to provide nursery habitat for aquatic species and the "destruction of the naturally high productivity" of key aquatic species in the river and bay. ACF-18_00072661, at ACF-18_00072735 (Livingston ¶ 20). These impacts have dire ecological and economic consequences. Commercial fishing during the 2007 drought, for example, experienced "decreases of white shrimp (down 90%), brown shrimp (down 55%), blue crabs (down 55%), and flounder (down 40%)." *Id.*, at ACF-18_00072734.

## II. The Impacts of the Corps' Operations on the Apalachicola Ecosystem Have Evaded Environmental Review Required by Federal Law.

Congress authorized the Corps to construct the upstream ACF River Basin reservoirs and dams in 1946 by adopting Chief of Engineers James B. Newman's Report, H.R. Doc. No. 80-300 (1947) [hereinafter "Newman Report"], through the 1946 RHA. ACF-18_00002704, at ACF-18_00002704–59. In addition to supporting hydropower, flood control, and navigation, these projects would also "afford recreational opportunities, benefit fish and wildlife conservation and make available an adequate water supply for the Atlanta area." *Id.*, at ACF-18_00002731 (Newman Report ¶ 13). *See id.*, at ACF-18_0002751, ACF-18_0002756 (Newman Report ¶¶ 80, 100).

11

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

The Corps first produced a Master WCM for its ACF operations in 1958 (ACF-18_00053976, at ACF-18_00054035), the year Congress passed the FWCA and a decade before Congress enacted NEPA.  The Corps added (and later updated) individual WCMs as new ACF projects were completed and came online. *Id*.  But the Corps did not take steps to update the Master WCM until 1989.  *Id. See* ACF-18_00054374, at ACF-18_00054378.  The Corps did not prepare an EIS at that time, despite NEPA requiring an EIS for any major federal action significantly affecting the human environment.  42 U.S.C. § 4332(C).

The 1989 draft WCM would have reallocated water storage and water supply for Georgia's benefit.  ACF-18_00053976, at ACF-18_00054084.  Alabama challenged that plan, and it was never finalized.  ACF-18_00054374, at ACF-18_00054379.  The litigation was stayed while Alabama, Florida, and Georgia attempted to reach a resolution regarding their water needs in the 1990s. *Id.*

In 2003, the states' effort to agree on an equitable water apportionment for the ACF Basin failed.  *Id.*, at ACF-18_00054380.  Litigation resumed, with Alabama and Florida challenging the Corps' continued operations as inconsistent with federal law.  *Id.*  Several others also filed suit.  *Id.*, at ACF-18_00054380–83.

12

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

In 2006, Florida sued the Corps over an interim operating plan (IOP) for species specially protected under the Endangered Species Act (ESA). *Id.*, at ACF-18_00054382.

In 2008, the City of Apalachicola challenged the Corps' operations under the 1989 draft WCM as violating NEPA. *Id.*, at ACF-18_00054383. In 2009, Appellant Apalachicola Bay and River Keeper intervened. *See City of Apalachicola, Fla. v. U.S. Army Corps of Eng'rs.*, No. 3:08-cv-00233, (M.D. Fla, Nov. 23, 2009), ECF No. 25.

Ultimately, several cases were consolidated by the panel on multi-district litigation. ACF-18_00054374, at ACF-18_00054383. The district court divided that litigation into phases to address (1) whether the Corps' operational changes for water storage and supply required additional congressional authorization; and (2) whether the Corps' operations were violating federal environmental laws, including NEPA. *Id.*, at ACF-18_00054383–84.

In 2009, the court ruled that the Corps could not undertake major operational changes for Georgia's water supply absent additional congressional authorization. *Id.* The Corps, Georgia, and WSPs appealed that decision to the Court of Appeals for the Eleventh Circuit, which reversed. The Court held that the Corps could

13

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

provide water supply to Georgia under both the Water Supply Act of 1958 and the

RHA because the Newman Report designated water supply an original project

purpose. *Tri-State Water Rts.*, 644 F.3d at 1192.

While that appeal was pending, the district court considered the

environmental claims. The court rejected the ESA claims but concluded that the

Corps had violated NEPA. ACF-18_00054374, at ACF-18_00054384. The court

rebuked the Corps for its "utter failure to conduct any sort of environmental

analysis whatsoever on the plan by which it has operated the ACF basin for more

than 20 years." *In re Tri-State Water Rts. Litig.*, No. 3:07-MD-01 (PAM/JRK),

2010 WL 11586590, at *9 (M.D. Fla. July 21, 2010). The court ultimately ruled

the NEPA violations prudentially moot, however, given the Corps' announcement

that it would develop a new WCM and prepare an EIS.[11] *Id.* at *10. On appeal,

the Eleventh Circuit noted the Corps' admission that it had not prepared the written

reports required by NEPA and found that the district court lacked jurisdiction to

rule on the Apalachicola case. 644 F.3d at 1181, 1185.

---

[11] In 2013, the court vacated its decision. This Court, however, has held that vacatur is not
necessary where issues are moot and there is no res judicata effect. *Democratic Exec. Comm. of
Fla. v. Nat'l Republican Senatorial Comm.*, 950 F.3d 790, 795 (11th Cir. 2020).

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

In 2016, the Corps issued the EIS and updated WCM.  In 2017, the Assistant Secretary for the Army (Civil Works) issued its ROD approving the Corps' actions.  ACF-18_00000131.

In the EIS, the Corps acknowledged that for decades it had continued to operate the ACF projects in accordance with the "status quo" reflected in the challenged 1989 draft WCM, plus IOPs adopted to comply with the ESA (which it referred to collectively as "current operations").  ACF-18_00053976, at ACF-18_00054035, ACF-18_00054048; ACF-18_00054106, at ACF-18_00054170.  The Corps' current operations constituted the "no action alternative" (or NAA), and the proposed action (or PAA) reflected updates to the WCM.

The Corps then determined that, as to the Apalachicola ecosystem, its proposed updated operations would not meaningfully depart from its "current operations."  On that basis, the Corps concluded that there would be no meaningful environmental impact either.  Those decades-long "current operations," however, had never been subjected to NEPA's required environmental impact analysis.  The Corps thus again avoided reckoning with the harms its operations have caused and continue to cause.  As a result, the Corps also shirked its duties to mitigate those harms, in further violation of federal law.

15

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

As to the Chattahoochee, the Corps acknowledged that its operational changes would harm some river segments but failed to comply with mitigation requirements under NEPA and WRDA.  Finally, the Corps acknowledged a duty toward fish and wildlife conservation under the FWCA—which extends broadly to all wildlife, 16 U.S.C. § 666b—but failed to meet it.

## STANDARD OF REVIEW

The Court applies de novo review to the issues raised in this appeal.  *Horsley v. Feldt*, 304 F.3d 1125, 1131 (11th Cir. 2002) (judgment on the pleadings); *Sierra Club v. Tenn. Valley Auth.*, 430 F.3d 1337, 1344 (11th Cir. 2005) (summary judgment); *SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 600 F.3d 1334, 1336 (11th Cir. 2010) (whether amendment of complaint was futile); *Fuerst v. Hous. Auth. of Atlanta*, 38 F.4th 860, 869 (11th Cir. 2022) (statutory interpretation).  The Court applies the APA's arbitrary and capricious standard to Appellants' NEPA claims.  *Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1169 (11th Cir. 2006).

## SUMMARY OF THE ARGUMENT

More than fifty years ago, Congress passed NEPA to require agencies to take a hard look at their actions' environmental impacts to inform their decisions and disclose those impacts to the public.  NEPA further requires agencies to

16

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

consider mitigation measures where their actions will have adverse effects.  Yet for decades, the Corps has refused to take a hard look at the harms it has caused through control of the waters flowing to the Apalachicola River, floodplain, and bay.  As a result, the Corps has also shirked its duty to consider mitigation to abate those harms.

The record plainly shows that the Corps' operations have had a significant impact on the Apalachicola ecosystem.  Denying this incontrovertible fact, the Corps claims that continuing operations it deems comparable (which also starve the river, floodplain, and bay of freshwater), and doing so for years to come, will also have no meaningful impact.  But the Corps' premise is false.  And so, the Corps' EIS cannot stand.

The Corps violated NEPA's requirements to assess the impact of its past, present, and future actions on the Apalachicola ecosystem, consider reasonable alternatives, and consider mitigation of environmental harms.  Its EIS was arbitrary, capricious, and not in accordance with the law, in violation of the APA. The district court thus erred in denying summary judgment to the Appellants and granting summary judgment to Appellees.

17

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

The Corps also violated WRDA by not including a plan to mitigate the harm to water quality it acknowledged would occur in Chattahoochee River segments. The district court erred in granting judgment on the pleadings on Appellants' WRDA claim based on an erroneous interpretation of the statute. Prior to 2007, WRDA required mitigation plans in reports submitted to Congress. But in 2007, Congress specifically expanded the statute by adding a new clause to prohibit the agency from selecting a water resources project alternative in "any report" unless the report contains a mitigation plan to redress ecological harm. By interpreting the amendment as also limited to reports submitted to Congress, the district court ignored the amendment's plain meaning and unlawfully rendered the new clause superfluous and void.

Finally, although the Corps admitted that fish and wildlife conservation was (1) a project purpose under the FWCA and (2) entitled to "equal consideration" as other project purposes, the Corps failed to treat it accordingly. Notwithstanding the Corps' admission, the district court ruled that FWCA Section 661 did not impose a duty on the Corps to grant fish and wildlife conservation "equal consideration." The district court then erred by denying as futile Appellants'

18

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

motion to amend the complaint to state alternate statutory bases for the Corps'
acknowledged duty to fish and wildlife conservation: FWCA Section 663 and the
1946 RHA.

## ARGUMENT

The Corps' actions were arbitrary, capricious, and not in accordance with the
law. And the district court's rulings fail as a matter of law. The Court should
therefore reverse and remand.

## I. The Corps Violated NEPA.

The administrative record was replete with evidence that the Corps'
operations have devastated and will continue to devastate the Apalachicola River,
floodplain, and bay ecosystem. Still, the Corps unreasonably concluded that
continuing its operations would have no meaningful impact on the Apalachicola
ecosystem, and that because its proposed action was operationally similar, it would
likewise have no meaningful impact. The Corps failed to analyze reasonable
alternatives and failed to consider mitigation. The Corps' action was arbitrary,
capricious, and otherwise not in accordance with the law, and must be set aside. 5
U.S.C. § 706(2)(A).

19

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

A.    **The Corps' Environmental Impact Statement was Based on a Fundamentally Flawed Premise Rendering its "No Impact" Conclusions Arbitrary and Capricious.**

NEPA requires that agencies analyze the direct, indirect, and cumulative impacts of their actions on the environment.  40 C.F.R. §§ 1508.7, 1508.25(c);[12] *Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs*, 941 F.3d 1288, 1293 (11th Cir. 2019) (agencies must "take a 'hard look' at the potential environmental consequences of their actions" (internal citations omitted)); *Grand Canyon Trust v. Fed. Aviation Admin.*, 290 F.3d 339, 341–43 (D.C. Cir. 2002).  "[S]imple, conclusory statements of 'no impact' are not enough to fulfill an agency's duty under NEPA."  *Del. Riverkeeper Network v. Fed. Energy Regul. Comm'n*, 753 F.3d 1304, 1313 (D.C. Cir. 2014) (citation omitted).

While the standard of review is deferential, the Court may find an agency action arbitrary and capricious where the agency failed to consider important aspects of the problem, offered an explanation that runs counter to the evidence, or is so implausible that it cannot be the product of agency expertise.  *City of N.*

---

[12] Appellants cite the regulations and guidance that were in place at the time of the agency's action (2017).  40 C.F.R. § 1506.13 (2020).

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

*Miami v. Fed. Aviation Admin.*, 47 F.4th 1257, 1266 (11th Cir. 2022) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

Here, the EIS stated that it would address impacts throughout the ACF Basin downstream to and including Apalachicola Bay.  ACF-18_00054106, at ACF-18_00054106.  The Corps discussed the "Affected Environment" in Section 2 of the EIS (starting at *id.*) and the "Environmental Consequences" of its WCM in Section 6 (starting at ACF-18_00054536).[13]  The Corps' statements regarding the Apalachicola River, floodplain, and bay appear in specific subsections therein.[14]

The EIS, however, failed to assess the environmental impact of the WCM on the Apalachicola River, floodplain, and bay because its conclusions were based on the demonstrably false premise that "current operations" are having no meaningful impact on the Apalachicola ecosystem.[15]  Starting from this false premise, the Corps summarily concluded that if "current operations" (the "no action alternative"

---

[13] These sections continue onto subsequent volumes of the Appendix.

[14] The EIS' Table of Contents appears at ACF-18_00053976, at ACF-18_00053978–99.  The Executive Summary appears at *id.*, at ACF-18_00054034–54081.

[15] Rather than take a hard look, the Corps made conclusory assertions that continuing its current operations would have no more than a "negligible" impact.  *See, e.g.,* ACF-18_00054803, at ACF-18_00054834 (Table 6.4-2); *id.*, at ACF-18_00054835 (negligible impact on vegetation and wildlife in Apalachicola River and floodplain); *id.*, at ACF-18_00054849 (same on fish and aquatic resources); *id.*, at ACF-18_00054859 (same on terrestrial vegetation communities, wetland ecosystems, and wildlife, including birds, mammals, insects, and others).

21

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

or NAA) are having no impact, then neither will similar, future operations (the "proposed action alternative" or PAA).  *See, e.g.*, ACF-18_00053976, at ACF-18_00054074 (only "negligible change" to vegetation and wildlife along the Apalachicola River because floodplain inundations would be very "similar" to current operations); *id.*, at ACF-18_00054075 (equating the "negligible effect" on freshwater flows to the Apalachicola Bay from the proposed action, as compared to current operations, with "no effects on fish and aquatic resources" in the bay); ACF-18_00054803, at ACF-18_00054923 (while "[a]ppreciable flow alteration" would likely have effects, flow under the PAA "would not differ appreciably" from current operations and so effects would likely be "negligible").[16]  By taking this tack, the Corps washed its hands of having to do the hard work of NEPA, which requires that an agency take an honest, hard look at the actual environmental impacts of its actions, analyze those impacts, and consider mitigation for environmental harms.

---

[16] *See* ACF-18_00053976, at ACF-18_00054057 (PAA would bring "[n]egligible/no changes" to oyster industry); *id.*, at ACF-18_00054075 (no "appreciable effects" on fish and aquatic resources in Apalachicola River); ACF-18_00054803, at ACF-18_00054859 (negligible effects on terrestrial and wetland ecosystems).

*Alabama, et al. v. U.S. Army Corps of Engineers, et al.*, No. 21-13104

The Corps' summary "no" or "negligible" impact conclusions fly in the face of its own acknowledgment that, because of factors including the Corps' regulation of downstream flows, the Apalachicola River is no longer pristine, the Apalachicola Bay has faced "pressure and [shown signs of] increased stress in recent years," and the Apalachicola floodplain has sustained significant harm. ACF-18_00054263, at ACF-18_00054314; ACF-18_00054803, at ACF-18_00054923; ACF-18_00054263, at ACF-18_00054305.

For example, in the "Affected Environment" Section, the Corps acknowledged that the Apalachicola floodplain had been "changing" during the last 30–40 years "toward drier conditions," including as a result of the Corps' regulation of freshwater flows, causing a decrease in floodplain connectivity and habitat alteration. ACF-18_00054263, at ACF-18_00054305. The Corps acknowledged that floodplain connectivity "is critical" to supporting vegetation, habitat, and wildlife. *Id.*

Indeed, the record showed, as one example, that tupelo cypress require inundation during the growing season to thrive. And but for water level declines in the Apalachicola floodplain, tupelo cypress forests would be inundated 47% of the time. ACF-18_00022182, at ACF-18_00022230. But from 1995–2004 (just

23

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

before the Corps began this update of the WCM in 2008), the tupelo swamps were only able to flood 29% of the time, fundamentally changing the hydrology of the area. *Id.* The record further showed that by 2004, the floodplain was drying out, and that the density of tree swamps had dramatically decreased by 37%, with an estimated loss of more than four million trees. ACF-18_00025183, at ACF-18_00025191. *See* ACF-18_00030016.

With all this evidence before it, the Corps failed to assess what further harm the floodplain (and dependent wildlife) would suffer because of the Corps' continued operations or proposed alternative. In short, the Corps failed to carry out the "analysis" part of the environmental impact analysis NEPA requires.

When it came to considering its actions' impacts on wildlife, the Corps failed again. At most, the "Affected Environment" Section recited *types* of birds, mammals, reptiles, amphibians, fish, and terrestrial microinvertebrates found generally in the broader ACF Basin. ACF-18_00054263, at ACF-18_00054309–12. It did not, however, assess the *status* of these species, including whether and how their populations, habitat, and abundance would change over time because of the Corps' current operations or proposed action. *See* ACF-18_00045007 (Apalachee Audubon Society comments describing declines in populations of

24

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

coastal bird species that nest around Apalachicola Bay and impact of Corps'
operations).

The Corps asserted that the Apalachicola Bay had remained "productive"
notwithstanding the Corps' "current operations."  But for this proposition, the
Corps relied on assessments of these natural resources produced thirty to forty
years before the EIS.  ACF-18_00054263, at ACF-18_00054305, ACF-
18_00054319, ACF-18_00054322.  The Corps provided no rationale for its
decision to rely on data from the 1970s and 1980s for its assessment of the
ecosystem's productivity as of 2016.  Nor could it.  *N. Plains Res. Council, Inc. v.
Surface Transp. Bd.*, 668 F.3d 1067, 1986 (9th Cir. 2011) (reliance on ten-year-old
data "does not constitute a 'hard look' under NEPA"); *Lands Council v. Powell*,
395 F.3d 1019, 1031 (9th Cir. 2005) (thirteen-year-old species surveys "too
outdated" for adequate NEPA analysis).

The EIS disregarded more recent information in the record that
demonstrated the contrary.  A 2008 study, for example, described the "loss" of
bay's ability to provide nursery habitat for aquatic species and the "destruction of
the naturally high productivity" of key aquatic species in the river and bay.  ACF-
18_00072661, at ACF-18_00072735.  During the 2007 drought, commercial

*Alabama, et al. v. U.S. Army Corps of Engineers, et al.*, No. 21-13104

fishing experienced a massive reduction in productivity, with "decreases of white shrimp (down 90%), brown shrimp (down 55%), blue crabs (down 55%) and flounder (down 40%)." *Id.*, at ACF-18_00072734. In 2013, a federal fisheries disaster was declared for Apalachicola Bay's oyster industry (ACF-18_00051020) something the EIS completely failed to mention. *Cf.* ACF-18_00054263, at ACF-18_00054349 (EIS describing oyster data only up to 2012).

In addition, while the Corps considered Georgia's water supply needs decades into the future (through the year 2050) (ACF-18_00053976, at ACF-18_00054041), the Corps undertook no analysis or projection of the impacts its operations would have on the Apalachicola ecosystem long term. Instead, the Corps jumped to a conclusion with no basis in the record.

The EIS concluded—in the face of clear evidence of harm—that these vital resources would suffer no harm because the Corps' proposed action would not result in flows that, according to the Corps, were meaningfully different from the status quo. In other words, rather than study and analyze the impacts of its actions on *the environment* (including the fish and wildlife that rely on the health of the Apalachicola River, floodplain, and bay), the Corps only measured the impacts of its actions on the amount of downstream water *flows*. It then assumed, without

26

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

evidence, that no appreciable change in *flows* meant no appreciable impact on the *environment*.  The Corps also failed to offer a rational connection between its recognition that the Apalachicola ecosystem has been subjected to a variety of stressors and alterations—including as a result of the Corps' actions—and its conclusion that more of the same would have no meaningful environmental impact.  *N. Miami*, 47 F.4th at 1266; *State Farm*, 463 U.S. at 43 (agency action is arbitrary or capricious where agency fails to demonstrate rational connection between facts found and choice made).  Since the Corps' starting premise has no legs on which to stand, its conclusions too must fall.

**B.    The Corps' Failure to Analyze Impacts of Drought Operations was Arbitrary and Capricious.**

The Corps also failed to assess the environmental impact on the Apalachicola River, floodplain, and bay of increased drought operations—during which the Corps withholds more water upstream both in anticipation of and in response to drought conditions throughout the ACF Basin.  The Corps' summary chart demonstrates that under the proposed action (PAA), (1) "drought operations" would be triggered seven times more often than under "current operations" (NAA) (twenty-one times versus three); (2) the basin would remain in "drought operations" more than twice as long; and (3) the most severe "drought zone

27

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

operations" would be triggered once, and last about three months, as opposed to not being triggered at all under "current operations." ACF-18_00054536, at ACF-18_00054635 (Table 6.1-14). Triggering drought operations more frequently and for longer periods would withhold more water upstream, and therefore reduce water flow downstream, more frequently and for longer periods. Additionally, very low flows and extremely low flows as low as 4,500 cfs[17] from Woodruff Lock and Dam (compared to the prior minimum of 5,000 cfs put in place to protect certain species under the ESA) would be permitted to occur more frequently and for longer periods than under current operations.[18] *Id.*, at ACF-18_00054635, ACF-18_00054638.

The Corps unreasonably characterized these drastic changes to drought operations as "slight." ACF-18_00053976, at ACF-18_00054072 (stating new drought operations could "trigger slightly constrained operations more frequently and over slightly longer periods"); ACF-18_00054536, at ACF-18_00054634. The

---

[17] For reference, over a historical period, mean annual discharge from the Apalachicola River to the bay was approximately 25,000 cubic feet per second (cfs), with minimum flows averaging 9,300 cfs and maximum flows averaging 200,000 cfs. ACF-18_00054106, at ACF-18_00054163. Low flows typically occur in the summer and fall while high flows occur in the winter and spring. *Id.*

[18] *See* ACF-18_00054106, at ACF-18_00054177–78 (minimum discharges to protect ESA-listed Gulf sturgeon and three freshwater mussels); ACF-18_00053976, at ACF-18_00054048.

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

Corps then summarily concluded that the environmental impact of these drought operations would be negligible because they would differ only "slightly" from "current operations."  ACF-18_00054803, at ACF-18_00054834 (Table 6.4-2) (describing impact on vegetation and wildlife as "negligible/no change"); *id.*, at ACF-18_00054835 (continuing current operations would have only "negligible effect" on river and bay vegetation and wildlife); *id.*, at ACF-18_00054835–39 (concluding no more than "slightly adverse short term" conditions, and that vegetation and wildlife would "endure," because drought operations would not appreciably alter flows).

Although the Corps characterized these significant drought operations differences as "slight," the agency was still required to assess whether the changes could nevertheless have profound impacts on the environment.  Instead, the Corps simply used its characterization of "slight" flow changes as a proxy for analyzing the impacts of these flow changes on *the ecosystem*.  The Corps offered no reasoned basis for this extrapolation and established no rational connection between the facts in the record (as to flows) and the agency's conclusion (as to environmental impact).  *N. Miami*, 47 F.4th at 1266; *Pennaco Energy, Inc. v. U.S.*

29

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

*Dep't of Interior*, 377 F.3d 1147, 1156 (10th Cir. 2004) (action must have reasoned basis and be supported by the record).

The Corps' approach was also scientifically unsound because even a purportedly "slight" difference in the amount, timing, and duration of extreme low flows can have a major environmental impact on ecologically sensitive wetlands that are already under great pressure and strain. ACF-18_00057607, at ACF-18_00057608; ACF-18_00046657, at ACF-18_00046702 (citing William J. Mitsch & James G. Gosselink, *Wetlands* 67–68 (2nd ed. 1993)).

And even while the Corps characterized proposed drought operations as having slight adverse effects on downstream water *flows*, the Corps assumed without evidence that there would still be no effect on *vegetation and wildlife*, expecting the effects to be infrequent and of short duration and assuming that, therefore, the ecosystem would "endure." ACF-18_00054803, at ACF-18_00054838. The Corps provided no factual basis for these conclusions, no analysis of the impact of past droughts on the ecosystem,[19] and no measure of what would constitute "endurance" for purposes of its determination that there would be

---

[19] Indeed, the EIS' description of the historic droughts of 2006–2008 and 2011–2012 failed even to mention the impact of the Corps' existing drought operations on the Apalachicola ecosystem. *See* ACF-18_00054106, at ACF-18_00054114.

30

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

no impact at all.  Indeed, given that the Corps' assessment of the Apalachicola ecosystem's productivity was based on outdated sources from the 1970s and 1980s—long before the Corps' "current operations" began in 1989 and the major droughts of the 2000s—the Corps' conclusions here were unsupported, arbitrary, and unreasonable.  Moreover, the Corps disregarded more recent evidence in the record of harm from low flows during periods of drought.  *See* ACF-18_00072661, at ACF-18_00072732, ACF-18_00072734–35 (Livingston 2008 ¶¶ 5–6, 16–17, 20).

### C.    The Corps' Failure to Perform a Cumulative Impacts Analysis Violated NEPA.

The Corps' failure to assess the impacts of its past and "current operations" also violates NEPA's mandate to consider the cumulative impacts of agency actions.  Cumulative impacts are those which "can result from individually minor but collectively significant actions taking place over a period of time."  40 C.F.R. § 1508.7.  NEPA required the Corps to consider the incremental effect of its action (continued operations in the basin) when added to past, present, and reasonably foreseeable actions.  *Id.*  Where a NEPA analysis "omits consideration of past impacts, followed by a conclusory suggestion that past impacts did not matter," it

31

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

"cannot be in conformance" with NEPA. *Ky. Riverkeeper, Inc. v. Rowlette*, 714 F.3d 402, 410 (6th Cir. 2013).

In the "Cumulative Impact" Section, the Corps claimed that the EIS had considered the cumulative impacts of the Corps' continued operations in the ACF Basin. ACF-18_00054803, at ACF-18_00054920. But, as demonstrated above, the EIS contains no analysis of the impact of the Corps' past or current operations on the Apalachicola ecosystem, much less an analysis of the cumulative effects of those operations.

In fact, the Corps devoted only four paragraphs to the cumulative impacts of its operations on biological resources anywhere in the ACF River Basin. *Id.*, at ACF-18_00054923. And none of these assessed "the impact on the environment" from the "incremental impact" of the Corps' operations "when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7.

In the first paragraph, the Corps generally acknowledged that "increased density of human habitation" in the ACF Basin will degrade wetlands, floodplains, and terrestrial ecosystems. ACF-18_00054803, at ACF-18_00054923. The Corps' generic observation provided no assessment of the cumulative impact of its operations on the Apalachicola ecosystem.

32

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

In the second paragraph, the Corps cursorily acknowledged "a variety of anthropogenic pressures," including modified flows from upstream reservoirs and "increased stress in recent years," on the Apalachicola Bay.  *Id.*  But the Corps dismissed these impacts with the conclusory (and as shown above, unreasonable) assertion that the estuary has remained "productive."  *Id.*  The Corps made no effort to assess the present productivity of the bay as compared to thirty years ago or as it might look thirty years into the future given the Corps' operations (and as added to other, foreseeable pressures).  *Cf.* 40 C.F.R. § 1508.7.  And the Corps made no assessment of the cumulative impact of these same stressors on the Apalachicola River and floodplain.

In the third paragraph, the Corps claimed that only "[a]ppreciable flow alteration (in terms of quantity, quality, timing, and distribution)" would likely have "potential effects on the Apalachicola Bay estuary, including its commercial fisheries."  ACF-18_00054803, at ACF-18_00054923.  Again, however, this assertion was premised on the false (and unsupported) assumption that current operations were not already having an adverse impact.  The Corps simply concluded that because downstream water flows "would not differ appreciably" from "current operations," the Corps' proposed action would only have a

33

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

"negligible" effect on the Apalachicola Bay estuary. *Id.* As explained above, the Corps' logic is flawed: (1) considering impacts to water *flows* is not the same as considering impacts to the *environment* from those flows, and the Corps provided no rational basis for its extrapolation; and (2) since current operations *are* harming the bay, it was implausible for the Corps to conclude that continuing similar operations would not *also* harm the bay. And, again, the Corps did not analyze the cumulative impacts of its operations on the river and floodplain.

Lastly, the Corps claimed that "[a]ny negligible changes" to water conditions in the bay caused by the proposed action would most likely be "inconsequential" when compared to "the cumulative effects of anticipated sea level rise." *Id.* However, the Corps was not tasked with making comparative observations, but rather with considering the *cumulative* impact of sea level rise (and other climate change impacts), in conjunction with the Corps' operations, on the environment. 40 C.F.R. § 1508.7. The Corps' mere observation that there may be more consequential impacts on the bay from sea level rise, moreover, does not pass for an analysis of the impacts of that foreseeable event on the environment.

The Corps' cursory treatment of cumulative impacts and its conclusory statements of little to no cumulative impact violate NEPA. *See Del. Riverkeeper*

34

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

*Network*, 753 F.3d at 1313 (failure to meaningfully assess cumulative impacts

violated NEPA); *N.C. Wildlife Fed'n v. N.C. Dep't of Transp.*, 677 F.3d 596, 602

(4th Cir. 2012) ("Conclusory statements that the indirect and cumulative effects

will be minimal or that such effects are inevitable are insufficient under NEPA.");

*Lands Council*, 395 F.3d at 1027 (vague, general, and non-detailed discussion of

past actions and their impacts was insufficient cumulative effects analysis, proper

analysis could have "informed analysis about alternatives presented for the current

project"); *Am. Oceans Campaign v. Daley*, 183 F. Supp. 2d 1, 19–20 (D.D.C.

2000) (rejecting NEPA document spending more time describing the proposed

alternative and NEPA requirements than analyzing impacts).

### D. The Corps Violated NEPA's Requirement to Consider All Reasonable Alternatives.

NEPA requires agencies to "identify and assess" reasonable alternatives

"that will avoid or minimize adverse effects" of proposed actions.  42 U.S.C.

§ 4332(2)(D), (E); 40 C.F.R. §§ 1500.2(e), 1502.14(a).  And, importantly, NEPA

requires a "thorough consideration of all appropriate methods of accomplishing the

aim of the action," including an "intense consideration of other *more ecologically

sound* courses of action."  *Env't Def. Fund v. U.S. Army Corps of Eng'rs*, 492 F.2d

Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104

1123, 1135 (5th Cir. 1974) (emphasis added).[20]  This requires taking a "hard look"

at all reasonable alternatives.  *Citizens for Smart Growth v. Sec'y of Dept. of*

*Transp.*, 669 F.3d 1203, 1211 (11th Cir. 2012).  Indeed, the evaluation of all

reasonable alternatives is "the heart" of the NEPA process and provides the basis

for a choice among options.  40 C.F.R. § 1502.14.

### 1.    The Corps Unlawfully Considered Only One Water Management Alternative to its "Current Operations."

While burying its head in the sand as to the adverse effects of its "current

operations," the Corps also gave short shrift to considering alternatives that would

avoid or minimize those adverse effects.  What the Corps did instead is consider

the environmental impacts of only two water management options: either

continuing its "current operations" (the "no action alternative" or NAA) or

adopting its proposed action (the "proposed action alternative" or PAA).  *See* ACF-

18_00054374, at ACF-18_00054472 (the Corps used phases to determine

alternatives; Phase 1 identified the proposed water management alternative that

would then be carried over for environmental impact analysis).[21]  The ten

---

[20] *See Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting as binding precedent decisions by Fifth Circuit prior to October 1, 1981).
[21] Section 4 of the EIS describes the water management options formulation.

*Alabama, et al. v. U.S. Army Corps of Engineers, et al.*, No. 21-13104

"alternatives" the Corps ultimately submitted for environmental impact analysis

consisted of either the Corps' "current operations" or its proposed action. These

purported alternatives only differed in terms of how the Corps would meet

Georgia's water supply demand. *Id.* (Phase 2 identified ways to meet Georgia's

water demand;[22] these water supply options were then combined with either

"current operations" (water management option 1) or the Corps' proposed action

(water management option 7) to form the "alternatives" the agency evaluated for

environmental impact[23]). As to fish and wildlife conservation, the Corps

considered no alternatives and instead only proposed to continue "current

operations" regarding reservoir fish spawn and passage. *Id.*, at ACF-18_00054434

(Table 4.2-1).[24]

　　As a result of this process, the EIS failed to evaluate the environmental

impact of other reasonable water management alternatives and failed to consider a

more ecologically sound alternative. *Env't Def. Fund*, 492 F.2d at 1135. The

Corps itself had identified seven other water management options (*see* ACF-

---

[22] Section 5 of the EIS describes the Georgia water supply options formulation.
[23] Section 6 of the EIS discussed the environmental consequences of these ten composite "alternatives."
[24] The Corps similarly proposed to continue measures for Gulf sturgeon and three freshwater mussel species. ACF-18_00054374, at ACF-18_00054417–ACF-18_00054418.

*Alabama, et al. v. U.S. Army Corps of Engineers, et al.*, No. 21-13104

18_00054374, at ACF-18_00054433–70), but did not carry those over for the environmental impact analysis even though the Corps acknowledged they would all meet the project purposes (*id.*, at ACF -18_00054470 (listing and ranking seven water management options on how well they each met project purposes)). *Cf.* 40 C.F.R. §§ 1502.14, 1502.16(d) (requiring evaluation of environmental effects of all reasonable alternatives); *N. Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1542–43 (11th Cir. 1990) (finding that agency appropriately rejected alternatives that only partly satisfied the project's purposes).

Instead, the Corps chose to rank *a priori* these water management options, and then move forward with only its preferred course of action.  The flaws in this approach were amplified by the Corps' ranking methodology, which was criticized by both U.S. Fish and Wildlife Service (USFWS) and the independent peer review commissioned by the Corps itself.[25]  ACF-18_00058487, at ACF-18_00058488–95; ACF-18_00078413, at ACF-18_00078447.

---

[25] The Corps contracted with the Batelle Memorial Institute to conduct an objective peer review of its NEPA process.  ACF-18_00078413, at ACF-18_00078418.

*Alabama, et al. v. U.S. Army Corps of Engineers, et al.*, No. 21-13104

Indeed, USFWS found that a proper methodology "would lead to formulation of an environmentally preferable alternative." ACF-18_00049304, at ACF-18_00049304; ACF-18_00066637, at ACF-18_00066640; ACF-18_00058487, at ACF-18_00058493. But the Corps refused, because this would require "considerable additional work if the selected alternative changes." ACF-18_00058487, at ACF-18_00058487. In other words, if using a proper methodology generated a more ecologically sound alternative—or really any other reasonable alternative—then the Corps would have to do the work of assessing the environmental impact of that alternative and presenting those findings to the public and decision-makers. But that is precisely what NEPA requires. 40 C.F.R. § 1502.1.

The Corps' decision to include only two water management options— "current operations" and the proposed action—in the Environmental Consequences Section of the EIS did not constitute a "hard look" at the environmental impact of reasonable alternatives. *Citizens for Smart Growth*, 669 F.3d at 1212; *see also Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723, 729 (9th Cir. 1995) ("The existence of reasonable but unexamined alternatives renders an EIS inadequate.").

39

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

### 2. The Corps Failed to Consider More Ecologically Sound Courses of Action.

The Corps also mischaracterized ecologically beneficial alternatives identified by others and then, based on those mischaracterizations, refused to consider those alternatives. Appellants, for example, proposed that the Corps develop and select an alternative that mimics the amount, timing, and variability of natural flows, to the maximum extent practicable. ACF-18_00046657, at ACF-18_00046663–65. *Accord* ACF-18_00045736, at ACF-18_00045737–40. Others made similar requests to accommodate the needs of Apalachicola Bay. *See, e.g.*, ACF-18_00045882, at ACF-18_00045887–89. Despite the qualifiers requesting flows that "mimic" natural flows "to the maximum extent practicable," the Corps mischaracterized these proposals as urging a wholesale return to "pre-dam" conditions which would negatively affect flood control. ACF-18_00054374, at ACF-18_00054427–28 (stating that "match[ing]" natural flow regimes would adversely affect flood risk management). And on that basis, the Corps eliminated the proposal from further consideration. *Id.*, at ACF-18_00054423–24. This clear mischaracterization of those proposals made the Corps' refusal to consider them unreasonable.

40

*Alabama, et al. v. U.S. Army Corps of Engineers, et al.,* No. 21-13104

Beginning in 2010, USFWS repeatedly recommended more ecologically sound alternatives that would adequately provide for fish and wildlife conservation downstream consistent with other project purposes.  ACF-18_00057607, at ACF-18_00057608–11; ACF-18_00057773, at ACF-18_00057773–74, ACF-18_00057806–19; ACF-18_00058013, at ACF-18_00058013–23; ACF-18_00058139, at ACF-18_00058139; ACF-18_00058150, at ACF-18_00058151; ACF-18_00066637, at ACF-18_00066640.  These included ensuring that a certain amount of water would reach the downstream ecosystem at key times as well as reintroducing some natural flows to restore elements of the ecosystem lost or reduced because of the Corps' current operations.  ACF-18_00057607, at ACF-18_00057608.  USFWS acknowledged that full restoration of natural flows "may not be attainable" but urged that even "[r]elatively small" changes can "have substantial ecological benefits."  *Id*.  USFWS requested that the Corps recommend an attainable frequency of increased water releases for the downstream ecosystem if the Corps found USFWS' proposals unattainable.  *Id.*  But the Corps declined.

The Environmental Protection Agency (EPA) similarly supported incorporation of "at least *some level*" of natural releases of water downstream to benefit aquatic ecosystems.  ACF-18_00045754, at ACF-18_00045766 (emphasis

41

*Alabama, et al. v. U.S. Army Corps of Engineers, et al.*, No. 21-13104

added). EPA noted that while the Corps claimed that restoring natural downstream flows would adversely impact flood risk management, the EIS failed to explain how that would be the case. *Id.*, at ACF-18_00045766–67. *See* ACF-18_00054374, at ACF-18_00054427–28 (Corps adhering to its position without explanation). *See State Farm*, 463 U.S. at 43 (agency must demonstrate rational connection between facts found and choice made).

The Corps also inaccurately suggested that it could not consider these ecologically sound alternatives without "a specific directive" to provide such freshwater to Apalachicola Bay. ACF-18_00056017, at ACF-18_00056018.[26] This suggestion flies in the face of NEPA's mandates. NEPA requires the Corps to consider more ecologically sound alternatives. *Env't Def. Fund*, 492 F.2d at 1135. NEPA also requires consideration of all reasonable alternatives. 40 C.F.R. § 1502.14. And NEPA regulations expressly provide that an alternative need not be within an agency's existing legal authority to warrant consideration. *Id.* §§ 1502.14(c), 1506.2(d); *Nat. Res. Def. Council, Inc. v. Morton*, 458 F.2d 827, 834 (D.C. Cir. 1972). *But see* ACF-18_00053976, at ACF-18_00054086 (stating

---

[26] In fact, freshwater flows are essential to fish and wildlife conservation, for which the Corps is required to adequately provide under the FWCA, 16 U.S.C. § 663, and which is an original project purpose under the RHA.

Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104

in the EIS that Corps did not consider any proposed changes that would have
exceeded its existing authority).  If the Corps determined that there was a more
ecologically sound alternative, but that it lacked the authority to select and proceed
with that alternative, then the Corps, Congress, and the public could determine
whether to pursue such authorization.

### E.    The Corps Violated NEPA's Mitigation Requirements.

The Corps' failure to acknowledge the harmful impacts of its operations on
the Apalachicola ecosystem means that the agency then did not proceed to consider
mitigation of those harms.  Where the Corps did acknowledge that its action would
adversely affect reaches of the Chattahoochee, the Corps violated NEPA by failing
to adequately consider mitigation of those harms.[27]

NEPA requires that an EIS consider mitigation measures, which includes
avoiding, minimizing, rectifying, reducing, or eliminating and compensating for
harm.  40 C.F.R. §§ 1508.25(b)(3), 1508.20(a)–(e), 1502.14(f), 1502.16(f), (h);
*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989).
"[O]mission of a reasonably complete discussion of possible mitigation measures

---

[27] As discussed further below, the Corps also failed to provide a mitigation plan separately
required under WRDA to redress these harms.

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

would undermine the 'action-forcing' function of NEPA." *Robertson*, 490 U.S. at 352. "Without such a discussion, neither the agency nor other interested groups and individuals can properly evaluate the severity of the adverse effects." *Id.* This discussion is necessary to ensure that the agency has taken a hard look at the environmental consequences of its actions. *Id.*

The EIS found that the WCM would have significant adverse effects on fish, wildlife, and water quality in reaches of the Chattahoochee River (due to increased wastewater releases), but the agency failed to consider or adequately discuss mitigation measures to lessen those harms. ACF-18_00054803, at ACF-18_00054925. Comments to the Corps highlighted this failure. *See* ACF-18_00046657, at ACF-18_00046728–30; ACF-18_00049364, at ACF-18_00049377; ACF-18_00045711, at ACF-18_00045730–31; ACF-18_00066637, at ACF-18_00066727–28; ACF-18_00049547, at ACF-18_00049591; ACF-18_00078413, at ACF-18_00078441.

The Corps claimed that it was not required to consider mitigation of these harms because the impacts were "indirect." ACF-18_00054803, at ACF-18_00054925. But NEPA requires consideration of the "means to mitigate adverse

44

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

environmental impacts," 40 C.F.R. § 1502.16(h), including both indirect and direct

impacts. *Id.* § 1508.8.

The Corps claimed it considered water management measures that would

offset adverse effects, but the EIS failed to identify a single such measure. ACF-

18_00053976, at ACF-18_00054079. The Corps' failure to provide any

documented information or analysis supporting the agency's position violates

NEPA. *Robertson*, 490 U.S. at 352; *Ky. Riverkeeper, Inc.*, 714 F.3d at 413.

## II.    The District Court's Interpretation of the 2007 Amendment to WRDA is Contrary to Law.

Separate and apart from NEPA, WRDA requires specific mitigation plans

"for damages to ecological resources, including terrestrial and aquatic resources,

and fish and wildlife losses" resulting from federal water resources projects. 33

U.S.C. § 2283(d)(1). Prior to 2007, this requirement applied only when the Corps

submitted a "proposal for the authorization of any water resources project to the

Congress" in a report that determined that the proposal—absent mitigation—would

cause a greater than "negligible adverse impact" on ecological resources and

wildlife. *Id.* (1986). In 2007, however, Congress amended Section 2283(d)(1) to

also require mitigation plans for ecological harm in "any report" that "select[s] a

project alternative," without limiting that requirement to reports to Congress. *See*

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

Mitigation for Fish and Wildlife and Wetlands Losses, Pub. L. No. 110-114,

§ 2036(a)(1), 121 Stat. 1041, 1092–94 (2007).  Specifically, Congress added the

following emphasized language:

> After November 17, 1986, the Secretary shall not submit any proposal
> for the authorization of any water resources project to Congress in any
> report, ***and shall not select a project alternative in any report***, unless
> such report contains [either a mitigation plan or a determination that
> any adverse ecological effects would be negligible].

33 U.S.C. § 2283(d)(1) (2007) (emphasis added).  Once triggered, Section 2283

requires the Corps to provide a detailed mitigation plan with specified components.

*Id.* § 2283(d)(3)(B)(i)–(vi).

Appellants pled that the Corps violated WRDA by failing to provide a

mitigation plan when it selected a project alternative in the EIS that the Corps

acknowledged would have more than negligible adverse effects on water quality

and "'substantially adverse effects' on riverine fish and aquatic resources in

reaches of the Chattahoochee River."  Doc. 7 at 47–49 ¶¶ 209–17.  *See id.* at 52 ¶¶

230–33.  The ROD did not cure this defect.  *Id.* at 7 ¶¶ 22–23, 26.

The district court dismissed the claim, erroneously ruling that

notwithstanding Congress' amendment, the mitigation plan requirement was

limited to reports submitted to Congress for authorization.  The court concluded

46

*Alabama, et al. v. U.S. Army Corps of Engineers, et al.*, No. 21-13104

that because the WCM documents were not submitted to Congress, WRDA did not

require the Corps to prepare a mitigation plan.  Doc. 146 at 19.

### A. The Unambiguous, Plain Meaning of "Any Report" in Section 2283(d)(1) Encompasses the Corps' EIS and ROD.

When interpreting a statute, if the text is clear "that is the end of the matter;

for the court, as well as the agency, must give effect to the unambiguously

expressed intent of Congress."  *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council*,

467 U.S. 837, 842–43 (1984).  Where the text includes undefined terms, courts

look to "the common usage of words" as defined by a dictionary.  *In re Walter*

*Energy, Inc.*, 911 F.3d 1121, 1143 (11th Cir. 2018).  *See Sandifer v. U.S. Steel*

*Corp.*, 571 U.S. 220, 227–28 (2014).

As the district court acknowledged, the statute does not define "report" and

typically courts are to give undefined terms their common and ordinary meaning.

Doc. 146 at 13.  Black's Law Dictionary defines "report" as "[a] formal oral or

written presentation of facts or a recommendation for action."  *Report* at no. 1,

Black's Law Dictionary (10th ed. 2014).  It also defines "report" as "[a]

collection of administrative decisions by one or more administrative agencies."  *Id.*

at no. 4.  Under either definition, the Corps' EIS and ROD constitute a "report."

The EIS is a written presentation of facts with a recommendation for action.  The

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

ROD adopted the EIS and its selected alternative, making these a collection of administrative decisions. Similarly, Merriam-Webster's Dictionary defines "report" as "a usually detailed account or statement" and "a usually formal record of the proceedings of a meeting or session." *Report*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/report (Nov. 9, 2022). An EIS meets these definitions as well.

In addition to the plain definition of "report," the modifier "any" preceding "report" demonstrates that "report" in the 2007 WRDA amendment is to be read expansively. *See Miljkovic v. Shafritz & Dinkin, P.A.*, 791 F.3d 1291, 1302 (11th Cir. 2015) (plain meaning of "any person" is expansive and encompasses all persons). "Any" means "every" or "of whatever kind" (as in, "every" or "whatever kind of" report that selects an alternative). *Any*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/any (Nov. 18, 2022). And as the pre-amendment statute already covered reports to Congress, the 2007 amendment's addition of a clause referring to "any report" that selects a project alternative— without being limited to those submitted to Congress—must be read more expansively than reports to Congress. *See id.*

48

Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104

The district court failed to reckon with the meaning of the expansive modifier "any" before "report" and ruled that the ordinary meaning of "report" should yield to a "technical" interpretation because of how "report" is used in other parts of WRDA. Doc. 146 at 13–15. But the district court's "technical meaning" attribution to the ordinary word "report" relied on fundamentally flawed reasoning. The district court observed that other WRDA sections address water resources project reports that are submitted to Congress because those projects require specific congressional authorization. *Id.* at 14. From this unremarkable observation, the district court concluded that "report" as used in the 2007 WRDA amendment can *only* mean reports to Congress. *Id.* at 15. But this is a fallacy of composition: just because some reports are reports to Congress does not—as a matter of logic or law—mean that all reports covered by the provision must be reports to Congress.

The district court's interpretation would impermissibly render Congress' amendment superfluous and void. *United States v. Manasche*, 348 U.S. 528, 538–39 (1955) ("The cardinal principle of statutory construction is to save and not to destroy."). Courts are charged with construing statutes to "give effect, if possible, to every clause and word," *id.*, so that none is rendered "superfluous, void, or

49

*Alabama, et al. v. U.S. Army Corps of Engineers, et al.*, No. 21-13104

insignificant." *Kozak v. Hillsborough Cnty.*, 644 F.3d 1347, 1349–50 (11th Cir. 2011). Ensuring that courts give all statutory terms operative effect is particularly important where, as here, Congress specifically amended the provision at issue. "When Congress alters the wording of a statute, we presume that Congress intended a change in the law." *Hiivala v. Wood*, 195 F.3d 1098, 1103 (9th Cir. 1999) (citation omitted); *U.S. Commodity Futures Trading Comm'n v. Hunter Wise Commodities, LLC*, 749 F.3d 967, 976–77 (11th Cir. 2014) (rejecting interpretation that rendered amendments superfluous and meaningless).

In this case, the district court's interpretation would render superfluous Congress' 2007 amendment to Section 2283(d)(1) by assigning the same meaning to the statute pre- and post-amendment. The district court's interpretation limits "reports" subject to mitigation plans only to those reports submitted to Congress for project authorization, which the pre-amendment language already required. As the district court acknowledged, the Corps must "study alternatives to ensure [a] proposal is formulated to achieve certain objectives" before the Corps recommends that project to Congress for authorization. Doc. 146 at 13–14. Thus, a report to Congress for authorization necessarily involves the selection of a project alternative. The 2007 amendment expanded the mitigation plan requirement to

50

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

"any report" that selects a project alternative.  The district court's reading rendered the separate clauses of the section interchangeable such that the amendment made no change in the law.  This reading is impermissible because it does not give separate effect to the new language added by Congress.  *See Fuerst*, 38 F.4th at 870 (court must avoid interpretation that would render a clause, sentence, or word superfluous, void, or insignificant).

The district court acknowledged the presumption against treating statutory terms as surplusage but turned the analysis on its head.  Rather than addressing whether its interpretation of the amendment ran afoul of the presumption, the district court discussed whether affording "reports" its ordinary meaning would somehow render as surplusage the more specific usage of other terms in other statutory provisions.  Doc. 146 at 15–16.  But this analysis is both misplaced— because it was not the question before the court—and flawed.  Recognizing the ordinary meaning of reports in Section 2283(d) does not affect how the word report, and more specific descriptors of certain types of reports (such as environmental impact statements), are used in other statutory provisions not at issue in this case.  *Cf. id.* at 15 (citing 33 U.S.C. § 2282(a)(4)).

51

Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104

The district court's reliance on Section 2346 was also misplaced.  Rather than "'distinguish[ing]' between 'reports,' final environmental impact statements, and records of decision," as the court states (Doc. 146 at 15), Section 2346 lists all these documents under the general heading of "Report repository," confirming that they are all types of reports, along with "report[s] to Congress," which notably are also separately enumerated as just one type of report.  33 U.S.C. § 2346(b)(1). Section 2282(a)(4) similarly does not "distinguish" between all "reports" and "associated environmental impact statements and mitigation plans" but rather contains the congressional definition for one type of report: "feasibility reports," which encompass the feasibility, environmental impact, and mitigation documents that comprise a recommendation for a water resources project that requires specific congressional authorization.  33 U.S.C. § 2282(a)(1), (4).

The district court claimed to have given effect to the 2007 amendment by concluding that the original mitigation requirement applied only to "new" project authorization reports, whereas the amendment applies to reports for "other" projects requiring congressional authorization, "most notably reevaluation reports submitted to Congress."  Doc. 146 at 16–17.  But a reevaluation report requiring Congressional authorization has always required a mitigation plan under the

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

provision's pre-amendment language because it would contain a proposal for the authorization of a water resources project.

The district court's reliance on statements in the congressional record also fails. That Congress intended the original Section 2283(d) requirement to apply to "all future proposals for water resources projects submitted to Congress by the Secretary for authorization" does not mean that those proposals had to be for "new" projects, as the court surmised. *Id.* at 17 (citing S. Rep. 99-126, at 24–26 (1986)). Rather, the statement meant what it said: that the provision applied to <u>all</u> future proposals for projects submitted to Congress for authorization, which could be proposals for new projects or proposals to modify existing projects.

Nor does the amendment's legislative history, which states that the amendment's "increased mitigation requirements apply to all new studies and any other project that must be reevaulated for any reason," support the narrow conclusion that Congress intended the amendment to apply only to changes to authorized projects that require further congressional authorization. *Id.* at 17–18 (citing 153 Cong. Rec. S11981 (Sept. 24, 2007) (statement of Sen. Boxer)). Quite to the contrary, the explicit expansion of the mitigation requirement to "all new studies" and "reevaluation" of "any other project" for "any reason" would clearly

53

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

encompass an EIS assessing the impact of a proposed alternative to modify

operation of an existing project.  That the amendment specifically did not limit the

mitigation plan requirement to reports submitted to Congress, as it had with the

provision's original language, forecloses any other reading.[28]  Had Congress

intended to limit its amendment to reports to Congress for authorization (an

exercise in redundancy), it would have said so.

The district court also misapplied the canon *noscitur a sociis*.  Rather than

elucidate the meaning of the word "report" by "construing proximate statutory

terms in light of one another" to "avoid giving unintended breadth to the acts of

Congress" (*id.* at 16), the court merged the two clauses of Section 2283(d) to mean

the same thing, thereby giving no meaning to the 2007 amendment.  *See, e.g.*,

*People for the Ethical Treatment of Animals, Inc. v. Miami Seaquarium*, 905 F.3d

1307, 1309 (11th Cir. 2018) (*noscitur a sociis* should not be used to deprive a term

of standalone meaning or to attribute to that term the same function as other words

---

[28] The district court's claim that the Conference Committee "rejected" this interpretation because the Senate version of the bill would have specifically identified environmental impact statements and other reports as requiring mitigation plans (while the House version would not have amended the provision), and that the final language must have reflected a "compromise" to limit the requirement to reports to Congress (Doc. 146 at 19), is pure speculation.  The broad language of the provision instead supports the conclusion that both chambers agreed to expand the provision to "any report[s]" that select a project alternative, including most notably environmental impact statements, without having to enumerate them.

*Alabama, et al. v. U.S. Army Corps of Engineers, et al.*, No. 21-13104

in a statute) (citing *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 697–702 (1995)).

With the 2007 amendment, Congress specifically prohibited the Corps from selecting a project alternative in "any report" unless that report contained a mitigation plan for any ecological harm that would result. An EIS is such a report. *See* 42 U.S.C. § 4332(C) (NEPA requires agencies to prepare a detailed EIS for any major federal action "significantly affecting the quality of the human environment"); 40 C.F.R. § 1502.1 (EIS must discuss reasonable alternatives); *id.* § 1502.14(e) (agency must identify its preferred alternative in final EIS). But there is no requirement for an EIS to be submitted to Congress unless adopting the proposed alternative in that EIS requires congressional authorization.

In this case, the Corps selected a project alternative in a report (the EIS) that was not submitted to Congress because the selection did not require congressional authorization. The EIS identified more than negligible adverse effects that would result from the Corps' selection of that project alternative. The 2007 WRDA amendment therefore required a mitigation plan. The district court's analysis of Section 2283 provided no explanation for why Congress would have intended its

55

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

expansive amendment to require mitigation plans to exclude an EIS for a water resources project that causes harm.

Moreover, the usage of "reports" elsewhere in WRDA includes reports not made to Congress. *See, e.g.*, 33 U.S.C. § 2282(c) (requiring detailed project reports for water resources project-related studies that can be approved by the Corps without specific authorization by Congress); *id.* § 2282(b)(5) (requiring Corps to issue a report to a non-federal interest, which pursuant to 42 U.S.C. § 1962d-5b(b) does not include Congress). And the statute contemplates that required mitigation measures need be submitted to Congress only under specific circumstances. 33 U.S.C. § 2283(b)(2) (requiring Corps to transmit a report to Congress whenever mitigation measures are likely to require condemnation of lands).[29]

The statute further recognizes that reports requiring mitigation plans include other final decision documents that are not submitted to Congress. *Id.*

---

[29] Indeed, the Corps has argued elsewhere that mitigation planning is required whenever ecological losses result from site selection for a water resource project previously approved by Congress. *See White Oak Realty, L.L.C. v. U.S. Army Corps of Eng'rs*, 746 F. App'x 294, 300 (5th Cir. 2018) (agreeing with Corps that mitigation requirements were properly imposed during implementation of project previously approved by Congress because "WRDA commands the Corps to mitigate for any impacts 'resulting from' or 'created by' a water resource project" (citing 33 U.S.C. § 2283(b)(1), (d)(1)).

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

§ 2283(d)(3)(C) (where it is not practicable to identify the entity responsible for monitoring mitigation "at the time of a final report of the Chief of Engineers <u>or other final decision document</u> for the project," entity must be identified later in partnership agreement, which is also not submitted to Congress) (emphasis added) (citing 42 U.S.C. § 1962d–5b)).

Finally, Corps regulations implementing similar statutes for other water resource projects, including Everglades restoration, flood control, and dam inspections, also expressly use the word "report" to describe documents not submitted to Congress.  *See, e.g.*, 33 C.F.R. § 209.140 (describing multiple "reports" the Corps must make to federal energy agency and/or keep private, not submitted to Congress); *id.* § 230.15 (progress and status reports provided upon request, not submitted to Congress); *id.* § 385.12 (pilot project design and technical data reports that are not required to be submitted to Congress); *id.* § 385.26 (project implementation reports to be approved by the Corps *or* submitted to Congress).

**B.    Even if the Phrase "Any Report" Were Ambiguous, the Corps' Informal Interpretation is not Entitled to Deference.**

Although the district court initially stated that it found Section 2283(d) to be ambiguous (Doc. 146 at 13), the court ultimately found that it could discern the

57

*Alabama, et al. v. U.S. Army Corps of Engineers, et al.,* No. 21-13104

meaning of the provision by employing the canons of statutory construction (*id.* at

13–18).  The court opined that its interpretation was "consistent" with the Corps'

guidance implementing the statute (*id.* at 18) but did not defer to it.

Even if this Court were to find the provision ambiguous, the Corps'

interpretation is not entitled to deference because it contravenes the plain meaning,

is unreasonable, and relies on a re-wording of the statutory language.

Memorandum from Theodore Brown, U.S. Army Corps of Engineers, to

Commanders, at 1 ¶ 1.a. (Aug. 31, 2009), https://cw-

environment.erdc.dren.mil/pdfs/09sep2-wrda-mitigation.pdf.

Where, as here, an agency's interpretation is rendered informally, the agency

is afforded minimal deference.  *Reno v. Koray*, 515 U.S. 50, 61 (1995).  Indeed,

courts award no deference to "conclusory" guidance that does not adequately

explain and justify its reasoning.  *See Arriaga v. Fla. Pac. Farms, L.L.C.*, 305 F.3d

1228, 1239 (11th Cir. 2002) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140

(1944)); *Quinchia v. U.S. Att'y Gen.*, 552 F.3d 1255, 1259 (11th Cir. 2008).

Here, the Corps' guidance offers no explanation or reasoning.  And for the

reasons stated above, the Corps' interpretation is contrary to the statutory language

and runs afoul of the canons of statutory construction.

58

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

III.    **This Court Should Reverse the District Court's Denial of Appellants' Motion for Leave to Amend the Complaint.**

The district court erred in denying as futile the Appellants' motion for leave to amend the complaint.  Leave to amend should have been "freely given" because the claims that Appellants sought to add are legally cognizable and there was no other "substantial reason to deny leave to amend." *Thomas v. Town of Davie*, 847 F.2d 771, 773 (11th Cir. 1988).

Despite the Corps' repeated references to fish and wildlife conservation as (1) an authorized project purpose for the entire ACF Basin under the FWCA that is (2) entitled to equal consideration as other project purposes (ACF-18_00054106, at ACF-18_00054166)[30] the district court held that FWCA Section 661, 16 U.S.C. § 661, did not impose a duty on the Corps as Appellants had originally alleged. Doc. 146 at 20–22.  Consistent with the court's scheduling order, Doc. 114 at 2, and the parties' scheduling agreement, Doc. 148 at 1, Appellants timely filed a motion for leave to amend, which sought to state alternate bases for the Corps' fish and wildlife conservation duties: (1) that fish and wildlife conservation was an

---

[30] *See also* ACF-18_00053976, at ACF-18_00054051 (stating ACF Basin projects must be operated to meet all project purposes, each project purpose considered equally important); ACF-18_00054374, at ACF-18_00054395 (all project purposes are considered equally), ACF-18_00054470; ACF-18_00054803, at ACF-18_00054821.

59

Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104

equal project purpose under the RHA original project authorization, and (2) that a

different section of the FWCA, Section 663, required the Corps to "adequately

provi[de]" for fish and wildlife conservation, a different standard than "equal"

consideration that Appellants alleged also had not been met.  Doc. 152-1 at 13–14;

Doc. 157-2 at 60–61 ¶¶ 221, 224.

## A. Appellants Alleged a Legally Cognizable Claim Under Section 663 of the FWCA.

The district court denied Appellants' amendment as futile, stating that

FWCA Section 663 "does not make fish and wildlife conservation a co-equal

purpose of the ACF Basin or require that the Corps give fish and wildlife

conservation equal consideration to other project purposes."  Doc. 160 at 5.  In so

doing, the district court failed to recognize that Appellants' Section 663 claim

involved a different standard.  It was not a Section 661 "equal consideration" claim

at all, but a Section 663 claim of "adequate provision."  Doc. 157-2 at 60–61

¶¶ 221, 224.

As the district court's ruling was based on a fundamental misinterpretation

of Appellants' proposed amendment, its futility determination cannot stand.

Appellants specifically sought to amend the FWCA claim by alleging that the

Corps "fail[ed] to adequately provide for fish and wildlife conservation" in

60

Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104

violation of Section 663. *Id.* Appellants explained that their proposed Amended Complaint retained the original Section 661 allegations of "equal consideration" only "to preserve those issues for appeal." Doc. 152-1 at 13, n.3.[31] However, the court relied on those same allegations, expressly retained only for purposes of appeal, to deny Appellants' motion to amend. Doc. 160 at 4–5 (describing retained allegation regarding equal consideration)).

Appellants' alternative claim under Section 663(a), however, did not depend on a finding that the Corps had a duty of equal consideration or that fish and wildlife conservation is a co-equal purpose of the ACF Basin. In other words, "equal consideration" was not a required element of the "adequate provision" claim. It was therefore error for the court to deny leave to add this claim based on the court's prior ruling that Section 663 did not make fish and wildlife conservation a co-equal project purpose.

The district court made no assessment of the viability of Appellants' "adequate provision" claim, and its denial of leave to amend was thus in error. *See Thomas v. Chevron U.S.A., Inc.*, 832 F.3d 586, 591–93 (5th Cir. 2016) (reversing denial based on futility where trial court failed to evaluate alternative claim).

---

[31] Appellants are not proceeding with the Section 661 claim on appeal.

61

*Alabama, et al. v. U.S. Army Corps of Engineers, et al.*, No. 21-13104

Moreover, Section 663 unambiguously imposes a duty on the Corps. 16 U.S.C. § 663(a) ("*[A]ny* department or agency of the United States" that "control[s] or modifie[s]" "the waters of any stream ... *shall*" "adequate[ly] provi[de]" for the conservation of wildlife and its habitat (emphasis added)). Section 663(a)'s text makes the duty of "adequate provision" mandatory "whenever the waters of any stream ... are controlled or modified ... *for any purpose whatsoever*." *Id.* (emphasis added).

Appellants' proposed amendment thus alleged a legally cognizable claim, and it was error for the court to deny leave to amend. *Thomas*, 832 F.3d at 591–93.

## B.    Appellants Alleged a Legally Cognizable Claim Under the 1946 RHA.

Attempting to reconcile the court's decision with the Corps' admissions, Appellants also sought to allege an alternate basis for the Corps' acknowledgement that fish and wildlife conservation was due equal consideration: that the original project authorization in the 1946 RHA established fish and wildlife conservation as an original project purpose. *See* Doc. 157-2 at 65–68 ¶¶ 241–47. The district court, however, found that fish and wildlife conservation was not an original project purpose because it is merely an "incidental benefit of the [ACF Basin]."

62

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

Doc. 160 at 10. In so doing, the court misapplied this Court's precedent in *Tri-State Water Rights*, 644 F.3d 1160, and misinterpreted the text of the RHA.

Proper application of this Court's opinion in *Tri-State Water Rights* compels the conclusion that fish and wildlife conservation is an authorized project purpose of the ACF Basin. There, the Court looked at the Newman Report, which Congress adopted as law, to understand what Congress had authorized the Corps to do in the ACF Basin. *Id.* at 1167–70 (citing Newman Report). The Court held that because the Newman Report called for minimum water releases from the Buford Dam to meet Atlanta's water supply needs "to the detriment of power generation," water supply was an authorized project purpose rather than an incidental benefit. *Id.* at 1169, 1188.

Here, the same reasoning applies. The Newman Report also calls for the release of minimum flows to protect fish, to the detriment of power generation. ACF-18_00002704, at ACF-18_00002751 (Newman Report ¶ 80) (stating that "in order to meet the estimated present needs of [Atlanta] *and* to prevent damage to fish," water releases "up to a maximum of 600 second-feet should be released from

63

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

Buford").[32]  Because "[b]y definition, one purpose that is to be accomplished to the detriment of another cannot be incidental," *Tri-State Water Rts.*, 644 F.3d at 1188, fish and wildlife conservation could not have been a mere incidental benefit of the project as the district court ruled.  Rather, it was an authorized purpose.

The congressional record confirms that fish and wildlife conservation is an authorized purpose of the Buford Dam, the foundational project for the Corps' operations in the ACF River Basin.  A 2007 House Resolution commemorating the anniversary of the Buford Dam states that "the Congress of the United States authorized the creation of Lake Sidney Lanier and Buford Dam by official act in 1946 for ... wildlife preservation."  H.R. 354, 110th Cong. (2007) (enacted).  This was echoed by a Congressional Research Service report on ACF drought management.  *Apalachicola-Chattahoochee-Flint (ACF) Drought: Federal Reservoir and Species Management* at CRS-4, Carter et al., Cong. Rsch. Serv., RL34250 (2007) ("In the case of the ACF ... the Corps operates its five dams for multiple purposes" including "fish and wildlife conservation").

---

[32] Other sections further confirm that fish and wildlife conservation was an authorized purpose of the ACF Basin projects.  *See* ACF-18_00002704, at ACF-18_00002731, ACF-18_00002755–56 (Newman Report ¶¶ 13, 96, 100).

Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104

The 1946 RHA, and this Court's interpretation of the Act, clearly indicates Congress' intent to include fish and wildlife conservation as an authorized purpose in the Buford Project. Since the passing of the RHA, Congress has confirmed this understanding. Appellants' proposal to amend their complaint to allege that the Corps failed to treat fish and wildlife conservation as an authorized project purpose is legally cognizable and is thus not futile.

### C. There Was No Other Substantial Reason to Deny Leave to Amend.

In addition to the claims being viable, there was no other substantial reason to deny leave to amend, such as undue delay, prejudice, or bad faith. *Foman v. Davis*, 371 U.S. 178, 182 (1962). The motion was timely filed in accordance with the court's case management order, Doc. 114 at 2, and the parties' scheduling agreement, Doc. 148. Amending the complaint would not have prejudiced opposing parties, since the new claims would not have required discovery, record supplementation, or modification of any scheduled deadlines. *See Nat'l Indep. Theatre Exhibitors, Inc. v. Charter Fin. Grp., Inc.*, 747 F.2d 1396, 1404 (11th Cir. 1984).

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

## CONCLUSION

Based on the foregoing, Appellants respectfully request that the Court reverse and remand.

Respectfully submitted this 2nd day of December 2022.

/s/ Tania Galloni
TANIA GALLONI
FL Bar No. 619221
CHRISTINA I. REICHERT
FL Bar No. 114257
Earthjustice
4500 Biscayne Blvd., Ste. 201
Miami, FL 33137
T: (305) 440-5433
F: (850) 681-0020
tgalloni@earthjustice.org
creichert@earthjustice.org

BONNIE MALLOY
FL Bar No. 86109
Earthjustice
111 S. MLK Jr. Blvd.
Tallahassee, FL
T: (850) 681-0031
F: (850) 681-0020
bmalloy@earthjustice.org

66

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

## <u>CERTIFICATE OF COMPLIANCE</u>

This is to certify that the foregoing Brief complies with the type-volume limitations and typeface requirements of Fed. R. App. P. 32(a). Specifically, this brief is printed in proportionally spaced, 14-point Times New Roman font using one-inch margins in compliance with Fed. R. App. P. 32(a)(4)–(6), and with the exception of footnotes and indented quotations, it is printed with double-spacing in compliance with Fed. R. App. P. 32(a)(4). Excluding the items that are exempted under Fed. R. App. P. 32(f), this brief contains a total of 12,991 words to meet the limitation of Fed. R. App. P. 32(a)(7)(B)(i). This certificate was prepared in reliance on the word processing system (Microsoft Word) used in this brief.

<u>/s/ Tania Galloni</u>
TANIA GALLONI

67

**Alabama, et al. v. U.S. Army Corps of Engineers, et al., No. 21-13104**

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Rule 25 of the Federal Rules of Appellate Procedure and

Eleventh Circuit Rule 25(c), I hereby certify that on the 2nd day of December

2022, I electronically filed the foregoing with the Clerk of the Court using the

CM/ECF system, which will automatically send notification of such filing to all

counsel of record in this case.  All registered CM/ECF users will be served by the

Court's CM/ECF system.

<u>/s/ Tania Galloni</u>
TANIA GALLONI

68