No. 21-13104 (No. 21-13444)

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

NATIONAL WILDLIFE FEDERATION, INC., et al.,
*Plaintiffs/Appellants*,

v.

UNITED STATES ARMY CORPS OF ENGINEERS, et al.,
*Defendants/Appellees*.

Appeal from the United States District Court for the Northern District of Georgia
No. 1:18-MI-00043 (Hon. Thomas W. Thrash)

# BRIEF FOR FEDERAL APPELLEES

TODD KIM
*Assistant Attorney General*

MICHAEL T. GRAY
*Attorney*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 532-3147
michael.gray2@usdoj.gov

Of Counsel:

CHRISTINA AUSTIN-SMITH
JESSE HUFSTEDLER
*Attorneys*
U.S. Army Corps of Engineers

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, the undersigned counsel certify the following persons or entities have been associated with or have an interest in the outcome of this case:

1. Allen, John C. (Attorney for Appellee / Intervenor State of Georgia)

2. Allen, Kenneth W. (Attorney for Appellee / Intervenor State of Georgia)

3. Andre, Abigail (Attorney for Amici Curiae Apalachee Audubon Society and Ocean Conservancy, St. George Island Civic Club and Plantation Owners, Robert Graham, Gwendolyn Graham, Calhoun County, Franklin County, Liberty County, Jackson County, Florida Coastal Conservation Association, Trip Aukeman, Albert Bryant, Shannon Hartsfield, Lynn Martina, Kevin Martina, Carmen McLemore, Daniel Taunton, Richard Bickel, Thomas Ward, and City of Apalachicola, Florida)

4. Apalachee Audubon Society and Ocean Conservancy (Amicus Curiae in District Court)

5. Apalachicola Bay and River Keeper (Plaintiff in District Court)

6. Atlanta Regional Commission (Appellee / Intervenor)

7. Aukeman, Trip (Amicus Curiae in District Court)

8. Austin Smith, Christina (Counsel for Army Corps of Engineers)

9. Bickel, Richard (Amicus Curiae in District Court)

10. Boies Schiller Flexner LLP (Attorneys for Amicus Curiae Robert Graham)

11. Bryant, Albert (Amicus Curiae in District Court)

12. Calhoun County, Florida (Amicus Curiae in District Court)

13. Carr, Christopher M. (Attorney for Appellee / Intervenor State of Georgia)

14. Chapman, Jeremy J. (District Commander for Mobile District of the U.S. Army Corps of Engineers)

15. City of Apalachicola, Florida (Amicus Curiae in District Court)

16. City of Atlanta, Georgia (Appellee / Intervenor)

17. City of Gainesville, Georgia (Appellee / Intervenor)

17. Cobb-County Marietta Water Authority (Appellee / Intervenor)

19. Coe, Alisa (Attorney for Plaintiffs National Wildlife Federation, Florida Wildlife Federation, and Apalachicola Bay and River Keeper)

20. Connor, Michael L. (Assistant Secretary of the U.S. Army for Civil Works)

21. DeKalb County (Appellee / Intervenor)

22. DeLapp, James A. (Appellee)

23. Drumm, Starr T. (Attorney for Appellant)

24. Dycus, John P. (Attorney for Plaintiffs National Wildlife Federation, Florida Wildlife Federation, and Apalachicola Bay and River Keeper)

25. Earthjustice Legal Defense Fund, Inc. (Law firm representing National Wildlife Federation, Inc., Florida Wildlife Federation, and Apalachicola Bay and River Keeper, Inc.)

26. Ellerhorst, Shelly Jacobs (Attorney for Appellee / Intervenor State of Georgia)

27. Fellows LaBriola, LLP (Attorneys for Appellant)

28. Florida Coastal Conservation Association (Amicus Curiae in District Court)

29. Florida Wildlife Federation (Plaintiff in District Court)

30. Forsyth County (Appellee / Intervenor)

31. Fortuna, John L. (Attorney for Appellees / Intervenors Atlanta Regional Commission, Cobb County-Marietta Water Authority, DeKalb County, Forsyth County, Fulton County, Gwinnett County, City of Atlanta, Georgia, and City of Gainesville, Georgia)

32. Franklin County, Florida (Amicus Curiae in District Court)

33. Fulton County (Appellee / Intervenor)

34. Galloni, Tania (Attorney for Plaintiffs National Wildlife Federation, Florida Wildlife Federation, Apalachicola Bay and River Keeper)

35. Gormley, Neil E. (Attorney for Plaintiffs National Wildlife Federation, Florida Wildlife Federation, Apalachicola Bay and River Keeper)

36. Gwendolyn Graham (Amicus Curiae in District Court)

37. Graham, Robert (Amicus Curiae in District Court)

38. Gray, Michael (Attorney for Appellee Federal Defendants)

39. Gretchen, Michael C. (Attorney for Appellant)

40. Gwinnett County (Appellee / Intervenor)

41. Hartsfield, Shannon (Amicus Curiae in District Court)

42. Hibner, Daniel H. (Division Commander for the South Atlantic Division of the U.S. Army Corps of Engineers)

43. Hill, Brandt P. (Attorney for Appellant)

44. Hufstedler, Jessie (Counsel for Army Corps of Engineers)

45. Jackson County, Florida (Amicus Curiae in District Court)

46. Jon L. Schwartz, Attorney at Law, P.C. (Law firm representing Robert Graham and Gwendolyn Graham, Amici in District Court Action)

47. Jones, Lewis B. (Attorney for Appellees / Intervenors Atlanta Regional Commission, Cobb County-Marietta Water Authority, DeKalb County, Forsyth County, Fulton County, Gwinnett County, City of Atlanta, Georgia, and City of Gainesville, Georgia)

48. Jones Fortuna LP (Attorneys for Appellees / Intervenors Atlanta Regional Commission, Cobb County-Marietta Water Authority, DeKalb County, Forsyth County, Fulton County, Gwinnett County, City of Atlanta, Georgia, and City of Gainesville, Georgia)

49. Kazmarek Mowrey Cloud Laseter LLP (Attorneys for Appellee / Intervenor State of Georgia)

50. Kelley, Jason E. (U.S. Army Corps of Engineers)

51. Kirkland & Ellis LLP (Attorneys for Appellee / Intervenor State of Georgia)

52. Korte, Brett (Attorney for Amicus Curiae Robert Graham)

53. LaBriola, Stephen T. (Attorney for Appellant)

54. Lacour, Jr, Edmund G. (Attorney for Appellant)

55. Lamont, Douglas (Appellee)

56. Law Office of Barbara Sanders (Attorney for Amicus Curiae St. George Island Civic Club and Plantation Owners)

57. Liberty County, Florida (Amicus Curiae in District Court)

58. Malloy, Bonnie (Attorney for Plaintiffs National Wildlife Federation, Florida Wildlife Federation, and Apalachicola Bay and River Keeper)

59. Marshall, Steven (Attorney for Appellant)

60. Martina, Kevin (Amicus Curiae in District Court)

61. Martina, Lynn (Amicus Curiae in District Court)

62. Maynard Nexsen (Attorneys for Appellants)

63. McLemore, Carmen (Amicus Curiae in District Court)

64. Mills, Jon (Attorney for Amici Curiae Robert Graham and Gwendolyn Graham)

65. National Wildlife Federation (Plaintiff in District Court)

66. Neiman Jr., John C. (Attorney for Appellant)

67. Patton Dycas Law, LLC (Attorneys for Plaintiffs National Wildlife Federation, Florida Wildlife Federation, and Apalachicola Bay and River Keeper)

68. Petrany, Stephen J. (Attorney for Appellee / Intervenor State of Georgia)

69. Pinkham, Jaime A. (Principal Deputy Assistant Secretary of the U.S. Army for Civil Works)

70. Primis, Craig S. (Attorney for Appellee / Intervenor State of Georgia)

71. Reichert, Christina I. (Attorney for Plaintiffs National Wildlife Federation, Florida Wildlife Federation, and Apalachicola Bay and River Keeper)

72. Roady, Stephen E. (Attorney for Amicus Curiae Apalachee Audubon Society and Ocean Conservancy)

73. Robinson-Dorn, Michael (Attorney for Amicus Curiae Robert Graham)

74. Sanders, Barbara (Attorney for Amicus Curiae St. George Island Civic Club and Plantation Owners)

75. Schifman, Reuben S. (Attorney for Appellee Federal Defendants)

76. Schwartz, Jonathan L. (Attorney for Amicus Curiae Robert Graham)

77. Semonite, Todd T. (Appellee)

78. Speer, Robert M. (Appellee)

79. Spellmon, Scott A. (Commander and Chief of Engineers of the U.S. Army Corps of Engineers)

80. St. George Island Civic Club and Plantation Owners (Amicus Curiae in District Court)

81. Stack & Associates, P.C. (Attorneys for Amici Curiae Apalachee Audubon Society and Ocean Conservancy and St. George Island Civic Club and Plantation Owners)

82. Stack, Donald J. (Attorney for Amici Curiae Apalachee Audubon Society and Ocean Conservancy and St. George Island Civic Club and Plantation Owners)

83. State of Alabama (Appellant)

84. State of Georgia (Appellee / Intervenor)

85. Sturm, Kimberly A. (Attorney for Amici Curiae Calhoun County, Franklin County, Liberty County, Jackson County, Florida Coastal Conservation Association, Trip Aukeman, Albert Bryant, Shannon Hartsfield, Lynn Martina, Kevin Martina, Carmen McLemore, Daniel Taunton, Richard Bickel, Thomas Ward, and City of Apalachicola, Florida)

86. Swider Berlin Shereff Friedman (Attorneys for Amicus Curiae Apalachee Audubon Society and Ocean Conservancy)

87. Swidler Berlin Shereff Friedman LLP (Law firm representing Apalachee Audubon Society and Ocean Conservancy, Amicus in District Court Action)

88. Taunton, Daniel (Amicus Curiae in District Court)

89. Thrash Jr, Thomas W. (United States District Judge for the Northern District of Georgia)

90. Turner, David C. (Appellee)

91. United States Army Corps of Engineers (Appellee)

92. United States Department of Justice, Environmental and Natural Resources Division (Representing Appellee Federal Defendants)

93. University of California Irvine Environmental Law Clinic (Representing Robert Graham and Gwendolyn Graham, Amici in District Court Action)

94. Vermont Law School Environmental Advocacy Clinic (Representing Calhoun County, Florida; Franklin County, Florida; Liberty County, Florida; Jackson County, Florida; Florida Coastal Conservation Association; Trip Aukeman; Albert Bryant; Shannon Hartsfield; Lynn Martina; Kevin Martina; Carmen McLemore; Daniel Taunton; Richard Bickel; Thomas Ward, and City of Apalachicola, Amici in District Court Action)

95. Ward, Thomas (Amicus Curiae in District Court)

96. Weissman, P.C. (Attorneys for Amici Curiae Calhoun County, Franklin County, Liberty County, Jackson County, Florida Coastal Conservation Association, Trip Aukeman, Albert Bryant, Shannon Hartsfield, Lynn Martina, Kevin Martina, Carmen McLemore, Daniel Taunton, Richard Bickel, Thomas Ward, and City of Apalachicola, Florida)

97. Williams, Jean E. (Attorney for Appellee Federal Defendants)

98. Wormuth, Christine (Secretary of the United States Army Corps of Engineers)

/s/ *Michael T. Gray*
MICHAEL T. GRAY

Counsel for Appellees

## STATEMENT REGARDING ORAL ARGUMENT

The United States believes the Court would benefit from oral argument in this case, as it involves several issues and a lengthy administrative record.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ....... C-1

STATEMENT REGARDING ORAL ARGUMENT

TABLE OF AUTHORITIES ....... iii

INTRODUCTION ....... 1

STATEMENT OF JURISDICTION ....... 2

STATEMENT OF THE ISSUES ....... 3

STATEMENT OF THE CASE ....... 4

A. Statutory and regulatory background ....... 4

B. Factual background ....... 5

1. History of the Corps' actions in the ACF Basin ....... 5

2. The EIS process ....... 8

a. Development of Alternatives ....... 10

i. First phase: water management alternatives ....... 11

ii. Second phase: water supply alternatives ....... 14

iii. Combined Water Supply and Water Management alternatives ....... 16

b. Discussion of environmental impacts ....... 16

c. ROD ....... 18

C. Course of Proceedings ....... 20

D. Standard of Review ....................22

SUMMARY OF ARGUMENT ....................23

ARGUMENT ....................25

I. The Corps complied with NEPA. ....................25

A. The Corps correctly described the environmental baseline and analyzed the impacts of its action. ....................25

B. The Corps adequately analyzed the impacts of its drought operations. ....................30

C. The Corps adequately considered cumulative impacts. ....................35

D. The Corps considered a reasonable range of alternatives. ....................39

E. The Corps adequately considered mitigation measures. ....................44

II. The district court correctly held that the Corps did not violate 33 U.S.C. § 2283(d), as amended by the 2007 WRDA. ....................46

III. The district court correctly denied Plaintiffs' motion for leave to file an amended complaint. ....................54

CONCLUSION ....................59

CERTIFICATE OF COMPLIANCE ....................60

# TABLE OF AUTHORITIES*

## Cases

*Alabama v. U.S. Army Corps of Eng'rs*, No. 90-1331 (N.D. Ala.) ...........................7

*Andrx Pharm., Inc. v. Elan Corp., PLC*,
421 F.3d 1227(11th Cir. 2005) ......................................................................56

*Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin.*,
126 F.3d 1158 (9th Cir. 1997) .......................................................................28

*Baltimore Gas & Elec. Co. v. NRDC*,
462 U.S. 87 (1983).............................................................................................4

*C.A.R.E. Now, Inc. v. F.A.A.*,
844 F.2d 1569 (11th Cir. 1988) .....................................................................35

*Cannon v. City of W. Palm Beach*,
250 F.3d 1299 (11th Cir. 2001) .....................................................................23

*Cascadia Wildlands v. Bureau of Indian Affairs*,
801 F.3d 1105 (9th Cir. 2015) ................................................................ 35, 39

*Citizens Against Burlington, Inc. v. Busey*,
938 F.2d 190 (D.C.Cir.1991)..........................................................................45

*Citizens for Smart Growth v. Secretary of Dept. of Transp.*,
669 F.3d 1203 (11th Cir. 2012) ............................................................ 22, 40, 43

*City of Oxford v. FAA*,
428 F.3d 1346 (11th Cir. 2005) .....................................................................31

*City of Oxford, Ga. v. FAA*,
428 F.3d 1346 (11th Cir. 2005) .....................................................................23

* *Custer County Action Ass'n v. Garvey*,
256 F.3d 1024 (10th Cir. 2001) .....................................................................28

---

* Authorities upon which we chiefly rely are marked with asterisks.

* *Florida Evergreen Foliage v. E.I. DuPont De Nemours & Co.*,
470 F.3d 1036 (11th Cir. 2006) .................................................... 23, 57

*Freeman v. Cont'l Gin Co.*,
381 F.2d 459 (5th Cir. 1967) .........................................................57

*Fund for Animals v. Rice*,
85 F.3d 535 (11th Cir. 1996) .........................................................22

* *Hells Canyon All. v. U.S. Forest Serv.*,
227 F.3d 1170 (9th Cir. 2000) .......................................................28

*Hills Civic Ass'n. v. Federal Highway Admin.*,
772 F.2d 700 (11th Cir. 1985) .................................................... 27, 40

*Holy Cross Wilderness Fund v. Madigan*,
960 F.2d 1515 (10th Cir. 1992) .....................................................41

*I.N.S. v. Cardoza-Fonseca*,
480 U.S. 421 (1987).......................................................................53

*In re ACF Basin Litigation*,
554 F. Supp. 3d 1282 (N.D. Ga., 2021)........................................ 22, 28

*In re ACF Basin Water Litig.*,
2020 WL 7496844 (N.D. Ga. Oct. 22, 2020) ................................. 21, 22, 57, 58

*In re ACF Basin Water Litig.*,
467 F. Supp. 3d 1323 (N.D. Ga. 2020)................................................ 20, 21, 51

*In re Appling*,
848 F.3d 953 (11th Cir. 2017) .......................................................49

*In re MDL-1824 Tri-State Water Rights Litig.*,
644 F.3d 1160 (11th Cir. 2011) ........................................ 5, 6, 7, 8, 58

*Jones v. United States*,
527 U.S. 373 (1999).......................................................................48

*Lamar, Archer & Cofrin, LLP v. Appling*,
138 S. Ct. 1752 (2018) .......... 49

*Lands Council v. Powell*,
395 F.3d 1019 (9th Cir. 2005) .......... 36

*Legal Envtl. Assistance Found. Inc. v. EPA*,
276 F.3d 1253 (11th Cir. 2001) .......... 23

*Louisiana v. U.S. Army Corps of Eng'rs*,
834 F.3d 57 (5th Cir. 2016) .......... 53

*Mann v. Palmer*,
713 F.3d 1306 (11th Cir. 2013) .......... 54

*Maynard v. Board of Regents of Div. of Universities of Florida Dept. of Educ.*,
342 F.3d 1281 (11th Cir., 2003) .......... 56

*N. Buckhead Civic Ass'n v. Skinner*,
903 F.2d 1533 (11th Cir. 1990) .......... 22, 40, 43

*National Wildlife Fed'n*,
75 F.4th 743 (7th Cir. 2023) .......... 48

* *National Wildlife Federation v. U.S. Army Corps of Engineers*,
75 F. 4th 743 (7th Cir. 2023) .......... 46, 47, 51

*Nw. Envtl. Advocates v. National Marine Fisheries*,
460 F.3d 1125 (9th Cir. 2006) .......... 36, 38

*Okanogan Highlands Alliance v. Williams*,
236 F.3d 468 (9th Cir. 2000) .......... 45

*Pub. Citizen, Inc. v. FAA*,
988 F.2d 186 (D.C. Cir. 1993) .......... 26

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989) .......... 4, 44, 45

*Robinson v. Shell Oil Co.*,
519 U.S. 337 (1997) .......................................................................................52

*Savage Servs. Corp. v. United States,*
25 F. 4th 925 (11th Cir. 2022) ......................................................................51

*Sec. & Exch. Comm'n v. Levin*,
849 F.3d 995 (11th Cir. 2017) .......................................................................48

*Sierra Club v. Van Antwerp*,
526 F.3d 1353 (11th Cir. 2008) .......................................................................4

*Smith v. Duff & Phelps, Inc.*,
5 F.3d 488 (11th Cir. 1993) ...........................................................................56

*Theodore Roosevelt Conservation P'ship v. Salazar*,
616 F.3d 497 (D.C. Cir. 2010) ............................................................... 44, 45

*Tongass Conservation Soc'y v. Cheney*,
924 F.2d 1137 (D.C. Cir. 1991) .....................................................................43

*United States ex rel. Hunt v. Cochise Consultancy, Inc.*,
887 F.3d 1081 (11th Cir. 2018),
aff'd, 139 S. Ct. 1507 (2019) .........................................................................52

*United States v. Arizona*,
295 U.S. 174 (1935) .......................................................................................47.

*Van Buren v. United States*,
141 S. Ct. 1648, 1657 (2021) .........................................................................49

*Vermont Yankee Nuclear Power Corp. v. NRDC*,
435 U.S. 519 (1978) .........................................................................................4

*Vill. of Bensenville v. FAA*,
457 F.3d 52 (D.C. Cir. 2006) .........................................................................26

*Waldman v. Conway*,
871 F.3d 1283 (11th Cir. 2017) .....................................................................54

*WildEarth Guardians v. Jewell*,
738 F.3d 298 (D.C. Cir. 2013) .....24

**Statutes**

5 U.S.C. § 706(2)(A) .....22

Fish and Wildlife Coordination Act, 16 U.S.C. §§ 661-667e .....3, 53-57

28 U.S.C. § 1291 .....3

28 U.S.C. § 1331 .....2

33 U.S.C. § 2215(d) .....49

33 U.S.C. § 2282(a) .....49

33 U.S.C. § 2282(a)(4) .....50, 52

33 U.S.C. § 2282a(f)(2) .....48

33 U.S.C. § 2282a(g) .....48, 49

* Water Resources Development Act of 2007, 33 U.S.C. §§ 2283-2283c .....2, 46-53

33 U.S.C. § 2283 .....46

33 U.S.C. § 2283(d) .....20, 47, 49, 52

33 U.S.C. § 2283(d)(1) .....46

33 U.S.C. § 2346 .....50, 52

National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-4347 .....2, 5

§ 4332(2)(C) .....50

§ 4332(2)(E) .....40

§ 4332(C) .....5, 44

Water Supply Act of 1958, 43 U.S.C. § 390b ....................7

Fiscal Responsibility Act of 2023, Pub. L. No. 118-5, 137 Stat. 10 (2023)..............5

Flood Control Act of 1962, Pub. L. No. 87-874, 76 Stat. 1173 ....................6

River and Harbor Act of 1945, Pub. L. No. 79-14, § 2, 59 Stat. 10 ....................5

Rivers and Harbors Act of 1946, Pub. L. No. 79-525, 60 Stat. 634 (1946) ... 3, 6, 54

## Other Authorities

Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 170 (2012) ....................49

* Council on Environmental Quality, Guidance on the Consideration of Past Actions in Cumulative Effects Analysis (2005) ....................36

* Council on Environmental Quality, "Memorandum to Agencies Containing Answers to 40 Most Asked Questions on NEPA Regulations," 46 Fed. Reg. 18,026–01 (Mar. 23, 1981) ....................27

H.R. Doc. No. 300, 80th Cong., 1st Sess. 27-28 (1947)....................6

H.R. Doc. No. 342, 76th Cong., 1st Sess. 77 (1939) ....................5

H.R. Rep. No. 110-80 (2007)....................52

Report of the Special Master, *State of Florida v. State of Georgia*, No. 142 Orig. (Dec. 11, 2019) ....................32

S. Rep. No. 99-126 (1985) ....................51

S. Rep. No. 110-58 (2007) ....................52

Implementation Guidance for Section 2036(a) of the Water Resources Development Act of 2007 (2009), *available at* https://usace.contentdm.oclc.org/utils/getfile/collection/p16021coll5/id/386.....53

## Rules

Fed. R. App. P. 4(a)(1)(B) ....................3

Fed. R. Civ. P. 15(a)....................54

## Regulations

87 Fed. Reg. 23453 (April 20, 2022)....................5

40 C.F.R. Part 1500 (2016)....................5

§ 1500.2(e) ....................40

§ 1502.14....................42

§ 1502.14(a) ....................41

§ 1502.14(f)....................44

§ 1502.16(h) ....................44

§ 1506.8....................50

§ 1508.25(b)(3) ....................44

§ 1508.25(c)(3)....................35

§ 1508.7.................... 5, 35

§ 1508.8....................5

## INTRODUCTION

This case is the latest appeal to arise from the longstanding dispute over the use of waters in the Apalachicola-Chattahoochee-Flint (ACF) river basin. The ACF basin is made up of the Chattahoochee River, which originates in North Georgia, flows southwest past Atlanta, and then flows south along Georgia's border, first with Alabama, then with Florida, where it joins the Flint River to form the Apalachicola River.

The United States Army Corps of Engineers (Corps) manages a series of five reservoir projects pursuant to a Master Water Control Manual (Master Manual) for the ACF Basin, which includes individual reservoir manuals. This case concerns an Environmental Impact Statement (EIS) completed by the Corps to evaluate the environmental impacts of updating the Master Manual. The previous Master Manual was published in 1958. The Corps had attempted to update the Manual since, but those attempts were stymied by decades of litigation. As part of the Master Manual update, the Corps considered longstanding requests by the State of Georgia and others to allocate additional storage capacity in the Basin to accommodate current and future water supply withdrawals.

The Corps' EIS explains in great detail the process the Corps took to arrive at discrete water management and water supply measures that were combined to form the alternatives the Corps evaluated. The EIS explains the environmental

impacts of each alternative as well as the environmental impacts associated with the *status quo*—a "no action" alternative—based on complex, state-of-the-art modeling done by the Corps' technical experts. Based on the information in the EIS, reviews by other Federal, State, and local agencies, Indian Tribes, input from the public, and input from numerous technical experts, the Corps selected an alternative that best serves the public interest and adopted it in a Record of Decision.

Plaintiffs-Appellants National Wildlife Federation and other environmental groups (Plaintiffs) challenge the Corps' Record of Decision and underlying environmental review as arbitrary and capricious, disputing the Corps' technical conclusions in the environmental review as well as the Corps' overall approach, both of which are within the agency's considerable technical expertise. The district court ruled in favor of the Corps, and this Court should affirm.

## STATEMENT OF JURISDICTION

(A) The district court had subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arose under the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-4347; the Water Resources Development Act of 2007 (WRDA), 33 U.S.C. §§ 2283-2283c; the Fish and Wildlife Coordination Act,

(FWCA) 16 U.S.C. §§ 661-667e; and the Rivers and Harbors Act of 1946, Pub. L. No. 79-525, 60 Stat. 634 (1946). R.7.[1]

(B) This Court has jurisdiction under 28 U.S.C. § 1291 because the district court entered a final judgment. R.235.

(C) That judgment was entered on August 12, 2021. R.235. Plaintiffs timely filed their notice of appeal on October 6, 2021. R.243; Fed. R. App. P. 4(a)(1)(B).

(D) The appeal is from final judgment that disposes of all parties' claims.

## STATEMENT OF THE ISSUES

1. Whether the district court correctly concluded that the Corps complied with NEPA when evaluating the environmental impacts of a revised Master Manual for the ACF Basin.

2. Whether the district court correctly concluded that the 2007 WRDA did not require the Corps to develop a specific mitigation plan in its environmental impact statement because the statement is not a "report" within the meaning of that statute.

---

[1] In this brief we use the form R.[docket number-attachment]:[page] for references to the record, such that the reference R.48:2 refers to district court docket entry 48 at page 2. References to the Administrative Record produced by the Corps are in the form ACF-18_[page].

3. Whether the district court correctly denied Plaintiffs leave to amend their complaint.

## STATEMENT OF THE CASE

### A. Statutory and regulatory background

NEPA requires a federal agency to consider the environmental impacts of a proposed major federal action and then "inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983). NEPA contains no substantive environmental standards and mandates no particular result. The statute "is essentially procedural," meant to ensure that federal agencies reach "a fully informed and well-considered decision." *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558 (1978). "NEPA only requires that the agency follow a certain process in deciding whether to take the action." *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1361 (11th Cir. 2008).

To comply with NEPA, an agency must take a "hard look" at the potential environmental consequences of a proposed action. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). The agency must analyze direct and indirect effects of the proposed action, as well as any cumulative impacts. 40

C.F.R. §§ 1508.7, 1508.8.[2] When analyzing proposed major federal actions "significantly affecting the quality of the human environment," the agency must prepare an Environmental Impact Statement (EIS). 42 U.S.C. § 4332(C).

### B. Factual background

#### 1. History of the Corps' actions in the ACF Basin

Congress authorized the system of dams and reservoirs in the ACF Basin under several statutes enacted over several decades of the mid-Twentieth Century. Those statutes adopted plans submitted by the Corps to Congress and thus "fully incorporated the terms of" the Corps' reports as part of the statutory scheme. *In re MDL-1824 Tri-State Water Rights Litig.*, 644 F.3d 1160, 1187 (11th Cir. 2011).

First, in 1939, the Corps of Engineers transmitted a report to Congress recommending development of the ACF Basin for multiple purposes, including navigation, hydroelectric power, national defense, commercial value of riparian lands, recreation, and industrial and municipal water supply. H.R. Doc. No. 342, 76th Cong., 1st Sess. 77 (1939). Congress approved the Corps' plan in the River and Harbor Act of 1945, Pub. L. No. 79-14, § 2, 59 Stat. 10, 17.

---

[2] Both the statute and the regulations implementing it have been amended since the Corps' decision in this case. *See* Fiscal Responsibility Act of 2023, Pub. L. No. 118-5, 137 Stat. 10, 39-46 (2023); 87 Fed. Reg. 23453 (April 20, 2022). All citations in this brief refer to the statutory provisions and regulations applicable at the time of the Corps' decision to adopt the Master Manual. 42 U.S.C. §§ 4321-4347 (1975); 40 C.F.R. Part 1500 (2016).

Second, in 1946, the Corps, in a report that the parties refer to as the Newman Report, recommended several changes to the original plan to provide system-wide benefits for multiple purposes, including flood control, hydropower, navigation, water supply, and recreation. ACF-18_33735. Those changes included reducing the proposed number of locks, dams, and reservoirs from twelve to four and moving one of the proposed hydropower generating dams and reservoirs further upstream from Atlanta to its eventual location in Buford, Georgia. ACF-18_46330 (H.R. Doc. No. 300, 80th Cong., 1st Sess. 27-28 (1947)). The explanation for doing so included "water supply" downstream, *Tri-State Water Rights*, 644 F.3d at 1189, as well as to include sufficient storage in the reservoir for extensive flood control for the basin, which would free up storage in downstream projects for other uses. ACF-18_33735. The report also expected that the federal hydropower plants would operate "as units of an integrated power system" with the existing non-federal projects in the basin. ACF-18_33741. Congress authorized the modified plan in the River and Harbor Act of 1946, Pub. L. No. 79-525, § 1, 60 Stat. 634, 635.

Third, in 1962, Congress completed the system by authorizing the construction of a fifth dam, to be located at West Point, Georgia. *See* Flood Control Act of 1962, Pub. L. No. 87-874, § 203, 76 Stat. 1173, 1182.

To govern operations at its system of dams and reservoirs, the Corps issues a Master Manual, including separate reservoir regulation manuals for each project. The Corps issued its first manuals for the ACF system in 1958 and 1959. By 1989, significant growth in the Atlanta area led the Corps to consider reallocating storage in the Buford Project to water supply under the authority of the Water Supply Act of 1958, 43 U.S.C. § 390b. The Corps prepared a draft Post Authorization Change ("PAC") Report and a draft of an updated Water Control Manual to govern operations in the ACF Basin. *Tri-State Water Rights*, 644 F.3d at 1174.

When the Corps issued the draft PAC report, Alabama immediately filed suit. *Alabama v. U.S. Army Corps of Eng'rs*, No. 90-1331 (N.D. Ala.). Two decades of litigation filed by multiple parties in multiple courts ensued, culminating in this Court's decision in *Tri-State Water Rights*. The draft PAC Report was never finalized, and during that entire period the Corps was "thwarted by the litigation process" from reaching any final decisions to revise either its Master Manual or the individual reservoir manuals in the ACF Basin. 644 F.3d at 1182, 1184.

This Court's decision in *Tri-State Water Rights* both freed the Corps to revise its Master Manual and significantly clarified the legal landscape as it pertains to the Corps' authority to include storage in the Buford Project for water supply. Following that decision, the Corps completed an extensive legal and

technical analysis of its water supply authority at the Project. As part of the analysis, the Corps concluded that it had authority to accommodate Georgia's request for storage at the Buford Project to facilitate withdrawals both downstream of the Project and from the reservoir itself, subject to NEPA analysis. ACF-18_33734

### 2. The EIS process

Because the Master Manual had not been formally updated since the late 1950s, the Corps had to review all of its water management activities in the basin including, for example, managing storage for flood control, hydropower generation, and drought management, in light of its clarified authorities following *Tri-State Wate Rights*. That extensive review necessitated drawing on the Corps' experience with conditions in the basin in the intervening decades, including a new drought of record, as well as ensuring continued compliance with, among other things, the Endangered Species Act. The result was a years-long, comprehensive, public process reviewing every aspect of the Corps' management of its projects in the ACF basin.

The Corps' EIS first "identifies, documents, and evaluates the environmental effects of operating [Corps] projects in the ACF Basin under alternative management regimes that could reasonably be expected to accomplish the purpose and need of the proposed federal action." ACF-18_54038. The purpose and need

for this action was "to determine how [Corps] projects in the ACF Basin should be operated for their authorized purposes in light of current conditions and applicable law and to implement those operations through updated water control plans and manuals." ACF-18_54035.

Consistent with NEPA regulations, the Corps began the EIS process with a notice of intent and a public scoping process. ACF-18_54039. More than a thousand stakeholders participated in scoping meetings resulting in 3,600 comments. *Id.*; ACF-18_56651-56689. Based on input from stakeholders, the Corps developed screening criteria to guide its gathering of information to help identify solutions and to formulate alternatives. ACF-18_5404. Those criteria called for any proposed measure or alternative considered in the update process for the Master Manual to:

- Meet the purpose and need of the proposed federal action
- Address one or more of the congressionally authorized project purposes
- Maintain at least the current level of flood risk management
- Be consistent with the contemporary water resources needs of the basin to the extent practicable
- Support the operation of the projects in the ACF Basin as a system
- Not increase the risk to public safety in the facility or downstream of the project
- Not exceed the physical limitations or pose risks to the structural integrity of the projects

- Not violate Corps responsibilities under the ESA

ACF-18_54040; ACF-18_54389-90.

Based on those criteria, the Corps produced a draft EIS published in the Federal Register in October 2015. ACF-18_42071. At the request of numerous stakeholders, the Corps extended the comment period several times, giving interested parties more than 100 days to comment. ACF-18_54040. The Corps considered all comments received on the draft EIS, and it modified the proposed alternatives and analysis in response to those comments. ACF-18_54041. The final EIS was published in December 2016 and on March 3, 2017, the Corps issued a Record of Decision (ROD), adopting the new Master Manual. ACF-18_149.

**a. Development of Alternatives**

Updating the Master Manual involved considering both "water management alternatives to refine project operations to more effectively meet authorized project purposes" as well as "an expanded range of water supply options." ACF-18_54044. Because the Corps could have elected to take a variety of actions related to either "water management" *or* "water supply" it was important to evaluate alternatives within each class separately. Therefore, the Corps proceeded in two phases. ACF-18_54044; ACF-18_54388; ACF-18_54472.

#### i. First phase: water management alternatives

During the first phase of its analysis, the Corps considered alternatives "focused on updating and improving overall system operations," ACF-18_134, with revisions and updates to current water management practices for the five reservoirs in the ACF Basin "with specific consideration given to methods of more effectively operating the projects as a system." ACF-18_54044. Technical experts within the Corps developed a wide array of water management measures that they then screened and ultimately combined into distinct water management alternatives. ACF-18_54044; ACF-18_54388. To discretely evaluate the impacts of those alternatives, the Corps assumed in this first phase of analysis that the water-supply withdrawals from Lake Lanier would be limited to the net withdrawals already authorized, as well as the withdrawals (and returns) actually made downstream of Lake Lanier and throughout the basin in the year 2007. ACF-18_54044. Holding water supply constant at a level that did not include new withdrawals, or withdrawals dependent on a new reallocation of storage, allowed the Corps to compare "performance of the water management alternatives using a consistent baseline condition that is relatively independent of the influence of the [new] water supply withdrawals." ACF-18_54044.

Corps technical experts identified challenges associated with current operations and identified several specific objectives to guide the development of water management alternatives, including:

- Defining "action zones" (partitions of reservoirs' conservation storage) on a scientific basis that eliminates disproportionate impact on particular reservoirs, ACF-18_54399-405;
- Developing a basin-wide drought operation plan and modifying operations to avoid prematurely triggering drought operations, ACF-18_54405-09;
- Reducing or eliminating adverse effect of system operations on federally listed threatened and endangered species, ACF-18_54416-22;
- Increasing the reliability of navigation on the ACF system and generally improving performance of the congressionally authorized project purposes, ACF-18_54410.

ACF-18_54045.

Next, the Corps developed specific "management measures"—discrete operational features or activities to address one or more objectives—based on input from the public and stakeholders received through the scoping process as well as the Corps' experience with the ACF project operations. ACF-18_54045. Those management measures included, for instance, changes to the way the reservoirs were drawn down and refilled within the course of a year, changing the "action zones," balancing zone drawdown proportionally among the various projects within the ACF system, making changes hydroelectric power generation, changing

drought operations and environmental flows, and developing navigation specific operations. ACF-18_54045.

The specific water management measures considered for each reservoir and the ACF project as a whole during the first phase of analysis included:

- Revised guide curves and actions zones, ACF-18_56745;
- Changes to drought operations, ACF-18_54407;
- Changes to minimum flows at Peachtree Creek, ACF-18_54407;
- Changes to hydropower operations, ACF-18_56753;
- Operational changes to support navigation, ACF-18_56753;
- Changes to facilitate Fish and Wildlife conservation, ACF-18_545416, ACF-18_56750;
- Changes in the computation of Basin Inflow, ACF-18_54414, ACF-18_56757;

ACF-18_54049. Those water management alternatives were then combined in various formulations to make up seven discrete water management alternatives including a "no action" alternative that represented current operations. *See* ACF-18_54050 at Table ES-2. The Corps then developed a process to rank the performance of the alternatives based on sophisticated modeling results, treating each project purpose as equal. ACF-18_54051; ACF-18_544470; ACF-18_54458. As a result of this ranking and evaluation process, the Corps identified Alternative

7 as the preferred Water Management Alternative. ACF-18_54470; ACF-18_54458.

#### ii. Second phase: water supply alternatives

In the second phase, the Corps considered "whether and how to accommodate current and future" demands for municipal and industrial water supply, including Georgia's water supply request. ACF-18_54044-45; ACF-18_54472. The Corps identified an array of water supply options that were combined with either the "no action" alternative or the proposed alternative (Water Management Alternative 7) to form combined ACF water Management/Water Supply alternatives for detailed evaluation and impact analysis. ACF-18_54052.

The Corps' objectives for the Water Supply phase were to improve the overall operation of the ACF Basin's dam-and-reservoir system as well as to "determine whether and in what amount to reallocate storage in Lake Lanier to support additional environmentally sustainable withdrawals for MI [municipal and industrial] water supply while ensuring sufficient water is available to meet other ACF authorized project purposes." ACF-18_54052. As with its development of the Water Management alternatives, when it came to Water Supply, the Corps developed and screened discrete management measures that would be considered and then combined to form alternatives. Those measures included:

- Water conservation and water use efficiency programs (including potable water reuse), ACF-18_54477;

- Groundwater supplies, ACF-18_54477;
- Desalination and pumping to service areas, ACF-18_54477;
- New nonfederal reservoirs, ACF-18_54478;
- Existing surface water sources (other than Lake Lanier), ACF-18_54478;
- Reallocation of Lake Lanier flood risk management, ACF-18_54478;
- Storage reallocation from inactive storage in Lake Lanier, ACF-18_54478;
- A proposed Glades Reservoir, ACF-18_54478;
- Reallocation of Lake Lanier conservation storage, ACF-18_54478;

ACF-18_54052.

After evaluating those measures, the Corps concluded that reallocation of Lake Lanier conservation storage was “the most viable and cost effective measure to meet the water supply need.” ACF-18_54053. The Corps determined that the other potential measures “(1) would not satisfy the identified need for water supply (2) would not be cost effective and or (3) would involve other more significant consequences.” *Id.* The Corps therefore moved forward with a more in-depth analysis of alternatives based on a reallocation of Lake Lanier’s conservation storage. Additionally, because some portion of the municipal and industrial water that is removed from the Lake becomes wastewater that is treated and ultimately added back to the Basin, the Corps modeled the various returns as well as withdrawals of water under various assumptions. ACF-18_54054-55 (Table ES-4 ).

#### iii. Combined Water Supply and Water Management alternatives

Having evaluated individual measures related to both Water Supply and Water Management, then combined each into discrete alternatives, the Corps next combined the Water Management alternatives with the Water Supply alternatives to create a set of combined alternatives. Those alternatives could then be compared to each other and to a "no action" alternative. The resulting nine alternatives—delineated as Alt1A, Alt1L, and Alt7A-Alt7M—represent a variety of water management measures as well as water supply measures. *See* ACF-18_54058-59 (Table ES-5 showing Summary of Considered Alternatives). The alternatives vary in which measures they implement, whereas the "no action" alternative (Alt1A), "represents no change from the current management direction or level of management intensity." ACF-18_54485.

### b. Discussion of environmental impacts

The EIS provides a thorough discussion of environmental impacts—both beneficial and adverse—as well as cumulative effects and mitigation measures. It is not possible to fully detail the comprehensive discussion of impacts in the space of this brief, but this section seeks to highlight some of the high-level structure and significant particularities of the Corps' analysis.

The discussion of environmental impacts in the EIS begins by identifying a baseline, the "affected environment:" a description of the "physical and social

conditions of the geographic area in which the impacts of the proposed action and alternatives are expected to occur" which serves as "a baseline from which potential environmental and socioeconomic effects likely to result from proposed changes . . . will be identified and evaluated." ACF-18_54106. The "affected environment" baseline incorporates cumulative impacts and changes over the Basin's history as well as an issue-by-issue discussion that spans hundreds of pages in the body of the EIS and even more in the appendices. Some of the primary topics it covers include: Water resources (including water quality, surface water, ground water, estuaries), ACF-18_54106-64; Water management (including detailed descriptions of the project purposes, water withdrawals, consumptive uses and return flows, inter-basin transfers, water planning and conservation), ACF-18_54164-232; Geology and soils, ACF-18_54263-84; Climate, ACF-18_54285-88; Land Use, ACF-18_54289-300; Biological resources (including vegetation, wildlife, fish, and endangered species), ACF-18_54300-32; Socioeconomic information (including affected population information, employment, environmental justice as well as to water demand, water withdrawals, navigation, agricultural water supply, power generation, flood risk, recreation), ACF-18_54332-60; Aesthetic resources, ACF-18_54360-61; Air quality, ACF-18_54361-62; Noise ACF-18_54362-63; Traffic and transportation, ACF-

18_54363-64; Cultural resources, ACF-18_54364-72; and Hazardous and toxic materials, ACF-18_54372.

The EIS also discusses in detail the environmental consequences of the proposed alternatives. As with the discussion of the environmental baseline, the vast scope of the discussion defies full inclusion here. However, even a summary of some of the main topics addressed exhibits the thoroughness of the consequences considered: Water quantity (including flow conditions, drought, navigation, water supply), ACF-18_54541-651; water quality (including temperature, dissolved oxygen, phosphorus, nitrogen), ACF-18_54651-736; geology and soils, ACF-18_54803-08; land use, ACF-18_54808-20; biological resources (including fish, wildlife, vegetation and protected species), ACF-18_54820-98; Socioeconomic impacts (including water supply, navigation, hydroelectric power, agricultural water, oysters in Apalachicola Bay, flood risk, recreation, environmental justice, protection of children), ACF-18_54898-914; aesthetic resources, ACF-18_54914-15; cultural resources, ACF-18_54915-17; climate change, ACF-18_54917-20; cumulative impact, ACF-18_54920-24; and mitigation, ACF-18_54924-26.

**c. ROD**

Ultimately, the Corps selected Alternative 7K, which the Corps concluded "would update the Master WCM and individual project water control plans to

operate the federal projects as a balanced and integrated system to meet all authorized project purposes in the ACF Basin, and would formally accommodate current and projected water supply uses of Lake Lanier." ACF-18_131. That alternative included several key water management measures and other features. For example, it maintained the current guide curves at the reservoir projects without making any structural changes. *Id.* It revised the action zones "to promote more effective use of conservation storage throughout the system to meet authorized purposes." *Id.* It updated and formalized a basin-wide drought operations plan "to more effectively" operate the system in drought conditions similar to those "that have been experienced in the basin since the original Master WCM was issued." *Id.* It provided a "more predictable navigation channel." *Id.* It prescribed the operations at Jim Woodruff Lock and Dam, the southernmost dam in the system, to support compliance with the Endangered Species Act. ACF-18_132. It continued releases to support water quality. ACF-18_133. And it provided releases for downstream water supply and reallocated storage in the Buford Project to support direct water supply withdrawals from the reservoir. *Id.*

### C. Course of Proceedings

Shortly after the Corps issued its ROD, the State of Alabama and Plaintiffs in this suit filed separate complaints.[3] Plaintiffs claimed the Corps violated NEPA (Count I), the 2007 WRDA (Count II), and the FWCA (Count III). The State of Georgia, the City of Atlanta, and entities charged with providing municipal water in northern Georgia (the Water Supply Providers) each intervened as defendants.

The Water Supply Providers filed a motion under Rule 12(c) for judgment on the pleadings as to Plaintiffs' WRDA and FWCA claims. R.116. The Corps joined in the motion. R.120. The district court granted defendants judgment on the pleadings as to those claims, concluding first that the 2007 WRDA did not require the Corps to prepare a "specific mitigation plan" because the EIS was not a "report" submitted to Congress under the meaning of the statute. 33 U.S.C. § 2283(d). *In re ACF Basin Water Litig.*, 467 F. Supp. 3d 1323, 1334 (N.D. Ga. 2020). The district court also granted judgment on the pleadings against Plaintiffs' FWCA claim. Plaintiffs asserted that the Corps violated the statute "by failing to give fish and wildlife conservation equal consideration to other project purposes," and by "prioritizing other project purposes over fish and wildlife conservation." R.7:53. But the statutory language Plaintiffs cited "unambiguously impose[d] no

[3] The district court also granted judgment to the Corps in Alabama's suit, and Alabama filed a notice of appeal. That appeal has been held in abeyance. See 11th Cir. Dkt. 61.

[such] duty over the Corps." *In re ACF Basin*, 467 F. Supp. 3d at 1335. Finally, although the Water Supply Providers had also argued that Plaintiffs could not state a claim under section 663 of that Act, *see* R.116:23-25, Plaintiffs' opposition asserted that Plaintiffs "ha[d] not … made a claim under Section 663." R.122:24. The district court therefore declined to address that section.

Plaintiffs then sought leave to amend their complaint to include two new claims. R.152. First, Plaintiffs asserted a FWCA claim based on Section 663 of that statute—the same provision on which it had earlier disclaimed reliance. Second, Plaintiffs attempted to revive their theory that fish and wildlife conservation was a "project purpose entitled to equal consideration" by relying on a different statute, the Rivers & Harbors Act of 1946. *See* R.152:14. The Corps opposed leave to amend as untimely, R.154, while the Water Supply Providers opposed as both untimely and futile, R.155.

The district court denied leave to amend because the amendments were futile. *In re ACF Basin Water Litig.*, 2020 WL 7496844, at *2 (N.D. Ga. Oct. 22, 2020). As to the FWCA claim, the district court noted that Section 663 requires only those "provisions for wildlife conservation that are consistent with the project's primary purpose," and that the FWCA otherwise "creates no mandate requiring the Corps to give equal consideration to fish and wildlife conservation as a co-equal purpose of all Corps projects." *Id.* at *2. The court likewise concluded

that the Rivers and Harbors Act claim was futile, explaining that Plaintiffs "failed to identify any statutory basis for the duties allegedly violated by the Corps." *Id.* at *4.

In January 2021, the parties filed cross-motions for summary judgment on Plaintiffs' remaining NEPA claim. R.168-1, R.201, R.213. The district court granted Defendants' motions in full, holding that "the Corps' years-long analysis of the ACF Basin clearly meets NEPA's procedural requirement." *In re ACF Basin Litigation*, 554 F. Supp. 3d 1282, 1307 (N.D. Ga. Aug. 11, 2021). This appeal followed.

**D. Standard of Review**

This Court reviews the district court's grant of summary judgment on Plaintiffs' NEPA claim de novo, applying the standard for reviewing agency action under the APA. *Citizens for Smart Growth v. Secretary of Dept. of Transp.*, 669 F.3d 1203, 1210 (11th Cir. 2012). Under the APA, a court holds agency action unlawful that it finds to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The "arbitrary and capricious" standard of review is "exceedingly deferential." *Fund for Animals v. Rice*, 85 F.3d 535, 541 (11th Cir. 1996); *see also N. Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1538 (11th Cir. 1990) ("Along the standard of review continuum, the arbitrary and capricious standard gives an appellate court the least

latitude in finding grounds for reversal."). And the burden to establish that agency action is arbitrary or capricious lies with Plaintiffs. *Legal Envtl. Assistance Found. Inc. v. EPA*, 276 F.3d 1253, 1265 (11th Cir. 2001) ("[A] party seeking to have a court declare an agency action to be arbitrary and capricious carries a heavy burden indeed."). In conducting review under the APA, the "reviewing court may not substitute its judgment for that of the agency but must, instead, defer to the agency's technical expertise." C*ity of Oxford, Ga. v. FAA*, 428 F.3d 1346, 1352 (11th Cir. 2005).

This Court reviews de novo a decision granting judgment on the pleadings. *Cannon v. City of W. Palm Beach*, 250 F.3d 1299, 1301 (11th Cir. 2001). The district court's decision denying Plaintiffs' motion for leave to amend on futility grounds is reviewed de novo. *Florida Evergreen Foliage v. E.I. DuPont De Nemours & Co.*, 470 F.3d 1036, 1040 (11th Cir. 2006).

## SUMMARY OF ARGUMENT

1. The Corps EIS studying the impacts of revising its Master Manual for the ACF Basin analyzed direct, indirect, and cumulative impacts on a wide array of resources. Plaintiffs take issue with the Corps' extensive analysis, contending that the analysis ignored impacts from previous operations in the basin, and failed to adequately consider alternatives, drought operations, cumulative impacts, and mitigation measures. To the contrary, the Corps employed its considerable

technical expertise to assess each of those areas and then to determine in how much detail to address particular impacts in the EIS. Courts have long recognized that "[t]he NEPA process involves an almost endless series of judgment calls, and the line-drawing decisions necessitated by the NEPA process are vested in the agencies" not in Plaintiffs, nor courts. *WildEarth Guardians v. Jewell*, 738 F.3d 298, 311-12 (D.C. Cir. 2013) (internal quotation and citation omitted)). The Corps' 1,000-page EIS reasonably analyzed the impacts associated with the manual update and complied with NEPA.

In sum, the Corps' discussion of the environmental impacts of the proposed action is thorough and complete, more than sufficient to show the Corps took a "hard look" at the potential environmental consequences of the proposed action. This Court should affirm.

2. The Corps did not violate the 2007 WRDA. That statute requires the Corps to include a "specific mitigation plan" when it prepares "any report" that selects "a project alternative." But it is clear from the surrounding context that the "reports" being covered by that section are reports to Congress, not environmental impact statements. As both the district court and the Seventh Circuit have concluded, an EIS that is not submitted to Congress is not such a report, and thus there was no requirement to include a "specific mitigation plan" in the EIS.

3. Finally, the district court did not err when it denied Plaintiffs leave to amend their complaint to add two new claims three years after filing the initial complaint. One of those claims Plaintiffs had expressly disclaimed in briefing on a motion for judgment on the pleadings. The other merely restated an already dismissed claim, but citing different statutory authority. The district court denied leave to amend on futility grounds, and the amendments were indeed futile. But this Court may also affirm on any ground that appears in the record, and the combination of Plaintiffs' delay and their seeking to test alternate legal theories seriatim also provides a sound basis on which to affirm the district court's denial of leave to amend.

## ARGUMENT

### I. The Corps complied with NEPA.

#### A. The Corps correctly described the environmental baseline and analyzed the impacts of its action.

Plaintiffs contend that the Corps did not capture the effects of revision to the Master Manual because the then-existing operations had not themselves undergone NEPA review, and thus the Corps should have instead studied its proposed action against a hypothetical environment that does not exist and has never existed. Op. Br. 20-27. To the contrary, by accurately describing the baseline environmental conditions as they developed under the Corps' actual operation of the ACF system, the Corps captured any environmental effects from the then-existing operation,

allowing it to study the impacts of its proposed actions on the environment as it existed, as NEPA contemplates.

The EIS exhaustively characterizes that baseline environment, describing the "physical and social conditions of the geographic area in which the impacts of the proposed action and alternatives are expected to occur" which serves as "a baseline from which potential environmental and socioeconomic effects likely to result from proposed changes . . . will be identified and evaluated." ACF-18_ 54106. That description of the "affected environment" baseline incorporates an issue-by-issue discussion spanning hundreds of pages in the body of the EIS and even more in the appendices. *E.g.*, ACF-18_ 54106-372. And Plaintiffs point to no specific flaws in the Corps' description of the existing environmental conditions in the ACF Basin.

By describing the environment as it actually existed when the Corps was considering how to revise the Master Manual, the Corps captured the past effects on the environment of its then-existing operations. And "judgments regarding the development of the baseline against which alternatives would be assessed are the sorts of expert analytical judgments to which courts typically defer." *Vill. of Bensenville v. FAA*, 457 F.3d 52, 72 (D.C. Cir. 2006); *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 196–97 (D.C. Cir. 1993); *Druid Hills Civic Ass'n. v. Federal*

*Highway Admin.*, 772 F. 2d 700, 709 (11th Cir. 1985) ("Balancing of the substantive environmental issues is consigned to the judgment of the agency.").

The Corps then appropriately compared that existing environment to the expected effects of the no-action alternative and the various action alternatives. Doing so was entirely consistent with the NEPA regulations and guidance issued by the Council on Environmental Quality. *See* "Memorandum to Agencies Containing Answers to 40 Most Asked Questions on NEPA Regulations," 46 Fed. Reg. 18,026–01 (Mar. 23, 1981). As that guidance explains, when an agency already has "ongoing programs initiated under existing legislation," then "'no action' is 'no change' from current management direction or level of management intensity." *Id.* at 18027. Thus, "the 'no action' alternative may be thought of in terms of continuing with the present course of action until that action is changed." *Id.* Otherwise, to attempt to compare a proposed action to "an alternative that is based on no management at all would be a useless academic exercise." *Id.*

Plaintiffs contend, however, that the Corps' conclusion that continuing the current operations (that is, the no-action alternative) would have negligible effect on the environment was erroneous because those operations have already impacted the environment and thus will continue to do so. Op. Br. 21 & n.15. But Plaintiffs point to no specific impacts that the Corps missed in describing the affected environment. Instead, the Corps identified the impacts from operating the ACF

system in the environmental baseline; any additional impacts from *continuing* those decades-long operations were, as one would expect, negligible. ACF-18_54803-34; ACF-18_ 548935; ACF-18_ 54849; ACF-18_ 54859.

As the district court correctly recognized, the Corps was not required to compare the no action alternative (or the action alternative, for that matter) to "environmental conditions that no longer exist" because decades have passed since the system was constructed. *See In re ACF Basin Water Litig.*, 554 F. Supp. 3d at 1303. Nor was the Corps required to rely on "artificial, historical baseline[s]" rather than the "realities" it faced on the ground. *Id*. *See also Custer County Action Ass'n v. Garvey*, 256 F.3d 1024, 1040 (10th Cir. 2001) ("The requirement to consider a no-action alternative does not provide Petitioners a vehicle in which to pursue allegations that past [agency] actions received insufficient environmental analysis."); *Hells Canyon All. v. U.S. Forest Serv.*, 227 F.3d 1170 (9th Cir. 2000) (rejecting attempt to require artificial, historical baseline); *Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin.*, 126 F.3d 1158, 1188 (9th Cir. 1997).

Finally, Plaintiffs briefly object to the Corps' conclusion that the impacts of the proposed action compared to the no-action alternative would be "slight" or "negligible" because the Corps, according to Plaintiffs, "only measured the impacts of its action on the amount of downstream water flows" and not on "the environment." Op. Br. 26-27. To start, flows in the system are part of the

environment, not something separate from it. And as Plaintiffs themselves argue, the flow regime is a significant driver of environmental impacts in the ACF Basin, and one over which the Corps has a measure of control. Op. Br. at 41, 46, 49. Analyzing incremental changes to instream flow is thus a meaningful method of assessing an action's effects upon the many riverine resources—whether they be biological, recreational, or chemical—that vary with such flow levels.

Regardless, Plaintiffs also never grapple with the actual data and analysis presented in the EIS. The EIS explains that "discharge rates on the Apalachicola River are similar across alternatives. Flow conditions downstream . . . for the proposed alternatives *would not be appreciably different* from flow conditions under the [no-action alternative]." ACF-18_54848 (emphasis added). But the Corps did not simply stop its analysis at that point and rely entirely on the negligible changes in the flow conditions. For example, the Corps examined predicted conditions in Apalachicola Bay and determined that there would be negligible changes in salinity and other water quality parameters—an unsurprising result given the negligible changes in water flow. ACF-18_54859. The EIS then took the next step and examined whether the negligible changes in flow resulting in negligible changes in salinity would have any other environmental impacts and concluded that "negligible effects would be expected to the terrestrial vegetation communities, freshwater and estuarine wetland communities, and terrestrial

wildlife resources including birds migratory and coastal mammals and insects and other invertebrates" in the Bay. ACF-18_54859. That result was confirmed by separate salinity modeling. *Id.* (citing Paramygin and Sheng 2015). The Corps' analysis was sound and correctly upheld by the district court.

### B. The Corps adequately analyzed the impacts of its drought operations.

The Corps considered in detail the environmental impact of operational changes meant to better respond to drought. The proposed alternative "would take a more proactive approach" to keeping water in the reservoir relative to the "no action" alternative, resulting in a "slightly beneficial overall effect" to system operations. ACF-18_ 54072. Under the plan, drought operations would likely occur more frequently over longer periods, more appropriately responding to the "conditions similar to those experienced several times over the modeled period of record" and also better positioning the Corps to respond to a more severe drought in future. ACF-18_ 54072.

Plaintiffs argue that the Corps characterizes the changes to drought operations as "slight" without examining whether "slight" changes "could nevertheless have profound impacts on the environment." Op. Br. 28-29. This is at bottom the same objection—and same mistake—that Plaintiffs make with respect to the environmental baseline, and the argument should be rejected for the same reasons. The Corps' examination of the impacts of drought operations in the EIS is

extensive, fully satisfying NEPA's "hard look" requirement. To start, the Corps was correct to describe the changes as slight. The "no action" and proposed action "both include current ramping rates, suspension of ramping rates in drought, and current minimum flow provisions [at key locations] on the Apalachicola River. . ." which flows into the Bay. ACF_18_54860. The EIS concludes therefore that "neither the flows nor the quality of the water entering Apalachicola Bay from the river would change appreciably under any of the proposed alternatives" and as a result there would not be adverse impacts, including on commercial fisheries in the Bay and essential fish habitat "by implementing any of the alternatives." ACF-18_54860. That technical conclusion is entitled to deference, *see City of Oxford v. FAA*, 428 F.3d 1346, 1352 (11th Cir. 2005), and Plaintiffs have offered nothing that shows it was arbitrary.

The Corps' analysis of drought operations was thorough and complete. The Corps notes historic droughts and their impacts on the Basin as part of the Corps' discussion of the affected environment. ACF-18_ 54112-14. The Corps then describes the current drought operations, which involve a technical series of steps and trigger points for the various reservoirs to guide the Corps "in reducing flow releases as pool levels drop as a result of drier than normal or drought conditions." ACF-18_ 54405-06. The EIS then describes particular drought-plan revisions as water management measures considered in the EIS which do not induce greater

drought (as drought is a natural phenomenon outside the Corps' control) but rather modify operations so that when drought does occur environmental impacts are less severe. ACF-18_ 54407.

In evaluating drought operations, the Corps used the state-of-the-art Reservoir System Simulation model developed by technical experts within the Corps' Hydrologic Engineering Center (HEC) (called the "HEC-Res-Sim" model or "ResSim") to simulate conditions in the Basin under the proposed drought operations plan. Doing so allowed the Corps to compare alternative drought operation regimes against real-world historical data. ResSim is the "standard for [Corps] reservoir operations modeling." ACF-18_ 54046; *see generally* ACF-18_56689 (Appendix E, HEC-ResSim Modeling Report). In evaluating an interstate water dispute original action in the Supreme Court, the Supreme Court Special Master noted he "place[s] significant weight modeling done using Res-Sim" as the Corps showed it "is the tool most capable of faithfully representing reservoir operations." Report of the Special Master at 57 n.38, *State of Florida v. State of Georgia*, No. 142 Orig. (Dec. 11, 2019) (internal marks and citation omitted).

Here, the Corps used the ResSim software to create a model of the ACF basin to simulate and evaluate operations using the various measures considered over a seventy-three year hydrologic period of record (1939-2011). ACF-

18_54046; ACF-18_56697. In other words, the Corps was able to "test" how different operational changes to drought operations and other water management changes would impact the reservoir using real-world hydrology, rainfall, and other data. *See generally* ACF-18_56697. That model allows the Corps to develop a meaningful comparison between alternatives using historical data.

The EIS devotes an entire subchapter to the environmental consequences of the various alternative drought operations regimes, ACF-18_54634, concluding that the proposed alternative would have a "slightly beneficial" effect on the environment as it would enable the Corps to operate its projects "more effectively in response to drought conditions" and "better position [the Corps] to address a more severe drought of record in the future." *Id.* The EIS also describes how the number of times that drought operations are triggered and the length of time that drought operations are in effect have implications for other natural resources, with those effects addressed in the discussion of the particular resources. *See*, *e.g.*, ACF-18_ 54806 (more consistent lake levels during drought operations protect shorelines from erosion); ACF-18_ 54835 (vegetation and wildlife along Apalachicola River "would be expected to experience short-term slight adverse conditions" during drought operations); ACF-18_ 54860 (even under extreme drought conditions operations should not adversely affect estuaries and associated

fish resources). The Corps took a hard look at the impacts of drought operations, and its thorough analysis was not arbitrary or capricious.

Finally, the triggering of drought operations under the proposed alternative does not induce or exacerbate drought conditions, as Plaintiffs appear to suggest. When there is drought, there is reduced rainfall, and flows will be reduced no matter what the Corps does. The question facing the Corps was how to manage that reduced flow, and what the impacts of those management choices would be as compared to the then-prevailing drought plan. As explained in the EIS, the earlier and more frequent triggering of drought operations under the proposed alternative reflects a more proactive approach to the onset of low-flow conditions from the lack of rain, enabling the Corps to better conserve storage during naturally occurring droughts. ACF-18_54112; 54634. By conserving water in reservoirs more proactively, the Corps ensures that it can provide sufficient flow to meet its requirements under the ESA and other statutes for as long as possible, even in historic drought. Thus, while drought *operations* would occur more frequently under the proposed alternative, "[c]omposite conservation storage values for the reservoirs would tend to remain higher for a greater portion of the modeled period than under the NAA." ACF-18_54638. The Corps fully considered and disclosed the environmental impacts of proposed changes to drought operations.

### C. The Corps adequately considered cumulative impacts.

Plaintiffs suggest that the Corps failed to consider cumulative impacts. Op. Br. 31. "NEPA requires that a federal agency examine not only the impact directly attributable to one project, but also the cumulative effects of that project." *See C.A.R.E. Now, Inc. v. F.A.A.*, 844 F.2d 1569, 1574 (11th Cir. 1988); 40 C.F.R. § 1508.25(c)(3). A "cumulative impact" is defined as:

> the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7.

Primarily, Plaintiffs' contention is a repeat of their contention that the Corps failed to examine the past impacts of its operations that themselves did not undergo NEPA review. Op. Br. 32-33. But in conducting a cumulative impacts analysis, an agency "may satisfy NEPA by aggregating the cumulative effects of past projects into an environmental baseline, against which the incremental impact of a proposed project is measured." *See Cascadia Wildlands v. Bureau of Indian Affairs*, 801 F.3d 1105, 1111 (9th Cir. 2015). As the CEQ guidance explains, agencies generally may "conduct an adequate cumulative effects analysis by focusing on the current aggregate effects of past actions without delving into the historical details of individual past actions." Council on Environmental Quality,

Guidance on the Consideration of Past Actions in Cumulative Effects Analysis (2005) at 1.

The Guidance also reiterates that "[a]gencies retain substantial discretion as to the extent of such inquiry and the appropriate level of explanation." *Id.* at 2. The degree of detailed data about the effects of past projects that is required largely depends on the degree to which such data is useful to the analysis of alternatives presented for the current project. *See Nw. Envtl. Advocates v. National Marine Fisheries*, 460 F.3d 1125, 1140 (9th Cir. 2006) (reasoning that, in light of the present-day studies showing that deepening would have little or no impact on salinity, a detailed cataloguing of past projects' effects on salinity was unnecessary, as it "would not have informed assessments about the project and its alternatives"); *Lands Council v. Powell*, 395 F.3d 1019, 1027-28 (9th Cir. 2005) ("The issue then is whether the description of past timber harvests and previous environmental harms caused by these past timber harvests was set forth in sufficient detail to promote an informed assessment of environmental considerations and policy choices by the public and agency personnel upon review of the [FEIS].")

Consistent with the CEQ Guidance and the caselaw, the Corps included discussions of cumulative impacts in the discussion of the "affected environment" and throughout the Corps' discussion of individual environmental impacts. For

example, the Corps discusses the historical development of reservoirs on in the ACF Basin and their impacts on the environment at great length, for instance in Section 2.1.1.1.6 which describes Lake Lanier and Buford Dam; Bull Sluice Lake and Morgan Falls Dam; West Point Dam and Lake; the collection of non-federal dams between West Point Dam and Walter F. George Lake; Water F. George Lock and Dam, George W. Andrews Lock and Dam; Lake Seminole and Jim Woodruff Lock and Dam; Lake Blackshear and Warwick Dam; Lake Worth and Flint River Dam; and the other reservoirs in the ACF Basin. ACF-18_54128-54155; ACF-18_54129 (Table 2.1-3) (Reservoirs on the mainstem); ACF-18_54155 (Table 2.1-4) (nonfederal reservoirs). The Corps also discusses historical and current water withdrawals, ACF-18_54188, water planning, management, and conservation activities pursued by non-federal entities. ACF-18_54194.

The Corps also considered cumulative impacts in the EIS in the specific section entitled "cumulative impacts." ACF-18_54923. That section confirms that while "flow alteration in terms of quantity quality timing and distribution would be likely to have potential effects on the Apalachicola Bay estuary," ACF-18_54923, because "flow conditions in the Apalachicola River downstream of Jim Woodruff Lock and Dam would not differ appreciably for the PAA and other alternatives compared to the NAA . . . the proposed update to the Master Manual would likely have a negligible effect on the aquatic resources and ecological function of the

Apalachicola Bay estuary." ACF-18_54923. The Corps' ResSim model confirms "that the PAA would have little effect on the flow. . . entering Apalachicola Bay compared to the NAA. Therefore the PAA or any of the other alternatives would be expected to have a negligible incremental effect on the hydrodynamic regime, aquatic resources, and ecological function of the Apalachicola Bay estuary compared to the NAA." *Id.* In situations like this, where the proposed action has no or negligible impacts compared to the no-action alternative, then extensive cataloging of past actions is not required. *See Nw. Envtl. Advocates*, 460 F.3d at 1140 (reasoning that, in light of the present-day studies showing that deepening would have little or no impact on salinity, a detailed cataloguing of past projects' effects on salinity was unnecessary, as it "would not have informed assessments about the project and its alternatives").

Plaintiffs are also incorrect that the Corps spent a mere "four paragraphs" on "biological resources anywhere in the ACF River Basin." Op. Br. 32-34. Plaintiffs fail to account for the portion of the EIS devoted to describing "Biological Resources" within the affected environment, which extensively describes "[c]urrent conditions of the biological resources" in the ACF Basin including "vegetation resources/wetlands, wildlife resources, fish and aquatic resources, protected species, and fish and wildlife management facilities." ACF-18_54300-332. That section discusses everything from specific tree species and multiple

types of wetlands to fish and insects. *Id.* Plaintiffs' myopic focus on the section of the EIS entitled "cumulative impacts" simply ignores the Corps' consideration of cumulative impacts across its analysis, including in its description of the affected environment. But courts must look to the agency's full analysis, not just one part of the EIS, and a full description of the affected environment is sufficient to meet the agency's responsibility to consider past cumulative impacts. *See Cascadia Wildlands v. Bureau of Indian Affairs*, 801 F. 3d 1105, 1111 (9th Cir. 2015).

**D. The Corps considered a reasonable range of alternatives.**

Despite the Corps' exhaustive, multi-phase process in which multiple water management measures were considered in a phased process culminating in nine action alternatives, Plaintiffs complain that the Corps should have carried forward even more measures, resulting in an exponentially larger array of alternatives Op. Br. 35-43. Development of alternatives to meet two distinct needs—water supply and water management—across an incredibly complex system is within the Corps' technical competence, and the agency is due deference in its treatment of alternatives. That treatment was reasonable here, and it unquestionably revealed the environmental impacts of each of nine distinct alternatives across a wide array of areas of environmental concern.

NEPA requires the agency to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves

unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E); see also 40 C.F.R. § 1500.2(e). But "NEPA provides little guidance in determining what alternatives must be considered," *N. Buckhead*, 903 F.2d at 1541, so courts defer to the technical expertise of the agencies in assessing alternatives. The scope of alternatives is "bounded by 'some notion of feasibility', and consideration need be given only to reasonable, non-speculative alternatives." *Id.* Thus, an "EIS is satisfactory if the treatment of alternatives, when judged against a 'rule of reason', is sufficient to permit a reasoned choice among the various options." *Id.* (citing *Druid Hills*, 772 F.2d at 713; *Citizens for Smart Growth*, 669 F.3d at 1212 (same)).

Plaintiffs first find fault in the Corps' decision to fully examine only the no action alternative and the Corps preferred water management alternative under various water supply possibilities. Op. Br. 36-39. Plaintiffs would have preferred the Corps to examine other water management alternatives, but the EIS discloses why the Corps opted not to consider the management options that were eliminated at the screening stage. *See* ACF-18_54477; ACF-18_54397. And the NEPA regulations require only that the Corps "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, *briefly discuss* the reasons for their having been eliminated."

40 C.F.R. § 1502.14(a) (emphasis added). The significant discussion in the EIS of eliminated management alternatives surely satisfied that regulation.

Indeed, it is the Corps—as the technical expert in managing reservoir projects—that is entrusted with discretion in selecting and screening water management alternatives. The NEPA regulations did not require the Corps to discuss every alternative that might meet the purpose and need of the project, Op. Br. 37-38, as the agency has discretion to identify from a subset of feasible alternatives those warranting further study, given all of the circumstances. *See* 40 C.F.R. 1502.14(a) (agency need only explore "reasonable alternatives" and "briefly discuss" reasons for eliminating others).

The Corps gave reasonable grounds for rejecting the water management and water supply alternatives it did not advance to further consideration. ACF-18_54397; ACF-18_54423-70; ACF-18_54477. For example, revised guide curves at West Point Lake were eliminated because "they would likely increase the flood risk downstream." ACF-18_54424. Similarly, the Corps explained that it decided not to study an alternative with a "seasonally varying baseflow hydrograph that would more closely approximate predam conditions" because doing so would adversely affect flood risk management. ACF-18_54427. That is all that NEPA required. *Holy Cross Wilderness Fund v. Madigan*, 960 F.2d 1515, 1528 (10th Cir. 1992) (upholding the Corps' discussion of alternatives in light of the deference that

courts give to agencies in this area, noting courts "uphold [an agency's] discussion of alternatives so long as the alternatives are reasonable and the agency discusses them in reasonable detail").

Plaintiffs contend that the Corps should have considered in greater detail water management measures suggested by Plaintiffs, the U.S. Fish and Wildlife Service, and other commenting parties which entailed operation of the reservoir to release water not for hydropower or other authorized purposes, but rather to "more closely mimic[] the amount, timing, and variability of natural flows." Op. Br. at 40-43 (citing ACF-18_ 46663). That proposed water management measure provided for increased flows during certain periods that corresponded with pre-dam conditions "to ensure seasonal high flows and river floodplain connectivity" to benefit "ecological functions and wildlife populations." ACF-18_ 54428.

The Corps took that request seriously and responded to it directly. The Corps explained its reasons for not considering the alternative, consistent with the regulation's directive to "briefly discuss the reasons" that measures were "eliminated from detailed study." 40 C.F.R. § 1502.14. The Corps explained that adopting that measure would require the Corps to "forgo operating the large [hydropower] generators at both dams for 30 to 60 days," causing "a significant loss in hydroelectric power production at the projects which would be in violation of the existing project authorizations." ACF-18_ 54428. The Corps also

determined that the proposal to provide "small pulses" of water to more closely match natural flows would risk "physical safety" of the dam due to the risk of increased debris, as well as adversely affecting "flood risk management and navigation" due to the amount of storage that would be required for the proposal. *Id.*

Finally, like all the Corps' environmental review under NEPA, the Corps' development and treatment of alternatives is within the agency's expertise and subject to a "rule of reason." *Citizens for Smart Growth*, 669 F.3d at 1212. The Corps was not required to adopt or bring forward for fuller consideration Plaintiffs' preferred alternatives or management measures, nor was the Corps required to analyze any specific number or scope of alternatives. *Citizens for Smart Growth*, 669 F.3d at 1212–13 (three alternatives sufficient); *N. Buckhead* (two alternatives studied in detail was sufficient); *Tongass Conservation Soc'y v. Cheney*, 924 F.2d 1137, 1140–42 (D.C. Cir. 1991) (finding that agency complied with NEPA when thirteen of fourteen alternatives were eliminated as unreasonable and only one alternative was discussed in detail in the EIS). The Corps' discussion of alternatives as it relates to this highly technical series of decisions should be upheld so long as it is not "arbitrary," and the Corps has clearly met that standard here.

### E. The Corps adequately considered mitigation measures.

Plaintiffs' final NEPA argument is that the Corps failed to adequately consider mitigation measures. Op. Br. 43-45. But the EIS contained an entire section entitled "Mitigation Considerations," which notes "mitigative actions were considered" throughout the planning process. ACF-18_54924.

An EIS must describe "the environmental impact of the proposed action, [and also] any adverse environmental effects which cannot be avoided should the proposal be implemented." 42 U.S.C. § 4332(C). "Implicit in this [latter] statutory requirement 'is an understanding that the EIS will discuss the extent to which adverse effects can be avoided.'" *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 503 (D.C. Cir. 2010) (quoting *Robertson*, 490 U.S. at 351-52). Accordingly, NEPA regulations require that the EIS and the ROD include a discussion of possible mitigation measures. 40 C.F.R. §§ 1508.25(b)(3), 1502.14(f), 1502.16(h).

But NEPA does not "demand the presence of a fully developed plan that will mitigate environmental harm before an agency can act" or a "detailed explanation of specific measures which will be employed to mitigate the adverse impacts of a proposed action[.]" *Robertson*, 490 U.S. at 351. Particularly where—as here—the proposed action does not entail a large change from the status quo, an agency's discussion of potential mitigation measures in an EIS need only include "sufficient

detail to ensure that environmental consequences have been fairly evaluated." *Roosevelt I*, 616 F. 3d at 503 (quoting *Robertson*, 490 U.S. at 352). "NEPA 'does not require agencies to discuss any particular mitigation plans that they might put in place,' nor does it 'require agencies—or third parties—to effect any.'" *Id.* (quoting *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 206 (D.C.Cir.1991)); *Okanogan Highlands Alliance v. Williams*, 236 F.3d 468, 477 (9th Cir. 2000) (although mitigating measures in EIS were "described in general terms and rel[ied] on general processes . . . the EIS considered extensively the potential effects and mitigation processes," and therefore agency had taken the requisite hard look).

Here, when considering mitigation, it is important to consider the larger context: "Updating the reservoir operations in the ACF Basin . . . would not involve construction or any other activity that would result in a permanent and irreversible physical change to natural systems of the ACF Basin to an extent greater than has already occurred under the NAA." ACF-18_ 54925. Thus, while in general the Corps was not taking an action that warranted extensive mitigation, the Corps nonetheless considered "mitigative measures" throughout the development of the Master Manual: "As potential water management measures were identified and alternatives were developed potential actions to offset adverse effects also were identified analyzed and considered in the planning process." ACF-18_ 54831.

As merely one example, the EIS considers "reasonable and prudent measures to avoid and minimize incidental take" of endangered species. ACF-18_54926. The EIS also notes that "all the alternatives incorporate measures known to benefit fish and wildlife such as current fish spawning and passage procedures and ramping rates and flow targets in the Apalachicola River at Chattahoochee Florida." ACF-18_ 54926. Mitigation measures were considered reasonably throughout the EIS in proportion to the overall impacts of the proposed action. No more is required under NEPA, and the Corps' analysis of mitigation throughout was reasonable.

## II. The district court correctly held that the Corps did not violate 33 U.S.C. § 2283(d), as amended by the 2007 WRDA.

Plaintiffs argue that 33 U.S.C. § 2283 required the Corps to prepare a mitigation plan as part of the EIS. Op. Br. 45-58. The Seventh Circuit recently rejected an identical argument, *National Wildlife Federation v. U.S. Army Corps of Engineers*, 75 F. 4th 743 (7th Cir. 2023), and this Court should do the same.

The statute provides as follows:

> After November 17, 1986, the Secretary shall not submit any proposal for the authorization of any water resources project to Congress in any report, and shall not select a project alternative in any report, unless such report contains (A) a recommendation with a specific plan to mitigate for damages to ecological resources, including terrestrial and aquatic resources, and fish and wildlife losses created by such project, or (B) a determination by the Secretary that such project will have negligible adverse impact on ecological resources and fish and wildlife without the implementation of mitigation measures.

33 U.S.C. § 2283(d)(1).

As the Seventh Circuit concluded, "the better understanding of 'report' in § 2283 is that the term refers only to a report submitted to Congress." *National Wildlife Fed'n*, 75 F. 4th at 749. Each tool of statutory interpretation—the plain language, the statutory context, legislative history, and the Corps' implementation of the provision—points in the same direction. *Id.* at 749-53.

First, the plain language of § 2283(d), read in context, makes clear that the provision does not apply to an EIS that is not submitted to Congress and instead applies only to reports accompanying project proposals or reevaluations that the Secretary of the Army submits to Congress. "Report," as it is used each time in this subsection, plainly refers to reports submitted to Congress. To start, just as it did when authorizing the projects in the ACF Basin, Congress has traditionally authorized the United States to construct and operate civil works projects based on reports the Chief of Engineers submits to Congress after conducting studies. *See, e.g.*, *United States v. Arizona*, 295 U.S. 174, 189-90 (1935). The section at issue begins with the language "shall not submit any proposal for the authorization of any water resources project to Congress in any report," which supplies the contextual meaning of "report," and the following language ("unless such report contains") suggests that the meaning is consistent throughout the subsection, especially considering the historical practice of Congress and the Corps.

The clause "shall not select a project alternative in any report" thus must not be isolated from the surrounding words that supply essential meaning. *Sec. & Exch. Comm'n v. Levin*, 849 F.3d 995, 1003 (11th Cir. 2017) ("To determine the plain meaning of a statute or regulation, we do not look at one word or term in isolation, but rather look to the entire statutory or regulatory context."). The phrase "any report" is thus a "shorthand reference" to the type of report already identified: one submitted to Congress. As the Seventh Circuit put it, "it is not unreasonable to think that congressional drafters saw no need to repeat 'to Congress' in the very next verb phrase." *National Wildlife Fed'n*, 75 F. 4th at 751; *see also Jones v. United States*, 527 U.S. 373, 389 (1999) ("Statutory language must be read in context and a phrase gathers meaning from the words around it." (quotation omitted)).

Section 2283(d)'s broader statutory context also supports that plain language understanding of "report" as used in the section. The word "report" also appears in nearby statutory sections, where it likewise refers to reports submitted to Congress. *National Wildlife Fed'n*, 75 F.4th at 750. Section 2282a(f)(2) provides that "a report of the Chief of Engineers for a water resources project…shall be submitted, on completion, to" two Congressional committees. 33 U.S.C. § 2282a(f)(2). Section 2282a(g) states that within "120 days after the date of completion of a report of the Chief of Engineers that recommends to Congress a water resources

project, the Secretary shall…review the report; and . . . provide any recommendations of the Secretary regarding the water resources project to Congress." *Id.* § 2282a(g). Other nearby sections describe in detail the project reports, general reevaluation reports, limited reevaluation reports, and feasibility reports that must be prepared for any water resources project requiring specific authorization from Congress. *See id.* §§ 2215(d), 2282(a). In each of those instances, "report" is used to describe something submitted to Congress. This strongly suggests that "report" carries the same meaning in § 2283(d), because "[a] word or phrase is presumed to bear the same meaning throughout a text." *In re Appling*, 848 F.3d 953, 958 (11th Cir. 2017) (quoting Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 170 (2012)), *aff'd sub nom. Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752 (2018).

Further, the subsection does not mention "environmental impact statements" disconnected from reports submitted to Congress. Because the Corps has not proposed a new water resources project or a project change to Congress and is instead updating its understanding of the environmental impacts of an existing, ongoing project, section 2283(d) is simply inapplicable. The term "environmental impact statement" has such a specific, technical meaning that it is hard to believe Congress would have intended to subsume it within "report" without explicitly saying so. *See Van Buren v. United States*, 141 S. Ct. 1648, 1657 (2021) ("When

interpreting statutes, courts take note of terms that carry 'technical meaning[s].'"). And Plaintiffs fail to identify a single instance in which Congress used "environmental impact statement" or "record of decision" interchangeably with (or subsumed by) "report." In fact, NEPA itself uses "report" distinctly from "statement," and indeed seems to contemplate reports as documents submitted to Congress. *See* 42 U.S.C. § 4332(2)(C) (providing that agencies must "include in every recommendation or report on proposals for legislation and other major Federal actions…a detailed statement" on the environmental impacts of the proposed action (emphasis added)); *see also* 40 C.F.R. § 1506.8 (identifying "legislative environmental impact statement" as a "detailed statement…to be included in a recommendation or report on a legislative proposal to Congress" (emphasis added)).

Similarly, Congress referred to "environmental impact statements" in other parts of the 2007 WRDA. For example, 2007 WRDA § 2043 (codified at 33 U.S.C. § 2282(a)(4)) distinguishes between "reports" and "associated environmental impact statement[s] and mitigation plan[s]." *See also* 2007 WRDA § 2041 (codified at 33 U.S.C. § 2346) (distinguishing between "final environmental impact statement[s]," "records of decision[s]," and various "report[s]"). It would be incongruous for Congress to intend to include "environmental impact statement" in the definition of "report" in § 2283(d) but not in the definition of

"reports" in other sections of the same statute. *See Savage Servs. Corp. v. United States,* 25 F. 4th 925, 933 (11th Cir. 2022) ("[c]ourts generally adhere to the principle that statutes relating to the same subject matter should be construed harmoniously if possible") (citation omitted).

Canons of construction cited by Plaintiffs do not support their interpretation of § 2283(d). Plaintiffs argue that the phrase "select a project alternative in any report," which Congress added in the 2007 WRDA, becomes surplusage under the district court's interpretation. Op. Br. 49-50. But that language is not surplusage; it broadened the type of reports to which the mitigation plan requirement applies, just not in the way Plaintiffs suggest. Before the addition of the "any report" phrase in 2007, section 2283(d) only applied to new requests for authorization. *See* S. Rep. No. 99-126, at 24-26 (1985) (Addendum 10a-12a) (describing the original § 2283(d) as applying to "all future proposals for water resources projects submitted to Congress by the Secretary for authorization"). As the district court concluded, the 2007 amendment expanded the provision to include other types of reports submitted to Congress, including reevaluation reports submitted to Congress to change an authorized project. *See ACF Basin*, 467 F. Supp. 3d at 1333; *National Wildlife Fed'n*, 75 F. 4th at 751.

Moreover, reading "report" to include environmental impact statements not submitted to Congress, as Plaintiffs prefer, would create a surplusage problem of

its own. Other sections of the statute distinguish between "reports" and associated "environmental impact statements." *See* 2007 WRDA §§ 2041, 2043; 33 U.S.C. §§ 2282(a)(4), 2346. The inclusion of "environmental impact statements" in those sections would be meaningless if EISs already fall within the definition of "reports."

If the statute is in any way ambiguous, the 2007 WRDA's statutory history removes any residual doubts about § 2283(d)'s inapplicability to the EIS. *See United States ex rel. Hunt v. Cochise Consultancy, Inc.*, 887 F.3d 1081, 1089 (11th Cir. 2018), aff'd, 139 S. Ct. 1507 (2019) ("Legislative history may prove helpful when the statutory language remains ambiguous after considering 'the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.'") (quoting *Robinson v. Shell Oil Co*., 519 U.S. 337, 341 (1997)). Congress rejected in conference the Senate version of the bill that would have expressly expanded § 2283(d)'s mitigation plan requirement to any final "record of decision, environmental impact statement, or environmental assessment." *See* S. Rep. No. 110-58, at 103 (2007) (Addendum 20a). In contrast, the House version would not have expanded the requirement at all. *See* H.R. Rep. No. 110-80, at 20 (2007) (Addendum 15a). The Conference Committee ultimately chose to limit the requirement to "reports" while broadening it to include any report in which the Secretary selected a project alternative. Adopting Plaintiffs'

interpretation would, as the district court concluded, "undo this compromise by interpreting the language of the amendment to have the meaning the Conference Committee rejected." *In re ACF Basin*, 467 F. Supp. 3d at 1334; *see also*, *National Wildlife Fed'n*, 75 F. 4th at 752. "Few principles of statutory construction are more compelling than the proposition that Congress does not intend sub silentio to enact statutory language that it has earlier discarded in favor of other language." *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 442-43 (1987) (quotation omitted).

Finally, the Corps' implementation guidance for the 2007 WRDA reasonably interprets "report" in § 2283(d) to mean a report submitted to Congress. That guidance provides that the 2007 amendment "ensure[s] that any report, submitted to Congress for authorization, shall not select a project alternative unless such report contains" a specific recommendation and plan to mitigation losses or a determination that the project will have negligible impacts. *See* Implementation Guidance for Section 2036(a) of the Water Resources Development Act of 2007 (2009), *available at* https://usace.contentdm.oclc.org/utils/getfile/collection/p16021coll5/id/386; *cf. Louisiana v. U.S. Army Corps of Eng'rs*, 834 F.3d 574, 587 (5th Cir. 2016) (deferring to Corps' reasonable interpretation of 2007 WRDA and collecting Supreme Court precedent on deference to agency interpretations).

Because § 2283 does not mandate that the Corps develop a specific mitigation plan for the Project and instead grants the Corps discretion to mitigate

environmental impacts, the District Court correctly concluded that the Corps did not violate any WRDA provision.

## III. The district court correctly denied Plaintiffs' motion for leave to file an amended complaint.

Once the time for amending a pleading as of right has expired, Rule 15(a) of the Federal Rules of Civil Procedure permits amendment "only by leave of court or by written consent of the adverse party." Fed. R. Civ. P. 15(a). "Although leave to amend shall be freely given when justice so requires, a motion to amend may be denied on numerous grounds such as undue delay, undue prejudice to the defendants, and futility of the amendment." *Mann v. Palmer*, 713 F.3d 1306, 1316 (11th Cir. 2013) (citation omitted). This Court may affirm a denial of leave to amend "on any ground supported by the record, regardless of whether that ground was relied upon or even considered below." *Waldman v. Conway*, 871 F.3d 1283, 1289 (11th Cir. 2017).

The district court denied Plaintiffs' motion for leave to add two claims—that the Corps violated section 663 of the Fish and Wildlife Coordinate Act and that the Corps acted contrary to the 1946 Rivers and Harbors Act, Pub. L. No. 79-525, 60 Stat. 634 (1946). Though the district court focused on futility (which we address below), the proposed amended complaint was also an improper attempt to resurrect claims already dismissed and base them on new theories that could have, and should have, been raised earlier.

To recap: the original complaint alleged that the Corps had failed to comply with the FWCA. The Water Supply Providers moved for judgment on the pleadings of that claim, explaining why neither section 661, section 662, nor section 663 provided a valid claim. The Corps joined the motion but pointed out that Plaintiffs had not pled a claim under section 663, issue, noting "[t]he National Wildlife Federation's Complaint does not allege that the Federal Defendants have violated section 663 or even cite that section specifically. It therefore appears unnecessary to address section 663 to grant the motion for partial judgment on the pleadings." R.120:2. In response, Plaintiffs expressly disclaimed reliance on Section 663, stating "the Conservation Plaintiffs have not asserted a claim … under Section 663." R.122:24. More than two years passed, the district court granted the motion for judgment on the pleadings, and only then did Plaintiffs move for leave to amend to assert the very claim under section 663 that they had earlier disclaimed. In doing so, Plaintiffs made no new factual or legal assertions, but merely reasserted the FWCA claim for which judgment on the pleadings had already been granted and added a citation to section 663 at the end. *Compare* R.7:53-54 *with* R.152-2:62-63.

Plaintiffs' proposed claim based on the 1946 RHA suffered from similar problems. Their earlier claim asserted a duty on the part of the Corps to give fish and wildlife "equal consideration" as a purpose of the ACF system, and the claim

based on the 1946 RHA merely restated that duty under a different statutory authority. R.152-2:63-65. If Plaintiffs believed the Corps had such a duty under any authority, they should have either pled it in the original complaint or, at the very least, asserted the source of the duty and sought leave to amend in response to the motion for judgment on the pleadings.

The combination of Plaintiffs' affirmatively disclaiming any section 663 claim, their restatement of essentially the same claim under a different statutory authority when invoking the 1946 RHA, and their delay in doing so, provide sound basis on which to affirm the district court's denial of leave to amend. *See*, *e.g.*, *Andrx Pharm., Inc. v. Elan Corp., PLC*, 421 F.3d 1227, 1236–37 (11th Cir. 2005) (affirming denial of leave to amend where the plaintiff waited one year after being put on notice of the deficiencies in its complaint and then attempted to introduce new theory of recovery); *Smith v. Duff & Phelps, Inc.*, 5 F.3d 488, 494 (11th Cir. 1993) (court did not abuse discretion in denying motion to amend claim plaintiffs disclaimed three years earlier); *Maynard v. Board of Regents of Div. of Universities of Florida Dept. of Educ.*, 342 F.3d 1281 (11th Cir., 2003) (delay of one year where there was "no good reason why [the plaintiff] could not have made the motion earlier"). Indeed, "the liberal amendment policy of Rule 15(a) does not countenance 'the old sporting theory of justice' or the use of the federal courts as a forum for testing alternate legal theories seriatim." *Florida Evergreen*, 470 F. 3d at

1042 (quoting *Freeman v. Cont'l Gin Co.*, 381 F.2d 459, 469–70 (5th Cir. 1967). Here, as in *Florida Evergreen*, Plaintiffs sought to test their legal theories seriatim when they could have brought each of their proposed new claims at the time of the original complaint or, at the very least, when the motion for judgment on the pleadings was filed.[4] The district court did not err when it denied Plaintiffs leave to amend.

Regardless, the district court was correct that Plaintiffs' amendments were futile. Section 663 requires that "federal agencies controlling bodies of water make adequate provisions for wildlife conservation" only to the extent that they are "consistent with the project's primary purpose." *In re ACF Basin*, 2020 WL 7496844, at *2. "[F]ish and wildlife conservation is not an authorized primary purpose of the ACF Basin." *Id.* And Plaintiffs did not identify any "provision" for fish and wildlife that they claim the Corps did not make but that would have been consistent with the ACF Basin's primary purposes. The FWCA claim based on section 663 was therefore futile.

Plaintiffs' proposed 1946 RHA claim was likewise futile. Plaintiffs assert the RHA made "fish and wildlife conservation an authorized project purpose of the

[4] Plaintiffs assert their motion for leave to amend was timely under the scheduling orders entered by the Court. Op. Br. 59 (citing R.114 and R.148). Those orders allowed the filing of motions to amend but did not waive any potential objections to the motions, including based on timeliness given the nature and circumstances of the proposed amendments.

ACF Basin." Op. Br. 62-63. As the district court explained, "the RHA authorized the development of the ACF Basin in accordance with the May 13, 1946 report of the Chief of Engineers," or "Newman Report," which was "fully incorporated" in the statute. *In re ACF Basin*, 2020 WL 7496844, at *2 (citing *In re MDL-1824 Tri-State Water Rights Litig.*, 644 F.3d 1160, 1187 (11th Cir. 2011)). Thus, to state a claim under the 1946 RHA, Plaintiffs needed to "identify specific language in the Newman Report demonstrating that Congress would have expected the Corps to operate the ACF system in the manner that the Plaintiffs demand." *Id.* at *4.

But there is no such language in the Newman Report. That report's "isolated phrase[s] regarding potential benefits to fish and wildlife conservation d[id] not support finding it as an authorized purpose," or anything more than an "incidental" one. *Id.* at *4. Plaintiffs focus on paragraph 80 of the Newman Report, which notes that "in order to meet the estimated present needs of [Atlanta] and to prevent damage" to fish, the Corps should release "up to a maximum of 600 cubic second-feet" from the Buford Dam. Op. Br. 63. But the paragraph "primarily focuses on the operational effect of the Buford Dam on the water needs of the Atlanta area." *In re ACF Basin*, 2020 WL 7496844, at *3. Its limited reference to fish "does not suggest that Congress envisioned an ongoing duty on the part of the Corps to release water from Lake Lanier, or any other reservoir, to benefit fish and wildlife in other ways." *Id.* at *4. Instead, the Newman Report merely notes that by

releasing water for downstream water supply—a project purpose also mentioned elsewhere in the report—the Corps would likewise benefit fish. That single reference did not create a duty on the Corps to operate the project to benefit fish and wildlife, and absent such a duty Plaintiffs' proposed amendment was futile.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's judgment in favor of the Corps.

Respectfully submitted,

/s/ *Michael T. Gray*
TODD KIM
*Assistant Attorney General*

MICHAEL T. GRAY
*Attorney*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 532-3147
michael.gray2@usdoj.gov

Of Counsel:

CHRISTINA AUSTIN-SMITH
JESSE HUFSTEDLER
*Attorneys*
U.S. Army Corps of Engineers

May 1, 2024
90-1-4-15412

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) this document contains 12,949 words.

2. This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

/s/ *Michael T. Gray*
MICHAEL T. GRAY

Counsel for Appellees