No. 21-13104

# IN THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

NATIONAL WILDLIFE FEDERATION, *et al.*,

*Plaintiff-Appellants*,

v.

U.S. ARMY CORPS OF ENGINEERS, *et al.*,

*Defendant-Appellees*.

On appeal from the
United States District Court for the Northern District of Georgia,
Civil Action No. 1:18-mi-00043-TWT
(Hon. Thomas W. Thrash, Jr.)

## INTERVENOR-APPELLEES GEORGIA WATER SUPPLY PROVIDERS' RESPONSE BRIEF

JONES FORTUNA LP

Lewis B. Jones
John L. Fortuna
111-A New Street
Decatur, GA 30030
(404) 850-3835

*Counsel for Intervenor-Appellees
the Atlanta Regional Commission,
City of Atlanta, Cobb County-
Marietta Water Authority, DeKalb
County, Forsyth County, Fulton
County, City of Gainesville, and
Gwinnett County*

# CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, the undersigned counsel certify the following persons or entities have been associated with or have an interest in the outcome of this case:

1.    Allen, John C. (Attorney for Appellee / Intervenor State of Georgia)

2.    Allen, Kenneth W. (Attorney for Appellee / Intervenor State of Georgia)

3.    Andre, Abigail (Attorney for Amici Curiae Apalachee Audubon Society and Ocean Conservancy, St. George Island Civic Club and Plantation Owners, Robert Graham, Gwendolyn Graham, Calhoun County, Franklin County, Liberty County, Jackson County, Florida Coastal Conservation Association, Trip Aukeman, Albert Bryant, Shannon Hartsfield, Lynn Martina, Kevin Martina, Carmen McLemore, Daniel Taunton, Richard Bickel, Thomas Ward, and City of Apalachicola, Florida)

4.    Apalachee Audubon Society and Ocean Conservancy (Amicus Curiae in District Court)

5.    Apalachicola Bay and River Keeper (Plaintiff in District Court)

6.    Atlanta Regional Commission (Appellee / Intervenor)

7.    Aukeman, Trip (Amicus Curiae in District Court)

8.    Bickel, Richard (Amicus Curiae in District Court)

9.    Boies Schiller Flexner LLP (Attorneys for Amicus Curiae Robert Graham)

10.    Bryant, Albert (Amicus Curiae in District Court)

11.     Calhoun County, Florida (Amicus Curiae in District Court)

12.     Carr, Christopher M. (Attorney for Appellee / Intervenor State of Georgia)

13.     Chapman, Jeremy J. (District Commander for Mobile District of the U.S. Army Corps of Engineers)

14.     City of Apalachicola, Florida (Amicus Curiae in District Court)

15.     City of Atlanta, Georgia (Appellee / Intervenor)

16.     City of Gainesville, Georgia (Appellee / Intervenor)

17.     Cobb-County Marietta Water Authority (Appellee / Intervenor)

18.     Coe, Alisa (Attorney for Plaintiffs National Wildlife Federation, Florida Wildlife Federation, and Apalachicola Bay and River Keeper)

19.     DeKalb County (Appellee / Intervenor)

20.     DeLapp, James A. (Appellee)

21.     Drumm, Starr T. (Attorney for Appellant)

22.     Dycus, John P. (Attorney for Plaintiffs National Wildlife Federation, Florida Wildlife Federation, and Apalachicola Bay and River Keeper)

23.     Earthjustice Legal Defense Fund, Inc. (Law firm representing National Wildlife Federation, Inc., Florida Wildlife Federation, and Apalachicola Bay and River Keeper, Inc.)

24.     Ellerhorst, Shelly Jacobs. (Attorney for Appellee / Intervenor State of Georgia)

25.     Fellows LaBriola, LLP (Attorneys for Appellant)

26.     Florida Coastal Conservation Association (Amicus Curiae in District Court)

27.     Florida Wildlife Federation (Plaintiff in District Court)

28. Forsyth County (Appellee / Intervenor)

29. Fortuna, John L. (Attorney for Appellees / Intervenors Atlanta Regional Commission, Cobb County-Marietta Water Authority, DeKalb County, Forsyth County, Fulton County, Gwinnett County, City of Atlanta, Georgia, and City of Gainesville, Georgia)

30. Franklin County, Florida (Amicus Curiae in District Court)

31. Fulton County (Appellee / Intervenor)

32. Galloni, Tania (Attorney for Plaintiffs National Wildlife Federation, Florida Wildlife Federation, Apalachicola Bay and River Keeper)

33. Gormley, Neil E. (Attorney for Plaintiffs National Wildlife Federation, Florida Wildlife Federation, Apalachicola Bay and River Keeper)

34. Gwendolyn Graham (Amicus Curiae in District Court)

35. Graham, Robert (Amicus Curiae in District Court)

36. Gray, Michael (Attorney for Appellee Federal Defendants)

37. Gretchen, Michael C. (Attorney for Appellant)

38. Gwinnett County (Appellee / Intervenor)

39. Hartsfield, Shannon (Amicus Curiae in District Court)

40. Hill, Brandt P. (Attorney for Appellant)

41. Jackson County, Florida (Amicus Curiae in District Court)

42. Jon L. Schwartz, Attorney at Law, P.C. (Law firm representing Robert Graham and Gwendolyn Graham, Amici in District Court Action)

43. Jones, Lewis B. (Attorney for Appellees / Intervenors Atlanta Regional Commission, Cobb County-Marietta Water Authority,

DeKalb County, Forsyth County, Fulton County, Gwinnett County, City of Atlanta, Georgia, and City of Gainesville, Georgia)

44. Jones Fortuna LP (Attorneys for Appellees / Intervenors Atlanta Regional Commission, Cobb County-Marietta Water Authority, DeKalb County, Forsyth County, Fulton County, Gwinnett County, City of Atlanta, Georgia, and City of Gainesville, Georgia)

45. Kazmarek Mowrey Cloud Laseter LLP (Attorneys for Appellee / Intervenor State of Georgia)

46. Kelley, Jason E. (Division Commander for the South Atlantic Division of the U.S. Army Corps of Engineers)

47. Kirkland & Ellis LLP (Attorneys for Appellee / Intervenor State of Georgia)

48. Korte, Brett (Attorney for Amicus Curiae Robert Graham)

49. LaBriola, Stephen T. (Attorney for Appellant)

50. Lacour, Jr, Edmund G. (Attorney for Appellant)

51. Lamont, Douglas (Appellee)

52. Law Office of Barbara Sanders (Attorney for Amicus Curiae St. George Island Civic Club and Plantation Owners)

53. Liberty County, Florida (Amicus Curiae in District Court)

54. Malloy, Bonnie (Attorney for Plaintiffs National Wildlife Federation, Florida Wildlife Federation, and Apalachicola Bay and River Keeper)

55. Marshall, Steven (Attorney for Appellant)

56. Martina, Kevin (Amicus Curiae in District Court)

57. Martina, Lynn (Amicus Curiae in District Court)

58. Maynard Nexsen (Attorneys for Appellants)

59. McLemore, Carmen (Amicus Curiae in District Court)

60. Mills, Jon (Attorney for Amici Curiae Robert Graham and Gwendolyn Graham)

61. National Wildlife Federation (Plaintiff in District Court)

62. Neiman Jr., John C. (Attorney for Appellant)

63. Patton Dycas Law, LLC (Attorneys for Plaintiffs National Wildlife Federation, Florida Wildlife Federation, and Apalachicola Bay and River Keeper)

64. Petrany, Stephen J. (Attorney for Appellee / Intervenor State of Georgia)

65. Pinkham, Jaime A. (Acting Assistant Secretary of the U.S. Army for Civil Works)

66. Connor, Michael L. (Assistant Secretary of the U.S. Army for Civil Works)

67. Primis, Craig S. (Attorney for Appellee / Intervenor State of Georgia)

68. Reichert, Christina I. (Attorney for Plaintiffs National Wildlife Federation, Florida Wildlife Federation, and Apalachicola Bay and River Keeper)

69. Roady, Stephen E. (Attorney for Amicus Curiae Apalachee Audubon Society and Ocean Conservancy)

70. Robinson-Dorn, Michael (Attorney for Amicus Curiae Robert Graham)

71. Sanders, Barbara (Attorney for Amicus Curiae St. George Island Civic Club and Plantation Owners)

72. Schifman, Reuben S. (Attorney for Appellee Federal Defendants)

73. Schwartz, Jonathan L. (Attorney for Amicus Curiae Robert Graham)

74. Semonite, Todd T. (Appellee)

75. Speer, Robert M. (Appellee)

76. Spellmon, Scott A. (Commander and Chief of Engineers of the U.S. Army Corps of Engineers)

77. St. George Island Civic Club and Plantation Owners (Amicus Curiae in District Court)

78. Stack & Associates, P.C. (Attorneys for Amici Curiae Apalachee Audubon Society and Ocean Conservancy and St. George Island Civic Club and Plantation Owners)

79. Stack, Donald J. (Attorney for Amici Curiae Apalachee Audubon Society and Ocean Conservancy and St. George Island Civic Club and Plantation Owners)

80. State of Alabama (Appellant)

81. State of Georgia (Appellee / Intervenor)

82. Sturm, Kimberly A. (Attorney for Amici Curiae Calhoun County, Franklin County, Liberty County, Jackson County, Florida Coastal Conservation Association, Trip Aukeman, Albert Bryant, Shannon Hartsfield, Lynn Martina, Kevin Martina, Carmen McLemore, Daniel Taunton, Richard Bickel, Thomas Ward, and City of Apalachicola, Florida)

83. Swider Berlin Sheref Friedman (Attorneys for Amicus Curiae Apalachee Audubon Society and Ocean Conservancy)

84. Swidler Berlin Sheref Friedman LLP (Law firm representing Apalachee Audubon Society and Ocean Conservancy, Amicus in District Court Action)

85. Taunton, Daniel (Amicus Curiae in District Court)

86. Thrash Jr, Thomas W. (United States District Judge for the Northern District of Georgia)

87. Turner, David C. (Appellee)

88. United States Army Corps of Engineers (Appellee)

89. United States Department of Justice, Environmental and Natural Resources Division (Representing Appellee Federal Defendants)

90. University of California Irvine Environmental Law Clinic (Representing Robert Graham and Gwendolyn Graham, Amici in District Court Action)

91. Vermont Law School Environmental Advocacy Clinic (Representing Calhoun County, Florida; Franklin County, Florida; Liberty County, Florida; Jackson County, Florida; Florida Coastal Conservation Association; Trip Aukeman; Albert Bryant; Shannon Hartsfield; Lynn Martina; Kevin Martina; Carmen McLemore; Daniel Taunton; Richard Bickel; Thomas Ward, and City of Apalachicola, Amici in District Court Action)

92. Ward, Thomas (Amicus Curiae in District Court)

93. Weissman, P.C. (Attorneys for Amici Curiae Calhoun County, Franklin County, Liberty County, Jackson County, Florida Coastal Conservation Association, Trip Aukeman, Albert Bryant, Shannon Hartsfield, Lynn Martina, Kevin Martina, Carmen McLemore, Daniel Taunton, Richard Bickel, Thomas Ward, and City of Apalachicola, Florida)

94. Williams, Jean E. (Attorney for Appellee Federal Defendants)

95. Wormuth, Christine (Secretary of the United States Army Corps of Engineers)

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, the Water Supply Providers affirm that no disclosures are necessary, as Intervenor-Appellees are governmental entities and a regional water authority created by statute under the laws of the State of Georgia.

## STATEMENT REGARDING ORAL ARGUMENT

The Water Supply Providers believe the issues in this case can be adequately addressed on the papers and that oral argument will not substantially aid the Court in resolving the questions presented. Nevertheless, to the extent oral argument is granted, the Water Supply Providers request to participate. The Master Water Control Manual for the ACF Basin and the Record of Decision at issue in this litigation implement this Court's decision in *In re MDL-1824 Tri-State Water Rights Litig.*, 640 F.3d 1160 (11th Cir. 2011), and fulfill Congress's original vision that Lake Lanier would be used to provide an "assured source of water supply" for metropolitan Atlanta and "safeguard[] the water supply of the metropolitan area," upon which millions of people depend. The Water Supply Providers thus have a significant interest in the Water Control Manual and Record of Decision at issue in this case.

# TABLE OF CONTENTS

Certificate of Interested Persons ................................................i

Corporate Disclosure Statement.............................................viii

Statement Regarding Oral Argument ......................................ix

Table of Contents ...................................................................x

Table of Citations ....................................................................i

Table of Abbreviations ...........................................................v

Statement Regarding Adoption of Other Parties' Briefs........................vi

Statement of Subject-Matter and Appellate Jurisdiction .......................vi

Statement of the Issues..........................................................1

Statement of the Case ...........................................................2

I.   Course of Proceedings Below..........................................4

II.  Statement of Facts.......................................................6

     A.   The ACF Reservoir System......................................6

     B.   The Master Manual and Water Control Plan .......................8

     C.   The Tri-State Water Wars .....................................9

     D.   The 2017 Update to the ACF Master Manual......................11

     E.   The Record of Decision.......................................15

     F.   NWF's Lawsuit Challenging the 2017 Manual ....................15

G. The Water Supply Providers' Motion for Partial Judgment on the Pleadings .................................................. 16

H. NWF's Motion to Amend ........................................................ 17

I. Summary Judgment, Appeal, and Agreement with Alabama .................................................................................. 18

III. Standard of Review .......................................................................... 18

Summary of the Argument .................................................................. 20

Argument ............................................................................................... 24

I. The District Court Correctly Dismissed NWF's Section 2283(d) Claim .................................................................... 24

A. Statutory Background .......................................................... 25

B. Based on its Text, Section 2283(d) Applies Only to WRDA "Reports" .................................................................. 27

C. The Legislative History of the 2007 Amendment to Section 2283(d) Confirms Congress Did Not Intend to Extend it to Environmental Impact Statements or Records of Decision ............................................................. 31

D.     Congress Has Accepted the Corps' Formal, Contemporaneous Interpretation of the 2007 Amendment ........................................................ 34

II.   The District Court Correctly Denied NWF's Request to Amend to Add Futile Claims that Could Have Been Brought at the Outset ........................................................ 35

    A.     Statutory Background and Pleading History ....................... 36

    B.     NWF Expressly Abandoned the Claim it Originally Pled Under Section 663 ....................................................... 41

    C.     NWF's Claim Under Section 663 Was Futile, Anyway ........ 42

       1.     Section 663 Does Not Apply to the ACF Projects ........ 43

       2.     Section 663 Does Not Apply Because Required Plans Have Never Been Approved ............................... 43

       3.     There Is No Law to Apply to Determine If the "Provisions" for Fish and Wildlife Are "Adequate" ..... 44

    D.     NWF's Claim Under the 1946 RHA Was Also Futile ........... 46

    E.     NWF's Three-Year Delay Warrants Denying Leave to Amend ........................................................ 54

Conclusion ........................................................ 57

Certificate of Compliance with Length Limit and Typeface and Type-

Style Requirements ................................................................. C-1

Certificate of Service ............................................................. C-1

# TABLE OF CITATIONS

**Supreme Court Opinions**                                      **Page(s)**

*CFTC v. Schor,*

    478 U.S. 833 (1986) ........................................................... 35

*Merit Mgmt. Grp., LP v. FTI Consulting, Inc.,*

    583 U.S. 366 (2018) ........................................................... 31

**Eleventh Circuit Opinions**

*Andrx Pharms., Inc. v. Elan Corp., Pub. Ltd. Co.,*

    421 F.3d 1227 (11th Cir. 2005) ........................................ 55

*Bledsoe v. Palm Beach Cnty. Soil & Water Conservation Dist.,*

    133 F.3d 816 (11th Cir. 1998) .......................................... 28

*Boyd v. Holman Corr. Facility,*

    856 F.3d 853 (11th Cir. 2017) .......................................... 19

*Brewer-Giorgio,*

    216 F.3d ........................................................................... 55

*Cockrell v. Sparks,*

    510 F.3d 1307 (11th Cir. 2007) ........................................ 42

*Cont'l Cas. Co. v. Winder Labs., LLC,*

    73 F.4th 934 (11th Cir. 2023) ............................... 19, 18-19

*Coventry First, LLC v. McCarty,*

    605 F.3d. 865 (11th Cir. 2010) ........................................ 19

*Fla. Evergreen Foliage v. E.I. Dupont De Nemours & Co.,*

    470 F.3d 1036 (11th Cir. 2006) ............................................................ 19, 55-56

*Hollywood Mobile Estates Ltd. v. Seminole Tribe of Fla.,*

    641 F.3d 1259 (11th Cir. 2011) ....................................................................... 19

*In re Appling,*

    848 F.3d 953 (11th Cir. 2017)........................................................................ 29

* *In re MDL-1824 Tri-State Water Rights Litig.,*

    640 F.3d 1160 (11th Cir. 2011) ..................................... ix, 7, 10, 18, 47, 52, 53

*In re Wild,*

    955 F.3d 1196 (11th Cir. 2020) ...................................................................... 28

*Islam v. Dep't of Homeland Sec.,*

    997 F.3d 1333 (11th Cir. 2021) ...................................................................... 20

*Maynard v. Bd. of Regents,*

    342 F.3d 1281 (11th Cir. 2003) ...................................................................... 55

*Medberry v. Crosby,*

    351 F.3d 1049 (11th Cir. 2003) ................................................................. 29-30

*Thomas v. Cooper Lighting, Inc.,*

    506 F.3d 1361 (11th Cir. 2007) ...................................................................... 56

*United States v. Brame,*

    997 F.2d 1426 (11th Cir. 1993) ...................................................................... 29

*United States v. Obando,*

    891 F.3d 929 (11th Cir. 2018) ........................................................................ 28

*United States v. Sec'y Fla. Agency for Health Care Admin.,*

  21 F.4th 730 (11th Cir. 2021) .......................................................... 27

*United States v. Silva,*

  443 F.3d 795 (11th Cir. 2006) ................................................... 27-28

## Federal Court Opinions

\* *Nat'l Wildlife Fed'n v. United States Army Corps of Eng'rs,*

  75 F.4th 743 (7th Cir. 2023) ........................................ 24, 25-26, 31

*Nat'l Wildlife Fed'n v. United States Army Corps of Eng'rs,*

  2022 WL 195332 (S.D. Ill. Jan. 22, 2022) ............................. 24, 25

\* *South Dakota v. Ubbelohde,*

  330 F.3d 1014 (8th Cir. 2003) ............................................ 2, 8, 45

*Missouri v. Corps of Eng'rs,*

  526 F. Supp. 660, 677 (W.D. Mo. 1980) ....................................... 37

## United States Code

5 U.S.C. § 706 ................................................................................. 20

5 U.S.C. §§ 701–706 ....................................................................... vii

16 U.S.C. § 662 ............................................................................... 36

16 U.S.C. § 663 .................................... 17, 21, 22, 23, 35, 39, 40, 41, 42, 43, 44

16 U.S.C. §§ 661–666c ................................................................... vii

28 U.S.C. § 1291 ............................................................................. vii

28 U.S.C. § 1331 ....................................................................... vii, 36

33 U.S.C. § 709 ................................................................................. 8

33 U.S.C. § 2282 ............................................................ 30, 33

33 U.S.C. § 2282a ........................................................... 28-29

33 U.S.C. § 2282d ........................................................... 29

33 U.S.C. § 2282e ........................................................... 29

33 U.S.C. § 2283 ......................... vii, 1, 15, 16, 18, 20, 21, 24, 27, 26, 27, 31, 34

33 U.S.C. § 2283a ........................................................... 29

33 U.S.C. § 2319 ............................................................ 8

33 U.S.C. § 2346) ........................................................... 30

42 U.S.C. §§ 4321–4347 ................................................. vii, 38

## Other

33 C.F.R. § 320.4 ........................................................... 36

40 C.F.R. § 122.44 ......................................................... 14

Anita S. Krishnakumar, Statutory History,

    108 Va. L. Rev. 263, 312–13 (Apr. 2022) ..................... 32

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| NEPA | National Environmental Policy Act |
| FWCA | Fish and Wildlife Coordination Act of 1958 |
| RHA | Rivers and Harbors Act |
| 2017 Manual | Master Water Control Manual for the Apalachicola-Chattahoochee-Flint River Basin in Alabama, Florida, and Georgia and a Water Supply Storage Assessment |
| ROD | Record of Decision |

## STATEMENT REGARDING ADOPTION OF
## OTHER PARTIES' BRIEFS

The Water Supply Providers adopt the responses of the State of Georgia and Federal Defendants to NWF's arguments regarding its claims under the National Environmental Policy Act contained in Part I of NWF's opening brief.

## STATEMENT OF SUBJECT-MATTER AND APPELLATE
## JURISDICTION

The Court has jurisdiction under 28 U.S.C. § 1331 because NWF's claims arise under the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–4347; the Water Resources Development Act of 2007, 33 U.S.C. § 2283; the Fish and Wildlife Coordination Act, 16 U.S.C. §§ 661–666c; the Rivers and Harbors Act of 1946, Pub. L. 79-525, 60 Stat. 634 (1946); and the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706.

The Court has appellate jurisdiction under 28 U.S.C. § 1291 because this is an appeal from a final judgment entered against NWF disposing of all Plaintiffs' claims. Docs. 146, 234, 235.

## STATEMENT OF THE ISSUES

1.     Whether the District Court correctly dismissed NWF's claim that 33 U.S.C. § 2283(d) requires inclusion of a "specific mitigation plan" in the EIS and ROD, where this requirement applies only to "reports" as that term is used in WRDA, and the 2017 Manual, EIS, and ROD are not "reports" in that sense, which is used for communications intended for Congress.

2.     Whether the District Court correctly denied NWF's motion for leave to amend its complaint, where NWF originally pleaded, but then expressly abandoned, one of the claims it sought to add; both claims were futile; and NWF provided no justification for waiting more than three years to assert claims it could have asserted at the outset.

3.     Whether the District Court correctly granted summary judgment on NWF's claim under the National Environmental Policy Act, where the Corps conducted an extensive environmental analysis, reasonably defined its objectives, reasonably screened certain alternatives, and subjected the remaining alternatives to rigorous review and study.

## STATEMENT OF THE CASE

This case involves a challenge by Appellants National Wildlife Federation, Florida Wildlife Federation, and Apalachicola River and Bay Keeper (collectively, "NWF") to the United States Army Corps of Engineers' adoption in 2017 of a long-needed update to the Master Water Control Manual for the Apalachicola-Chattahoochee-Flint ("ACF") River Basin (the "2017 Manual"). It is the latest case, and hopefully the last, in a decades-long controversy regarding the Corps' management of the ACF Basin.

The 2017 Manual explains how the Corps will operate its system of reservoirs on the Chattahoochee River. It is the first Master Manual in the history of the ACF Basin to provide for the coordinated operation of all five projects consistent with modern conditions. It includes a balanced drought operations plan to ensure all stakeholders "share the pain" when there is not enough water; protects endangered species at all times; provides navigation windows to accommodate commercial traffic in the Apalachicola River; and fulfills the original Congressional vision of using Lake Lanier to provide an assured source of water supply for Metropolitan Atlanta.

If affirmed, the 2017 Manual also may put an end to the "Tri-State Water Wars" and set the stage for future cooperation between the States. Alabama, Georgia, the Water Supply Providers, and the Corps have reached an agreement to resolve Alabama's claims related to the Corps' reservoir operations in the ACF Basin and metropolitan Atlanta's water supply withdrawals from Lake Lanier and the Chattahoochee River. *See* ECF 59 & Ex. 1.[1] If implemented by the Corps, all interstate litigation concerning the ACF Basin will be concluded.

All that remains is the resolution of this appeal, in which NWF claims the Corps' carefully balanced operational plan does not give sufficient priority to fish and wildlife in the Apalachicola River and Bay, and that more study is needed — because a five-year, 7,000-page EIS is not enough.

The District Court rightly rejected each of these contentions, and its decisions should be affirmed. The 2017 Manual strikes a careful balance among competing purposes of the ACF reservoirs. And, after exhaustive study, the EIS concludes the selected plan will "have no

---

[1] All references to papers filed in this appeal are to the ECF Number and the page number that appears in the header generated by the Court's ECF system.

appreciable incremental effect on flow conditions in the Apalachicola River," AR54628,[2] "no incremental effect on freshwater inflows to Apalachicola Bay," AR54633, and "no more than negligible effects on flow conditions in the Apalachicola River, or water quality salinity and fish and aquatic resources in the River or Bay," AR138–39. The Corps' decision to adopt the 2017 Manual should be upheld so the protracted litigation over the ACF Basin can be brought to a long-overdue conclusion.

## I.    Course of Proceedings Below

NWF and Alabama filed separate suits challenging the 2017 Manual, EIS, and Record of Decision ("ROD") in the United States District Court for the District of Columbia on April 17, 2017. Docs. 1, 7. On March 29, 2018, the court in Washington, D.C. transferred the cases to the United States District Court for the Northern District of Georgia, Docs. 84, 85, 86, where they were consolidated, Doc. 101.

---

[2] Most documents in the administrative record are labeled with the prefix "ACF-18_" followed by an eight-digit number. For example, the Corps' Record of Decision is Bates labeled as "ACF-18_00000131." Unless otherwise specified, the Water Supply Providers have omitted the prefix and extra digits for ease of reading, so the Record of Decision is cited simply as "AR131."

On May 22, 2020, the District Court granted judgment on the pleadings under Federal Rule of Civil Procedure 12(c) as to Counts II and III of NWF's complaint. Doc. 146. Following the District Court's ruling, NWF on June 26, 2020 sought leave to amend its complaint, Doc. 152, a motion the Water Supply Providers, Federal Defendants, and State of Georgia opposed, Docs. 154, 155, 156. The District Court denied NWF's motion to amend on October 10, 2020. Doc. 160.

The parties then filed cross-motions for summary judgment as to Count I, NWF's only remaining claim. Docs. 165, 168, 168-1, and 219 (NWF MSJ); 201 and 203 (Federal Defs.' Resp. and Cross-MSJ); 213 and 214 (Georgia Resp. and Cross-MSJ); 217 and 218 (Water Supply Providers Resp. and Cross-MSJ); 224 and 225 (NWF Reply and Resp.); 228 (Federal Defs.' Reply); 231 (Georgia Reply); and 233 (Water Supply Providers Reply).

On August 11, 2021, the District Court granted summary judgment in favor of the Federal Defendants, Water Supply Providers, and State of Georgia on all remaining claims. Doc. 234. The clerk entered final judgment on August 12, 2021. Doc. 235. NWF filed its Notice of Appeal in the District Court on October 6, 2021. Doc. 243.

## II.    Statement of Facts

### A.    The ACF Reservoir System

The Corps operates its reservoirs on the Chattahoochee River pursuant to "specific" and "general" authorities established by Congress. Specific authorities are established in the original legislation authorizing construction of the projects, beginning with the River and Harbor Act of 1946 ("1946 RHA"), Pub. L. 79–525, 60 Stat. 634 (1946), which originally authorized the system to be constructed for purposes of navigation, flood control, hydropower, and water supply. *In re MDL-1824 Tri-State Water Rights Litig.*, 644 F.3d 1160, 1167–68 (11th Cir. 2011). This specific authority is supplemented by "general authorities," such as the Flood Control Act of 1944 and Fish and Wildlife Coordination Act, 16 U.S.C. §§ 661 *et. seq.*, which provide more limited authority to operate the reservoirs for other objectives that are not inconsistent with the primary purposes identified by the specific authority of the 1946 RHA. AR54164–65.

Notwithstanding its importance to this scheme, the 1946 RHA did not specifically enumerate the "authorized purposes" of the ACF Reservoir System. It merely authorized the Secretary to proceed in accordance with a report by Division Engineer Newman (the "Newman

Report") dated March 13, 1946. *See* Pub. L. 79-525, 60 Stat. 635, H.R. Doc. No. 80–300 (1947), SUPPAR004057. The Newman Report thus "became part of the authorizing legislation for the project," *Tri-State Water Rights*, 644 F.3d at 1168, and it is this document that defines the "authorized purposes" the Corps must balance when it develops a Master Manual, *id*. at 1186–87.

The Newman Report recommended that Congress authorize a system of reservoirs to provide for navigation, hydropower, flood control, and an "assured source of water supply" for metropolitan Atlanta. *Id.* at 1167–68, 1187–92. The "Buford Project" would impound what is now known as Lake Lanier. In addition to providing water supply to the Atlanta area, General Newman advised Congress that the Buford project would include a hydroelectric plant with "28,900 kilowatts of installed capacity and a dependable capacity of 24,000 kilowatts." SUPPAR004075. More importantly, General Newman advised that "flow regulation by [the Buford Project] is necessary to the economical development of hydroelectric power at" Lake Seminole (then called "Junction") and a second location ("Columbia") near the present-day West Point Lake. *Id.*

## B.   The Master Manual and Water Control Plan

While defining the purposes for which the ACF Projects are operated, the 1946 RHA and Newman Report also entrust the Corps with substantial discretion to balance purposes when these objectives conflict, as they often do. *See South Dakota v. Ubbelohde*, 330 F.3d 1014 (8th Cir. 2003). This balance is left mostly to the Corps, which is required to document its choices in a "Water Control Plan" developed with appropriate environmental analysis and public participation. Corps regulations describe the Water Control Plan as follows:

> The melding of all [authorized and operating purposes] is reflected in the water control plan. In many cases, the uses are somewhat conflicting, and some degree of compromise is required to achieve the water management goals…. The balancing of water use demands and priorities are defined in the water control plan.

ER 1110-2-3600, Management of Water Control Systems (30 Nov. 1987) at p. 2-2 ¶ 2-1(d).

By statute and regulation, Water Control Plans are required for every Corps project. *See* 33 U.S.C. § 709; 33 U.S.C. § 2319; ER 1110-2-240 p. 3-1 (May 2016); *see also Ubbelohde*, 330 F.3d at 1019 (discussing the Corps' duty to prescribe regulations under 33 U.S.C. § 709 and its

duty to "strike a balance among many interests" in managing the Missouri River Basin). When multiple projects operate as a system, like the ACF, a "Master Manual" including Water Control Plans for each project is also required.

## C.    The Tri-State Water Wars

The 2017 Manual was a long time coming. It is the result of a process that began in the early 1970s, when State and regional officials realized that changes to a Master Manual issued in 1958 were needed to address new conditions and new challenges. These new conditions include construction of three new reservoirs after the 1958 plan was adopted, new environmental requirements, the need for a drought plan, and a growing recognition that changes were needed to fulfill the system's original purpose of ensuring an adequate water supply for metropolitan Atlanta. AR54084–85.

Following a collaborative study by state, local, and federal officials called the Metropolitan Atlanta Area Water Resources Management Study ("MAAWRMS"), the eventual plan was to "reallocate storage" in Lake Lanier to ensure adequate water supplies would be available for the Water Supply Providers. AR54043, AR54375–77. As part of that same

1989 action, the Corps also proposed to update the ACF Master Manual to reflect then-current conditions and include new drought operations. AR54378–79. The water supply aspects proved especially controversial, however, and Alabama and Florida sued to block their implementation in 1990, triggering the "Tri-State Water Wars" that stymied progress in the ACF Basin for the next several decades. AR54379–86.

The status of water supply as an "authorized purpose" of Lake Lanier was a major point of contention in that litigation. That issue was resolved in 2011, when this Court held that Congress originally authorized Lake Lanier to be constructed in part to "protect and assure the water supply of the Atlanta metropolitan area." *See Tri-State Water Rights*, 644 F.3d at 1193; AR54384–85. The Court further held that the Corps had wrongly denied a longstanding request by Georgia to accommodate metropolitan Atlanta's water supply needs from the reservoir, because the Corps' decision was based on an incorrect understanding of the water supply authority Congress had provided. *Tri-State Water Rights*, 644 F.3d at 1186–97. This Court thus remanded the matter to the Corps with instructions to "reexamine the request" in light of its clarified authority. *See id.* at 1197, 1200–01.

In 2012, the Corps filed a legal opinion with this Court analyzing its water supply authority at Lake Lanier, consistent with the Court's instructions. AR54035, AR54085, AR54385–86, AR33734–81. The Corps concluded the agency had the authority to grant Georgia's request and meet metropolitan Atlanta's water needs, but an environmental impact statement would be needed to guide its final decision regarding the specific quantities of water that could be provided to the Water Supply Providers. AR54385, AR33735 & n.4.

### D. The 2017 Update to the ACF Master Manual

Following this Court's *Tri-State Water Rights* decision, the Corps reinitiated the long process of updating its 1958 Master Manual for the ACF System, which by then was even more out of date. After initiating the study in 2012, the Corps then spent the next five years hearing from stakeholders, considering alternatives, and preparing an Environmental Impact Statement to update its operation of the ACF System to balance the needs of all stakeholders.

The Environmental Impact Statement takes a hard look at a wide range of impacts to the myriad of interests identified through the Corps' scoping process, which included substantial opportunities for public

participation, including multiple open houses, notice-and-comment, and preparation of a formal "Scoping Report" that identified numerous stakeholders, interests, and potential benefits and impacts to be evaluated. AR54087–101, AR68454–608. These included benefits and impacts to aquatic species and water quality from different reservoir release patterns; the deleterious effects of flooding; the deleterious effects of controlling floods, including environmental impacts from reduced floodplain inundation; the benefits of providing an assured water supply to the metropolitan area, including the environmental impact of *failing* to do so, such as the construction of new reservoirs by local governments turned away from Lake Lanier; and the benefits and impact of providing "navigation windows" to entice commercial barge traffic to return to the Apalachicola River. *See generally* AR68454–608.

The Corps also coordinated extensively with the U.S. Fish & Wildlife Service ("USFWS") and state wildlife agencies about the impacts to fish and wildlife of the 2017 Manual and proposed alternatives. The consultations and the resulting recommendations are set out in nearly 1,400 pages of correspondence and reports in the EIS. AR54416, AR54820–33, AR57599–58984. As required by the Endangered Species

Act, the Corps also initiated "formal consultation" with USFWS regarding possible impacts and mitigation for threatened and endangered species. AR58985–59447.

After completing its initial evaluation, the Corps prepared a Draft EIS, held another set of open-houses at locations throughout the ACF Basin, and accepted comments from the public, including NWF as well as state and federal agencies. AR54101, AR55374–56646. After revising its proposal based on comments received, the Corps released an EIS spanning almost 7,000 pages that analyzed potential environmental impacts of the selected operating plan and numerous alternatives, including many proposed by the federal and state wildlife agencies. *See generally* AR53976–59870 [EIS Vols. 1-7]. The Corps also accepted and responded to comments on the Final EIS before issuing its ROD adopting the preferred alternative. AR54104, 142–48.

The EIS concludes the 2017 Manual will have, at most, a "negligible" effect on the Apalachicola River and Bay. AR54075. It finds the Corps' updated operations would have "no effects on fish and aquatic resources" in the Apalachicola River estuary, *id.*; "no appreciable incremental effect on flow conditions in the Apalachicola River,"

AR54628, AR54624–28; and "no incremental effect on freshwater inflows to Apalachicola Bay," AR54632–33.

While the EIS found at most "negligible" impacts downstream in the Apalachicola River and Bay, it stated that the Corps' computer modeling showed the potential for adverse water quality impacts in the upper reaches of the Chattahoochee River near Atlanta if the State of Georgia failed to comply with the Clean Water Act by allowing future discharges to violate Clean Water Act requirements. AR54057, AR54718, AR54735.

The EIS also recognized, however, that the Clean Water Act requires Georgia to adjust limits in future discharge permits to ensure future discharges do not violate applicable water quality standards. *See* 40 C.F.R. § 122.44(d), AR54260, AR54518. Given the existence of this clear statutory mandate, and the appropriate presumption that Georgia will comply with federal law, the EIS "assume[d] that over time, water quality standards will be met because of reductions achieved" through Clean Water Act requirements. AR54924.

## E.    The Record of Decision

On March 30, 2017, the Corps issued a ROD adopting the 2017 Manual for the ACF Basin. AR131–49. The ROD adopts the "preferred alternative" for system operations identified through the EIS. AR132. It also reiterates the Corps' earlier conclusion in the EIS that the overall effects of its changed operations "on flow conditions, salinity, or fish and aquatic resources in the Apalachicola River and Bay" will be "negligible" at most. AR138–39.

## F.    NWF's Lawsuit Challenging the 2017 Manual

NWF sued to challenge the 2017 Manual shortly after it was adopted. Doc. 7. NWF's complaint stated three claims: (1) Count I, alleging the EIS is legally insufficient; (2) Count II, alleging a violation of 33 U.S.C. § 2283(d), which was enacted as part of the Water Resources Development Act of 1986 ("WRDA 1986") and amended by the Water Resources Development Act of 2007 ("WRDA 2007"); and (3) Count III, alleging a violation of provisions of the Fish and Wildlife Coordination Act of 1958. *See generally id.*

### G.     The Water Supply Providers' Motion for Partial Judgment on the Pleadings

The Water Supply Providers moved for judgment on the pleadings as to Counts II and III in July 2018. Docs. 116; 127. The District Court granted this motion as to both claims in an order dated May 22, 2022. Doc. 146 at 1, 10–22.

Regarding NWF's claim under WRDA 2007 in Count II, the District Court held that 33 U.S.C. § 2283(d) applies only to "reports" submitted by the Corps to Congress. Doc. 146 at 11-19. This ruling was based on the plain text of the statute guided by the ordinary rules of statutory construction. It is also supported by the drafting history of § 2283(d), which is unusually clear in establishing that operative limitations in the text of § 2283(d) were very specifically intended.

Regarding Count III, the District Court held the FWCA does not establish "fish and wildlife conservation" as a "co-equal purpose" of the ACF System, and thus the Corps violated no duty by declining to treat it as such. Doc. 146 at 20-22. Because NWF's complaint had not identified any specific provision of the FWCA as allegedly having been violated, the Water Supply Providers had, in their brief, demonstrated that NWF could not state a claim under any section of the FWCA, including

specifically Section 663. Doc. 116-1 at 25–27. In its response, NWF urged the Court not to address these arguments, stating they were "irrelevant" because NWF "[had] not asserted … a claim under Section 663." Doc. 122 at 25.

### H.    NWF's Motion to Amend

After the District Court granted the Water Supply Providers' motion, NWF sought leave to amend its complaint to add "new" claims remarkably similar to the claims that had just abandoned and/or dismissed. Doc. 152. These included a claim under Section 663 of the FWCA asserting that it requires the Corps to make "adequate provision" for fish and wildlife, even if it is not required to treat fish and wildlife as a "co-equal purpose." Additionally, NWF proposed to add a new claim asserting that fish and wildlife is a "co-equal purpose" under the 1946 RHA, if not the FWCA. The District Court denied NWF's motion to amend on October 22, 2020. Doc. 160.

In its ruling denying leave to amend, the District Court acknowledged NWF's prior representation that "they were not asserting a claim under Section 663," *id.* at 4, before denying leave to add a claim under Section 663 on grounds of futility, *id.* at 4–11. Regarding NWF's

proposed claim under the 1946 RHA, the District Court carefully analyzed the authorizing legislation, consistent with this Court's decision in *Tri-State Water Rights. Id.* at 5–11. Based on that analysis, the District Court found that nothing in the RHA supported NWF's claim that it "suggests a specific intent to benefit fish and wildlife downstream or imposes a specific duty on the Corps regarding fish and wildlife conservation in the ACF Basin." *Id.* at 11. The District Court thus found NWF's proposed claim futile, explaining that it "fails to state a claim because the Plaintiffs failed to identify any statutory basis for the duties allegedly violated by the Corps." *Id.*

## I.   Summary Judgment, Appeal, and Agreement with Alabama

On August 11, 2021, the District Court granted summary judgment dismissing all remaining claims by Alabama and NWF. Alabama and NWF both appealed; but Respondents and Respondent-Intervenors reached an agreement with the State of Alabama, whose appeal has been stayed pending review and implementation of the compromise.

## III.   Standard of Review

A district court's grant of judgment on the pleadings is reviewed *de novo. Cont'l Cas. Co. v. Winder Labs., LLC*, 73 F.4th 934, 940 (11th Cir.

2023). Judgment on the pleadings should be granted when, taking the facts alleged as true, "the moving party is entitled to judgment as a matter of law." *Id.* (quotations omitted).

Denial of leave to amend the pleadings is reviewed for abuse of discretion, but the underlying legal conclusions are reviewed *de novo*. *Coventry First, LLC v. McCarty*, 605 F.3d. 865, 869 (11th Cir. 2010). "[A] motion to amend may be denied on numerous grounds such as undue delay, undue prejudice to the defendants, and futility of the amendment." *Fla. Evergreen Foliage v. E.I. Dupont De Nemours & Co.*, 470 F.3d 1036, 1041 (11th Cir. 2006) (quoting *Brewer-Giorgio v. Producers Video, Inc.*, 216 F.3d 1281, 1284 (11th Cir. 2000) (citations and internal quotation marks omitted)). A district court's determination that an amendment would be futile is reviewed *de novo*. *Hollywood Mobile Estates Ltd. v. Seminole Tribe of Fla.*, 641 F.3d 1259, 1264 (11th Cir. 2011). "An amendment is considered futile when the claim, as amended, would still be subject to dismissal." *Boyd v. Holman Corr. Facility*, 856 F.3d 853, 864 (11th Cir. 2017).

In an Administrative Procedure Act case, a district court's grant of summary judgment is reviewed *de novo*, applying the familiar APA

standard providing for agency actions to be upheld unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." 5 U.S.C. § 706(2)(A); *Islam v. Dep't of Homeland Sec.*, 997 F.3d 1333, 1346 (11th Cir. 2021). Under this "deferential standard," the Court assesses "whether the agency's decision demonstrates a 'rational connection between the facts found and the choice made.'" *Id.* (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). The Court's role is simply "to ensure that the agency came to a rational conclusion, not to conduct [its] own investigation and substitute [its] own judgment for the administrative agency's decision." *Id.* (quoting *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008)).

## SUMMARY OF THE ARGUMENT

1.     The District Court correctly held that 33 U.S.C. § 2283(d) does not apply to the 2017 Manual, EIS, or ROD. Section 2283(d) requires a "specific mitigation plan" to be included in a "report," a term that is used in WRDA statutes to refer to communications intended for Congress. The 2017 Manual, EIS, and ROD are not "reports" in that sense.

The text of Section 2283(d) shows that it applies only to reports submitted to Congress recommending authorization for new projects or (as amended in WRDA 2007) recommending or reporting on changes to projects previously authorized. Therefore, it does not apply to the 2017 Manual, EIS, or ROD. The syntax of Section 2283(d), its statutory context, its legislative history, and the contemporaneous official implementation guidance provided by the Corps all confirm this interpretation.

2.    The District Court properly denied NWF's motion to amend its complaint to add claims under Section 663 and the 1946 RHA.

2a.    After alleging in Count III of its original complaint that the Corps violated the FWCA by failing to make "adequate provision" for fish and wildlife — as it now claims is required by 16 U.S.C. § 663 — NWF expressly abandoned any claim under that code section in response to the Water Supply Providers' motion for judgment on the pleadings, stating it "was not making a claim under Section 663." The District Court accepted and relied on that representation when it declined to address the Water Supply Providers' argument that NWF could not state a claim under

Section 663. There is no error in denying leave to amend to add a claim NWF expressly abandoned.

But, whether or not abandoned, the claim was futile for the reasons set forth in the Water Supply Providers' motion for judgment on the pleadings: *First,* the FWCA applies only to projects authorized after its passage in 1958. Of the five ACF Projects, only West Point Lake was authorized after 1958; but FWCA procedures were followed for that project for that very reason, and Congress authorized and accepted the "provisions" for wildlife conservation at West Point Lake as being "adequate" when it authorized the project based on the reports provided by the Corps.

*Second,* to the extent Section 663(b) applies, it requires any plans for the "adequate provision" for fish and wildlife to be "in accordance with" plans approved by "the head of the agency exercising the administration of the wildlife resources of the particular State wherein the waters and areas lie." Because the water and areas affected by the ACF projects lie almost entirely in Georgia and Alabama, but neither State approved any plan consistent with the plans advocated by NWF, NWF cannot state a claim under Section 663(a).

*Third*, to the extent Section 663(a) applies, there is no law for this Court to apply to determine whether the Corps' provision for fish and wildlife conservation was "adequate." As such, the decision about how to best "provide" for fish and wildlife conservation is committed to the Corps' discretion.

2b. The District Court was also correct that NWF's claims under the 1946 RHA were futile. Nothing in the 1946 RHA or the Newman Report shows that Congress intended fish and wildlife conservation to be a "coequal purpose" of the ACF System, or for fish and wildlife to be given any greater priority than the substantial attention they were given. The authorities NWF cites are entirely unpersuasive.

2c. Finally, NWF unduly delayed in seeking leave to amend. NWF offered no justification for waiting over three years to assert claims it could have asserted at commencement. There was no change in the facts or law. This court does not permit seriatim testing of legal theories that could have been pleaded originally.

**ARGUMENT**

## I. The District Court Correctly Dismissed NWF's Section 2283(d) Claim

This Court should affirm the District Court's holding that the "mitigation plan" requirement under 33 U.S.C. § 2283(d) does not apply to the 2017 Manual, EIS, or Record of Decision. The text, context, and history of Section 2283(d) show that the requirements established in that code section apply only to "reports" submitted to Congress within the framework of the Water Resources Development Act.

The United States Court of Appeals for the Seventh Circuit recently rejected NWF's § 2283(d) theory in a decision against NWF in an unrelated case. *See Nat'l Wildlife Fed'n v. United States Army Corps of Eng'rs*, 75 F.4th 743, 749–53 (7th Cir. 2023) (unanimously affirming the district court's ruling in *Nat'l Wildlife Fed'n v. United States Army Corps of Eng'rs,* 2022 WL 195332, 2022 U.S. Dist. LEXIS 11747 (S.D. Ill. Jan. 22, 2022)). Without referring to the District Court's decision in this case, a unanimous Seventh Circuit panel independently reached the same conclusion. Like the District Court here, the Seventh Circuit concluded based on statutory text and canons of interpretation that, "the better understanding of 'report' in § 2283(d)(1) is that the term refers only to a

report submitted to Congress." *Id*. at 749. This Court should follow the Seventh Circuit and affirm the District Court's judgment for all the same reasons.

## A.    Statutory Background

"Water Resources Development Acts" are the omnibus statutes used by Congress to authorize and direct the Corps' civil works program. These statutes are typically enacted on a biennial cycle, and they are often distinguished by the year of enactment (*e.g.*, "WRDA 1986"). The WRDA statutes have the same structure and perform the same function as the 1946 RHA that authorized the ACF Projects, and many other "River and Harbor" and "Flood Control" Acts of earlier decades, before these bills all became "Water Resources Development Acts."

As the Seventh Circuit observed in rejecting NWF's Section 2283(d) claim, the WRDA statutes and their predecessors amount to a "dialogue" between Congress and the Corps regarding the Corps' civil works program. *See Nat'l Wildlife Fed'n*, 75 F.4th at 750 ("From the early days of the Republic, internal improvements to promote commerce, including river management and flood control, have been a major focus of federal spending and personnel, with Congress legislating and appropriating

many details of the improvements."). This dialogue includes direction provided by Congress through WRDA statutes, "studies" performed by the Corps in response to "study authorities" provided by those statutes, and "reports" submitted by the Corps to Congress to document its studies and to recommend projects for authorization in future WRDA statutes.

Within that context, Section 2283(d) was originally enacted as Section 906 of WRDA 1986, as follows:

> (d) After the date of enactment of this Act, the Secretary shall not submit any proposal for the authorization of any water resources project to the Congress unless such report contains (1) a recommendation with a specific plan to mitigate fish and wildlife losses created by such project, or (2) a determination by the Secretary that such project will have negligible adverse impact on fish and wildlife.[3]

This provision was amended in WRDA 2007, which inserted the phrase "and shall not select a project alternative in any report," after the first reference to reports, as shown below:

> (d) After the date of enactment of this Act, the Secretary shall not submit any proposal for the authorization of any water resources project to the Congress **in any report, and shall not select a project alternative in any report**, unless such report contains (1) a recommendation with a specific plan to mitigate fish

---

[3] Pub. L. 99-662 (Nov. 17, 1986) § 906, 100 Stat. 4187, codified at 33 U.S.C. § 2283(d).

and wildlife losses created by such project, or (2) a
determination by the Secretary that such project will
have negligible adverse impact on fish and wildlife.[4]

NWF contends the 2007 amendment fundamentally altered the
Corps' obligations under a different statute, NEPA, by requiring "specific
mitigation plans" to be included, not only in WRDA reports submitted to
Congress, but also in environmental impact statements and records of
decision prepared by the Corps for the Corps' own use. The amended text
does not require interpreting a minor amendment to a minor provision
as effecting such a major change to the Corps' civil works program,
however; and the legislative history of the 2007 amendment is unusually
clear in demonstrating Congress did not intend this result.

**B.     Based on its Text, Section 2283(d) Applies Only to
        WRDA "Reports"**

Statutory interpretation begins "with the words of the statutory
provision[,]" which must be interpreted within the context of the text and
statute in which they appear. *United States v. Sec'y Fla. Agency for
Health Care Admin.*, 21 F.4th 730, 739 (11th Cir. 2021). Courts do not
"look at one word or term in isolation[.]" *United States v. Silva*, 443 F.3d

---

[4] Pub. L. 110-114 (Nov. 8, 2007) § 2036, 121 Stat. 1092. codified at 33 U.S.C.
§ 2283(d) (emphasis added).

795, 798 (11th Cir. 2006). "Statutory construction is a holistic endeavor," and a "provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . ." *In re Wild*, 955 F.3d 1196, 1206 (11th Cir. 2020) (cleaned up).

When the context shows that an undefined term bears a "technical meaning," or is a "term[] of art," such terms should be interpreted accordingly. *United States v. Obando*, 891 F.3d 929, 934 (11th Cir. 2018) (quoting Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 73 (2012)). This general rule applies with particular force to statutes like the WRDAs that focus on the administrative processes of a specific federal agency, such as the Corps. When specialized terms are used in this context, they should be given the meaning Congress and the Corps both understand them to have. "Congress is deemed to know the executive . . . gloss given to certain language and thus adopts the existing interpretation unless it affirmatively acts to change the meaning." *Bledsoe v. Palm Beach Cnty. Soil & Water Conservation Dist.*, 133 F.3d 816, 822 (11th Cir. 1998).

As in other WRDAs, Congress consistently used the word "report" in WRDA 2007 to refer only to reports submitted to Congress. *See*, *e.g.*,

33 U.S.C. § 2282a(f)(2) (requiring that "a report of the Chief of Engineers for a water resources project" be submitted to specified congressional committees) (added by § 2033 of WRDA 2007); 33 U.S.C. § 2282d(a) (requiring the Secretary of the Army to develop and submit to Senate and House committees a "Report to Congress on Future Water Resources Development"); 33 U.S.C. § 2282e(a) (requiring the Corps to prepare and submit to Congress a "post-authorization change report" for water resources development projects); 33 U.S.C. § 2283a(1) (requiring the Secretary to submit to specified congressional committees "a report on the status of construction of projects that require mitigation") (added by § 2036 of WRDA 2007). "[A] word or phrase is presumed to bear the same meaning throughout a text." *In re Appling*, 848 F.3d 953, 958 (11th Cir. 2017) (quoting Scalia & Garner, *supra*, at 170 (2012)). Here, that means the term "report" in Section 2283(d) should be limited to reports submitted to Congress.

Interpreting the term "report" consistently also avoids rendering other terms superfluous. "[A]ny interpretation which renders parts or words in a statute inoperative or superfluous is to be avoided." *United States v. Brame*, 997 F.2d 1426, 1428 (11th Cir. 1993); *see also Medberry*

*v. Crosby*, 351 F.3d 1049, 1060 (11th Cir. 2003) (the court should not interpret statutory text to render "any provision, or even any word, of a statute so as to make it superfluous"). Other WRDA 2007 provisions refer to "reports," "environmental impacts statements," and "records of decision." *See*, *e.g.*, Pub. L. 110-114, WRDA 2007 § 2043 (codified at 33 U.S.C. § 2282(a)(4)) (distinguishing between "reports" and "associated environmental impact statement[s] and mitigation plan[s]"); WRDA 2007 § 2041 (codified at 33 U.S.C. § 2346) (establishing filing requirements for any "final feasibility study, final environmental impact statement, final reevaluation report, final post-authorization report, record of decision, and report to Congress prepared by the Corps of Engineers"). If the term "report" included "environmental impact statements" and "records of decision," the references to "environmental impact statements" and "records of decision" would be superfluous.

Even without benefit of statutory context, linguistic analysis alone requires interpreting "any report" in the context of the words around it. The preceding clause ("shall not submit any proposal for the authorization of any water resources project to Congress in any report") supplies the contextual meaning of "report," and the language that

immediately follows it ("unless such report contains") suggests that the

meaning is consistent throughout the subsection. As the Seventh Circuit

aptly observed in rejecting the same claim by NWF:

> Congress used "report" to refer to submissions to Congress in the verb clause that immediately precedes the disputed phrase in § 2283(d)(1) itself: the specific fish and wildlife mitigation requirement applies to water resources project proposals submitted "to Congress in any report...." § 2283(d)(1). It is not unreasonable to think that congressional drafters saw no need to repeat "to Congress" in the very next verb phrase.

*Nat'l Wildlife Fed'n*, 75 F.4th at 750–51.[5]

### C. The Legislative History of the 2007 Amendment to Section 2283(d) Confirms Congress Did Not Intend to Extend it to Environmental Impact Statements or Records of Decision

The drafting history of WRDA 2007 shows with uncommon clarity

that Congress did not intend the revised text to include "environmental

impact statements," as NWF contends, because a version of the bill that

---

[5] The heading of Section 2283(d) reads, "Mitigation plans as part of *project proposals*." 33 U.S.C. § 2283(d) (emphasis added). "Although section headings cannot limit the plain meaning of a statutory text . . . they supply cues as to what Congress intended . . . ." *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 583 U.S. 366, 380 (2018) (quotations and citations omitted). As such, the heading here suggests the term "report" refers to reports to Congress requesting authorization or reevaluation.

would have done exactly that was specifically rejected in conference. *Cf Tanner v. United States*, 483 U.S. 107, 125 (1987) (O'Connor, J.) (finding that a conference committee's rejection of proposed text established with "uncommon clarity" that a proposed interpretation was not intended). Even the strictest textualists find drafting history regarding rejected proposals compelling. *See* Anita S. Krishnakumar, *Statutory History*, 108 Va. L. Rev. 263, 312–13 (Apr. 2022) (based on empirical analysis of Supreme Court decisions, concluding the Court's textualists often attribute significance to rejected proposals).

The version of WRDA 2007 originally passed by the Senate would have expanded Section 2283(d) to include "any final record of decision, environmental impact statement, or environmental assessment." S. Rep. 110-58, at 103 (Apr. 30, 2007). The version passed by the House would not have expanded the mitigation requirement at all. *See* H. R. Rep. 110-80, at 20 (Mar. 29, 2007) (establishing mitigation plan requirements without changing the circumstances in which such plans are required). The compromise adopted by the conference committee, and ultimately enacted into law, was to limit the requirement to "reports" while broadening it to include any report in which a project alternative was

selected — thus broadening the statute to include other reports, most notably "reevaluation reports" submitted to Congress to change an authorized project. The interpretation advanced by NWF would undo this compromise by "interpreting" the compromise language to have the meaning the Conference Committee rejected.

NWF's separate argument that an interpretation consistent with Section 2283(d)'s intended meaning would render it "superfluous" (ECF 37 at 76–78) misses the mark because it ignores the stated purpose of the amendment, as described its sponsor on the Senate floor: "the increased mitigation requirements apply to all new studies *and any other project that must be reevaluated for any reason.*" 153 Cong. Rec. 25,205 (Sept. 24, 2007) (emphasis added). This is consistent with the text of the amendment as interpreted by the District Court: because "reevaluation reports" are defined as a type of feasibility report" under 33 U.S.C. § 2282(a)(4), they are required to be submitted to Congress under 33 U.S.C. § 2282a(f).

## D.    Congress Has Accepted the Corps' Formal, Contemporaneous Interpretation of the 2007 Amendment

The Corps provided a definitive interpretation of WRDA 2007's amendment to Section 2283 in formal "implementation guidance" published on August 31, 2009. This guidance interprets Section 2283(d), as amended, as requiring that "any report, submitted to Congress for authorization, shall not select a project alternative unless such report contains [a specific mitigation plan or finding of no significant impact]."[6]

Congress has enacted five WRDAs since the implementation guidance was published,[7] but it has not taken any of these opportunities to "correct" the Corps' interpretation. "[W]hen Congress revisits a statute giving rise to a longstanding administrative interpretation without

[6] *See* U.S. Army Corps of Engineers, Memorandum for Commanders re: Implementation Guidance for Section 2036(a) [33 U.S.C. § 2283(d)] of the Water Resources Development Act of 2007 (WRDA 07) – Mitigation for Fish and Wildlife and Wetlands Losses, 1 (Aug. 31, 2009), available at https://bit.ly/USACE-2283.

[7] *See* Pub. L. 117-263, Division H, Water Resources Development Act of 2022; Pub. L. 116-260, Division AA, Water Resources Development Act of 2020; Pub. L. 115-270, America's Water Infrastructure Act of 2018; Pub. L. 114-322, Water Infrastructure Improvements for the Nation Act of 2016; Pub. L. 113-221, Water Resources Reform and Development Act of 2014.

pertinent change, the 'congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress.'" *CFTC v. Schor*, 478 U.S. 833, 846 (1986). If Congress intended a different meaning, it had ample opportunity to express its objections to the Corps' interpretation and revise the law; that it did not is clear evidence the Corps' interpretation coincides with Congress's intent.

***

In summary, the District Court correctly rejected NWF's interpretation of Section 2283(d), and its ruling should be affirmed.

## II. The District Court Correctly Denied NWF's Request to Amend to Add Futile Claims that Could Have Been Brought at the Outset

NWF contends the District Court erred by denying its motion for leave to amend to state "new" claims under Section 663(a) of the Fish and Wildlife Coordination Act and the 1946 RHA. Because the District Court correctly determined that both claims were futile, this Court should affirm.

In addition to futility, the Court may also determine that neither claim was "new"; that NWF originally pled but expressly abandoned its

claim under Section 663(a); that NWF's motion for leave to amend three years after the litigation commenced was untimely; that NWF has not shown any reason, let alone good cause, for waiting three years to amend its complaint to assert claims that could have been asserted based on facts included in the original complaint; and that it would be unfair to the Respondents and Respondent-Intervenors to allow an amendment under these circumstances.

## A.    Statutory Background and Pleading History

The FWCA is a procedural statute designed to provide Congress "better information on the effects of water projects on fish and wildlife resources while considering project authorizing legislation." S. Rep. No. 85-1981 (July 28, 1958), *reprinted in* 1958 USCCAN 3446, 3451. As such, the FWCA requires the Corps to consult with fish and wildlife agencies and give consideration to their recommendations in deciding whether to recommend a project for authorization by Congress or to issue a Section 404 permit authorizing construction of a dam. *Id.*; *see also* 16 U.S.C. § 662(b); 33 C.F.R. § 320.4(c).

Courts have recognized that the FWCA's procedures "largely duplicate those imposed by NEPA" and that compliance with NEPA "will

'automatically take into consideration all of the factors required by the Fish and Wildlife Act . . . .'" *E.g.*, *Missouri v. Corps of Eng'rs*, 526 F. Supp. 660, 677 (W.D. Mo. 1980) (quoting *Envtl. Def. Fund, Inc. v. Froehlke*, 473 F.2d 346, 356 (8th Cir. 1972)). Thus, to the extent NWF complains that the Corps' consideration of alternatives intended to benefit fish and wildlife was improper, those claims can be adequately addressed in the context of NWF's NEPA claims.

In the case below, NWF does not allege that the Corps failed to comply with any procedural requirement under FWCA. Nor could it. Whether or not FWCA procedures were legally mandated in this case — given that neither the Master Manual nor the EIS recommends structural modifications to its reservoirs and neither constitutes a "report or recommendation to Congress"[8] — the Corps followed them as part of its NEPA process. The EIS includes nearly 1,400 pages of reports, correspondence, and other FWCA coordination materials. *See* AR57599–

---

[8] As stated in the EIS: "Although the PAA does not include any construction or structural modifications to the ACF Basin projects, nor is a report or a recommendation to Congress part of this effort, [the Corps] used the general framework of the FWCA to solicit input from USFWS and state agencies and to organize the information provided." EIS at 6-285 & Vol. 6, Appx. J, at 2.

58984 [EIS Vol. 6, Appx. J, at pp. 1 to 1,386]. This more than satisfies any procedural obligations under the FWCA.

Rather than alleging a procedural violation, NWF made an incorrect substantive claim in its original complaint. Specifically, NWF asserted that the FWCA changed the statutory criteria for the Corps' evaluation of the 2017 Manual by making fish and wildlife conservation a "coequal purpose" to be given "equal consideration" in relation to other authorized purposes. NWF repeatedly asserted in its Complaint that these provisions "require[] the Corps to manage the ACF to avoid damage to, and improve the health of, all fish and wildlife affected by the project." Doc. 7 at 50 (¶ 221). The Water Supply Providers showed in their motion, however, that the FWCA provision on which NWF principally relied, Section 661, applies only to "the Secretary of the Interior," who has no authority over or connection to the Army Corps of Engineers, and merely authorizes the Interior Secretary to perform certain tasks that have no bearing on the Corps or its reservoirs.[9] 16 U.S.C. § 661(b). The District

---

[9] Under the FCWA, "the Secretary of the Interior is authorized" to perform acts such as (1) "provid[ing] assistance to" federal, state, and other agencies on a range of things like "the development, protection, rearing, and stocking of all species of wildlife, resources thereof, and their

Court thus properly dismissed NWF's original claim, and NWF has not appealed that ruling.

In addition to asserting that Section 661 makes fish and wildlife conservation a "coequal purpose" of all Corps water projects, NWF's original complaint also made other claims under other provisions of the FWCA, including Section 663. For example, NWF's original complaint criticized the Corps' allegedly "abject failure to adequately provide for fish and wildlife conservation in the Apalachicola River, Floodplain and Bay, and in the Chattahoochee River." Doc. 7 at 50 (¶ 224). And NWF specifically alleged in Count III of its original complaint that the Corps violated FWCA by failing "to adequately provide for fish and wildlife conservation," including the following allegation, which NFW now characterizes as stating a claim under Section 663(a):

> The Corps' failure to properly interpret and account for the fish and wildlife conservation purpose is reflected in the Updated WCM's abject *failure to adequately provide for fish and wildlife conservation* in the Apalachicola ecosystem and the Chattahoochee River.

---

habitat," "in providing public shooting and fishing areas," and in carrying out other measures to effectuate the purposes of the act; (2) to survey and prepare reports on "wildlife of the public domain"; and (3) "to accept donations of land and contributions of funds" in furtherance of the act. 16 U.S.C. § 661(b).

Doc. 7 at 53 (¶ 238) (emphasis added).

The Water Supply Providers' motion for judgment on the pleadings addressed this allegation and showed that NWF could not state a claim under Section 663(a) for three reasons. Doc. 116-1 at 25–27. Instead of responding to these arguments, NWF stated that the Water Supply Providers' arguments regarding Section 663 were "irrelevant" because NWF had "not asserted … a claim under Section 663." Doc. 122 at 25. The District Court declined to address Section 663 in its order based on this representation by NWF. *See* Doc. 146 at 21–22 (stating that "Plaintiffs clarify that they are not … asserting a claim under Section 663" and citing NWF's response to the Water Supply Providers' motion); *id*. at 20–22 (declining to address arguments related to Section 663).

The proposed amended complaint repeats the original allegation while adding a legal citation to Section 663(a), as shown in the redline of its complaint NWF submitted to the District Court:

> The Corps' failure to properly interpret and account for the fish and wildlife conservation purpose is reflected in the Updated WCM's abject failure to adequately provide for fish and wildlife conservation in the Apalachicola ecosystem and the Chattahoochee River. See 16 U.S.C. § 663(a) (requiring the Corps to make adequate provision for fish and wildlife conservation).

Doc. 152-3 at 62 (¶ 236) (emphasis in redline provided by NWF). The District Court did not err when it denied NWF's motion to amend to restate the claim the court had just dismissed.

## B.   NWF Expressly Abandoned the Claim it Originally Pled Under Section 663

NWF either abandoned or waived any claim under Section 663. Because the amended complaint did not add any material new factual allegations, and the Water Supply Providers showed in their motion that none of those allegations stated a claim under any provision of the FWCA, including Section 663, the District Court's order granting judgment on the pleadings — which NWF has not appealed — applies with equal force to the proposed amendment. Any arguments or citations of authority to support its allegation in Count III of NWF's original complaint that the Corps "fail[ed] to adequately provide for fish and wildlife conservation in the Apalachicola ecosystem and the Chattahoochee River" could have and should have been made in NWF's response to that motion. By declining to make those arguments at that time, and instead expressly representing it was not making a claim under Section 663, NWF either abandoned or waived any claim under that provision.

It would have been improper and unfair to Respondents and Respondent-Intervenors to allow NWF to revive that claim after abandoning it. Had NWF responded to the Water Supply Providers' arguments regarding Section 663, the Water Supply Providers could have addressed NWF's arguments in their reply brief and the District Court could have resolved the claim on the pleadings. Allowing NWF to revive its claim after dismissal would result in the resources devoted by the Water Supply Providers and the Court to resolving NWF's FWCA claims being wasted.

## C.  NWF's Claim Under Section 663 Was Futile, Anyway

Had NWF not expressly abandoned its claim under Section 663, it failed to state a claim for the reasons set forth in the Water Supply Providers' motion for judgment on the pleadings, to which NWF declined to respond. Therefore, the District Court did not err by denying NWF's motion for leave on grounds of futility. *See, e.g., Cockrell v. Sparks*, 510 F.3d 1307, 1310 (11th Cir. 2007) ("Leave to amend a complaint is futile when the complaint as amended would still be properly dismissed or be immediately subject to summary judgment for the defendant.").

### 1. Section 663 Does Not Apply to the ACF Projects

Section 663 applies only at the time a project is initially authorized and constructed. *See* 16 U.S.C. § 663(a) (directing agencies to take certain actions "whenever the waters of any stream or other body of water are impounded, diverted, the channel deepened, or the stream or other body of water otherwise controlled or modified for any purpose whatever"). Because the ACF projects were authorized and constructed, and the waters impounded, before the FWCA was enacted, Section 663 does not apply to them.

### 2. Section 663 Does Not Apply Because Required Plans Have Never Been Approved

Even if Section 663 applied to the ACF Projects, the requirement to make "adequate provision" for wildlife conservation is expressly limited by the next paragraph, which provides that such provisions "shall be in accordance with general plans approved jointly by" the relevant federal agencies and "*the head of the agency exercising the administration of the wildlife resources of the particular State wherein the waters and areas lie*." 16 U.S.C. § 663(b) (emphasis added).

The ACF projects lie almost entirely in Georgia and Alabama, whose wildlife resources are managed by the Georgia Department of

Natural Resources (Georgia DNR) and the Alabama Department of Conservation and Natural Resources (Alabama DCNR), respectively. NWF did not allege that either state agency has approved a plan for "adequate provision" of fish and wildlife under Section 663(a), let alone any plan consistent with any of the alternatives promoted by NWF. Because no such plan has been approved — and NWF did not allege that such a plan existed, even after the Water Supply Providers asserted in their motion that none had been, Doc. 116-1 at 27 — NWF failed to allege a necessary element for a claim under Section 663(a).

### 3. There Is No Law to Apply to Determine If the "Provisions" for Fish and Wildlife Are "Adequate"

Finally, there is no law for this Court to apply to determine whether the Corps' provision for fish and wildlife was "adequate." NWF does not and could not deny that the Corps made *some* provision for Fish and Wildlife, as the EIS is replete with examples including specific operating plans to enhance reservoir fisheries, protect spawning fish, and release water to protect Gulf sturgeon and mussels in the Apalachicola River. *E.g.*, AR54175–82; AR54530–33. NWF's argument, therefore, is not that the Corps made "no provision," but rather that the provisions it made were not "adequate." But this allegation fails to state a cognizable claim,

because there is no law for a court to apply to determine if provisions for fish and wildlife conservation in the 2017 Manual are "adequate."

The Eighth Circuit confronted a similar situation in *South Dakota v. Ubbelohde*, 330 F.3d 1014 (8th Cir. 2003), which addressed a very similar challenge to the Corps' operation of the Missouri River reservoir system. The Eighth Circuit explained that it could examine the Corps' process to ensure that each interest was given due consideration, but that it was ultimately up to the Corps to develop a plan to balance competing interests, and there was no law to apply to determine if the "correct" balance was struck:

> Because the Flood Control Act calls on the Corps to balance these various interests, the courts can review the Corps's decisions to ensure that it considered each of these interests before making a decision. What the text of the Act does not provide is a method of deciding whether the balance actually struck by the Corps in a given case is correct or not.

*Id.* at 1027.[10]

---

[10] In *Ubbelohde*, the Eighth Circuit also considered whether the Corps' operations were consistent with its water control manual for the basin. *Id.* at 1027–31. That is not a consideration in this case, because the prior water control manual is being revised and replaced.

The same is true here. It is undisputed the Corps considered fish and wildlife in developing the 2017 Manual, and thus made some provision for fish and wildlife. There is no law for any court to apply, however, to determine if those provisions were "adequate." The proposed claim is not cognizable.

### D. NWF's Claim Under the 1946 RHA Was Also Futile

NWF also proposed to add a new Count IV alleging the Corps violated the 1946 RHA by not treating fish and wildlife as a "coequal purpose." As with Count III, NWF relied on factual allegations asserted in the original complaint but sought leave to add a new legal theory based on those allegations. The proposed Count IV asserts the Corps "violated" the 1946 RHA by

> failing to treat fish and wildlife conservation as an original authorized project purpose; failing to operate and manage the ACF projects according to all authorized purposes, including fish and wildlife conservation; abandoning fish and wildlife conservation as an authorized project purpose; subjugating fish and wildlife conservation to other authorized project purposes; and failing to provide for fish and wildlife conservation.

Doc. 152-3 at 65 (¶ 243). The District Court correctly denied leave to amend to assert this new claim on grounds of futility.

First, NWF labors under the mistaken belief that the 1946 RHA identifies "authorized purposes" as such. To the contrary, this phrase is not found in the RHA, which does not enumerate purposes. "[I]f any such enumeration existed, it would not have required decades of litigation to establish that water supply is an authorized purpose of Lake Lanier." Doc. 160 at 6 (Thrash, J.). Instead, the authorizing statute simply states the Secretary of the Army was "authorized to [] prosecute[]" certain works "in accordance with" a report by the Chief of Engineers dated May 13, 1946. Pub. L. 79-525, 60 Stat. 634, 634 (1946).[11] Therefore, to identify the "authorized purposes" of the ACF Projects, it is necessary to examine the underlying reports to determine what Congress intended when it authorized the Army to "prosecute" the plan they describe. *See Tri-State Water Rights Litig.*, 644 F.3d at 1167–68.

To state a claim under the 1946 RHA for "inadequate consideration" of fish and wildlife, NWF would have to demonstrate, based on the

---

[11] The Chief's Report for the ACF system summarized and incorporated a detailed "survey report" prepared by General Newman (the "Newman Report"), which explained the specific benefits Congress could achieve by authorizing the ACF projects. Both documents are reproduced (along with related material) in House Document 80-300, which is in the record at Doc. 155-1 and SUPPAR004057. *See also Tri State Water Rights*, 644 F.3d at 1167–68 ( (explaining how these documents fit together).

underlying documents, that Congress would have expected the Corps to prioritize fish and wildlife conservation more than it did. As shown below, however, the Newman Report provides zero support for such a claim. It focused primarily on navigation, flood control, and navigation benefits. Water supply for Atlanta is also discussed. But the words "fish" and "wildlife" appear in just three paragraphs: 80, 96, and 100, none of which discusses fish and wildlife conservation as anything more than an incidental benefit of the reservoir system. Each paragraph is discussed below.

Paragraph 80 discusses potential damage to fish and wildlife in the vicinity of Atlanta due to hydropower operations at Lake Lanier:

> 80. If operated at a 100-percent load factor, the Buford development [Lake Lanier] would provide a minimum continuous flow of 1,634 second feet, more than sufficient to meet the water needs of the Atlanta area. However, if the plant were operated on peak loads, as it should be for maximum power value, it would be shut down during the weekend and week-day periods; as a result of those shut-downs, the minimum flow … would be only about 50 second feet. In order to meet the estimated present needs of the city, and to prevent damage to fish, riparian owners, and other interests by complete shutdowns of … varying flows up to a maximum of 600 second-feet should be released from Buford so as to ensure at all times a flow at Atlanta not less than 650 second-feet…. The minimum release may have to be increased somewhat as the area develops.

Doc. 155-1 at 49 (citing SUPPAR004104).

This statement does not establish "fish and wildlife conservation" as a "coequal purpose" of Lake Lanier or the ACF System as a whole. To the contrary, it recognizes that peaking hydropower operations at Buford Dam would need to be limited "to prevent damage to fish" that could be caused by "complete shutdowns" when hydropower is not being generated. To this end, Paragraph 80 recognized that hydropower operations would need to be adjusted "so as to insure at all times a flow at Atlanta not less than 650 second-feet" to provide water for Atlanta and to prevent damage to fish. *Id.* Furthermore, while General Newman did recognize that the amount of water provided to Atlanta might need to increase in the future "as the area develops," this paragraph does not suggest or make any provision for releases to benefit fish at Atlanta to increase over time. Because it is undisputed that the Corps releases at least this much water to ensure the flow at Atlanta is achieved, and there is nothing in the Newman Report to suggest Congress expected anything more, this paragraph provides no support for the "fish and wildlife" operations NWF desires.

Paragraph 96 is even worse for NWF, as it merely acknowledges that creation of Lake Lanier would produce fish and wildlife benefits in and around the reservoir itself:

> 96. The Buford Reservoir, with an area of 34,300 acres and a shoreline over 500 miles long, would present many attractive sites for recreation facilities, and might benefit the development and conservation of fish and wildlife resources. Although it is impractical in a report of this scope to determine an exact monetary value for such benefits, it is certain they would be real and large.

Doc. 155-1 at 53 (citing SUPPAR004108).

Like Paragraph 96, Paragraph 100 discusses fish and wildlife conservation only as an "incidental benefit" of constructing the proposed reservoir system, not as a factor to be given equal consideration in the balancing of other purposes:

> Provision of that development as part of the system would increase the minimum monthly flow at the Upper Columbia site from about 1,300 second feet to 6,040 second feet, with a corresponding increase at [Lake Seminole]. It would simplify the reregulation of flows at [Lake Seminole] to provide a more adequate continuous flow at all times in the Apalachicola River for navigation. Without Buford, about 4,000,000 cubic yards of excavation would be required in the Apalachicola River below [Lake Seminole] to provide a channel 9 feet deep; with Buford, the excavation required would be reduced to about one-half that amount. *Incidentally, it would ensure an adequate municipal and industrial water supply for the Atlanta*

> *area, would produce large benefits in the way of*
> *recreation, fish and wildlife conservation,* and similar
> matters, and would, with the added flood-control storage
> proposed herein, contribute to the reduction of floods
> and flood damages in the basin below.

Doc. 155-1 at 54 (citing SUPPAR004109).

In its proposed Count IV, NWF contended these three paragraphs
impose a duty on the Corps to "treat fish and wildlife conservation as an
original authorized purpose," which the Corps allegedly violated by
"subjugating" fish and wildlife "to other authorized purposes." Doc. 152-3
at 65 (¶ 243). NWF also contended that one of these paragraphs (it is
unclear which) creates a duty on the Corps "to consider" alternative
operating plans that would "benefit fish and wildlife," *id.* (¶ 244), and not
to "elevat[e]" the purposes for which the system was authorized and
constructed over the "incidental" benefit to fish and wildlife mentioned in
passing in Paragraph 100 of the Newman Report.

The futility of these arguments is especially apparent when viewed
in context of the fish and wildlife alternatives NWF believes the Corps
was statutorily required to consider. Almost all were focused on adjusting
reservoir operations to provide "freshwater flows" to the Apalachicola
River and Bay or to other, unnamed locations in the Chattahoochee

River. *Id.* at 18–19 (¶¶ 63–67), 26–28 (¶¶ 101–106). There is no suggestion in the Newman Report that reservoir operations might potentially need to be adjusted to provide "freshwater flows" to the Apalachicola River and Bay or any point in the Chattahoochee River other than Atlanta, as discussed in Paragraph 80. There is no plausible argument Paragraphs 80, 96, and 100 create any such duty. If it exists, it must arise under some statute other than the 1946 RHA.

NWF cites this Court's conclusion in *Tri-State Water Rights* that *water supply* is an authorized purpose of Lake Lanier as evidence that fish and wildlife conservation is an "authorized purpose" too, but NWF misunderstands that decision. This Court specifically held that water supply is an "authorized, rather than incidental, use of water stored in Lake Lanier." *See* 644 F.3d at 1189. This holding was based primarily on text in the Newman Report showing that Buford Dam "was designed with water supply specifically in mind," coupled with the Court's reading of Paragraph 80, which shows that Congress specifically contemplated water being released to accommodate water supply needs "at the expense of some detriment" to other project purposes. *See id.* at 1187–89. This Court thus found that water supply is an "authorized," not "incidental"

purpose of the reservoir, explaining that, "[b]y definition, one purpose that is to be accomplished to the detriment of another cannot be incidental." *See id.* at 1188. The Newman Report provides no basis for a similar holding as to fish and wildlife conservation.

The other authorities NWF relies upon are entirely unpersuasive. NWF cites a whereas clause in a 2007 House Resolution commemorating the 50th anniversary of Lake Lanier in advance of "National Marina Day," which states:

> Resolved, That the House of Representative recognizes the 50th anniversary celebration of the beginnings of marinas, power production, recreation, and boating on Lake Sidney Lanier, Georgia.

H. Res. 354, 153 Cong. Rec. 15,281, 15,281 (June 11, 2007).

Nothing in this resolution conveys a broad intent to operate ACF Reservoirs to provide freshwater flows to benefit fish and wildlife throughout the basin, including hundreds of miles downstream in the Apalachicola River and Bay. A single passing reference to fish and wildlife in a single recital is the only mention of that subject in the entire document. It is consistent with the recognition that construction of the reservoir might produce fish and wildlife benefits in and around the reservoir itself. And, in any event, statements in a resolution adopted by

one chamber 60 years after the 1946 RHA was passed cannot alter its legislative text or the authorization it provides.

NWF's reliance on a single statement in a 2007 Congressional Research Service ("CRS") Report (also written 60 years after-the-fact) is equally unpersuasive. A passing statement in the background section of a CRS report, with no citation to authority and no discussion of the 1946 RHA, carries no weight.

In sum, the statements cited by NWF do not establish that fish and wildlife conservation was anything more than an "incidental benefit" of the reservoir system authorized by the 1946 RHA. Nothing in that statute or the underlying Newman Report requires the Corps to give fish and wildlife conservation any greater priority than it did.

## E. NWF's Three-Year Delay Warrants Denying Leave to Amend

NWF moved to amend more than three years after initiating this action, and more than two years after the Water Supply Providers' motion for judgment on the pleadings was filed. There is no reason the proposed amendments could not have been filed years ago, either in the original complaint, or after the Water Supply Providers served their opening brief accompanying their Rule 12(c) motion. The proposed

amendments do not address newly discovered facts or events that transpired after the original complaint was filed. And NWF has offered exactly zero justification for waiting to bring them.

While leave to amend is freely granted as a general matter, this Court has routinely held that delays far less substantial and far more justified warrant denial. *See*, *e.g.*, *Andrx Pharms., Inc. v. Elan Corp., Pub. Ltd. Co.*, 421 F.3d 1227, 1236–37 (11th Cir. 2005) (affirming denial of leave to amend where the plaintiff waited one year after being put on notice of the deficiencies in its complaint and then attempted to introduce new theory of recovery); *Maynard v. Bd. of Regents*, 342 F.3d 1281, 1287 (11th Cir. 2003) (same, where there was "no good reason why [the plaintiff] could not have made the motion earlier" and no explanation for the plaintiff's failure to include the amended claim in the original complaint); *Brewer-Giorgio*, 216 F.3d at 1284 (same, where plaintiff sought to amend over a year after commencement and "failed to demonstrate good cause for that delay").

The "liberal amendment policy of Rule 15(a) does not countenance 'the old sporting theory of justice' or the use of the federal courts as a forum for testing alternate legal theories seriatim." *Fla. Evergreen*

*Foliage v. E.I. Dupont De Nemours & Co.*, 470 F.3d 1036, 1042 (11th Cir. 2006). NWF had every ability to bring its amended claims when it filed this case. Instead, NWF decided to wait until its claims had been dismissed — consuming the resources of the parties and the court — before trotting out new claims to replace those they just lost. This is improper and alone justifies denial of leave to amend.[12]

NWF suggests (ECF 37 at 86) that its delay should be excused because the scheduling order contemplated amendments to the pleadings, but that is not correct. The consent scheduling order contemplated amendments to cure technical defects in the pleadings or to allege additional facts necessary to support the claims made. It did not authorize NWF to conjure new legal theories to support claims previously dismissed.

---

[12] While the district court did not deny leave to amend on grounds that NWF unduly delayed in asserting its claims, and instead proceeded directly to the merits and concluded they were futile, the district court's denial of the amendment can be affirmed on those grounds. *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) ("We may affirm the district court's judgment on any ground that appears in the record, whether or not that ground was relied upon or even considered by the court below.").

## CONCLUSION

In conclusion, after almost 35 years, it is time for the litigation over the ACF Basin to end. Alabama, Georgia, the Corps, and the Water Supply Providers have reached an agreement to resolve this case. This leaves this appeal by NWF as the only obstacle to a long-overdue conclusion.

Thankfully, NWF provides no basis to overturn the District Court's conclusions and this last obstacle is easily overcome. The Court should affirm the District Court's decisions, uphold the 2017 Manual, and put this protracted litigation to an end.

Respectfully submitted this 1st day of May, 2024.

**JONES FORTUNA LP**

*/s/ Lewis B. Jones*
LEWIS B. JONES
 Georgia Bar No. 042498
 lbjones@jonesfortuna.com
 404-862-3234

*/s/ John L. Fortuna*
JOHN L. FORTUNA
 Georgia Bar No. 435149
 jfortuna@jonesfortuna.com
 404-858-4797

111-A New Street
Decatur, GA 30303

*Counsel for Intervenor-Appellees the
Atlanta Regional Commission, City of
Atlanta, Cobb County-Marietta Water
Authority, DeKalb County, Forsyth
County, Fulton County, City of
Gainesville, and Gwinnett County*

**CERTIFICATE OF COMPLIANCE WITH LENGTH LIMIT
AND TYPEFACE AND TYPE-STYLE REQUIREMENTS**

1.     The foregoing brief complies with the type-volume limits of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because, excluding the sections identified in Rule Federal Rule of Appellate Procedure 32(f), it contains 11,604 words.

2.     The foregoing brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)(A) because it was prepared using Microsoft Word 365 in 14-point Century Schoolbook font.

**CERTIFICATE OF SERVICE**

I certify that on May 1, 2024, I filed the foregoing Intervenor-Appellees' Georgia Water Supply Providers' Response Brief with the Clerk of Court using the Court's CM/ECF system. All registered CM/ECF users will be served by the Court's CM/ECF system.

/s/ *John L. Fortuna*

*Counsel for Intervenor-Appellees the Atlanta Regional Commission, City of Atlanta, Cobb County-Marietta Water Authority, DeKalb County, Forsyth County, Fulton County, City of Gainesville, and Gwinnett County*